SPS

**COMMONWEALTH OF VIRGINIA**
**CIRCUIT COURT OF FAIRFAX COUNTY**
**4110 CHAIN BRIDGE ROAD**
**FAIRFAX, VIRGINIA 22030**
**703-691-7320**
**(Press 3, Press 1)**

**RECEIVED**

JAN 1 2 2023

**TOWN ATTORNEY'S OFFICE**

Denise Randles vs. Town of Herndon Police Department, The et al.
                                                CL-2022-0000426

TO:   **Town of Herndon, The**
      **777 Lynn Street**
      **Herndon VA 20170**

**SUMMONS – CIVIL ACTION**

The party upon whom this summons and the attached complaint are served is hereby notified
that unless within 21 days after such service, response is made by filing in the Clerk's office
of this Court a pleading in writing, in proper legal form, the allegations and charges may be
taken as admitted and the court may enter an order, judgment or decree against such party
either by default or after hearing evidence.

**APPEARANCE IN PERSON IS NOT REQUIRED BY THIS SUMMONS.**

Done in the name of the Commonwealth of Virginia, on December 29, 2022.

                            **JOHN T. FREY, CLERK**

                            By: _____
                                       **Deputy Clerk**

**Plaintiff's Attorney:  Mary Ann Kelly**



EXHIBIT

A

FAIRFAX COUNTY CIRCUIT COURT
19th JUDICIAL CIRCUIT OF VIRGINIA

Denise Randles                              )
                                            )
        Plaintiff,                          )
                                            )        Case No:
    v.                                      )
                                            )
The Town of Herndon Police Department       )        **2022   00426**
397 Herndon Parkway                         )
Herndon, VA 20170, and                      )
                                            )        **RECEIVED**
The Town of Herndon,                        )
                                            )        JAN 1 2 2023
        Defendants.                         )
                                            )        **TOWN ATTORNEY'S OFFICE**

## COMPLAINT

Ms. Denise Randles, by counsel, for her Complaint in this matter states as follows:

### NATURE OF THE ACTION

1.    This is a civil action stating claims that arose during Plaintiff Randles's employment as a

Police Officer with Defendant Town of Herndon Police Department "Herndon PD"), in the Town of

Herndon.

### JURISDICTION AND VENUE

2.    This court has jurisdiction pursuant to Va. Code Sec 8.01-328.1 and concurrent

jurisdiction over federal claims pursuant to 42 U.S.C. 2000e 5(f) and 28 U.S.C. §1343 (a)(3).

3.    Venue is proper under Va. Code Sec. 8.01-262 and 42 U.S.C. 2000e-5(f) (3), and 28

U.S.C. §1391 because the events described herein took place within this judicial district.

4.    Ms. Randles exhausted all required administrative remedies in the U.S. Equal

Employment Opportunity Commission ("EEOC").

5.    This action is timely filed.

1

## PARTIES

6.   Plaintiff Randles ("Randles") is an adult female citizen of Virginia.

7.   Town of Herndon Police Department and the Town of Herndon provide various services to the public and are located within Fairfax County.

## FACTS SUPPORTING CLAIMS AND RELIEF

### Randles Enjoyed an Excellent Performance History

8.   Randles was hired by the Town of Herndon's Police Department in 2000.  She started as a patrol officer and was promoted in 2005 to Crime Prevention Officer.

9.   A couple of years later, she received a step-up in rank when she was appointed Corporal, a position that required her to return to street patrol.  In 2013 Herndon Police Chief Maggie DeBoard asked her to come back and again serve as Crime Prevention Officer, which she agreed to do so even though it meant giving up her supervisor position.

10.  Randles was well liked, successful, and earned a history of good performance reviews. For instance, she was recognized with the Distinguished Service Award and included in the Department's 2018 Awards Ceremony publication.  As explained below, she was removed as Crime Prevention Officer and reassigned to street patrol in November of 2018 by a superior office who sexually harassed and retaliated against her.  She was still working as a Senior Police Officer on street patrol when she was forced out of the Department in November of 2021.  At all times relevant to this action, Thompson was an officer superior to Randles in rank.

### Randles Is Sexually Harassed by A Superior Officer

11.  From about 2006 to 2008, Randles endured pressure from one of her superior officers, Stephen Thompson, to have intimate relations with him.  At the time, he was a Sergeant.  Although his advances were unwelcomed, she feared retribution if she did not comply with his demands.

12.   Randles was able to escape Thompson's influence and sexual demands when she was reassigned to a different patrol shift and could avoid personal contact with him.  Once away from him, she was able to make it clear to him that she wanted things to be professional only.  He took it very poorly.

## Randles Is Subject to Renewed Sexual Harassment and Threats

13.   When Thompson joined Crime Prevention as the Criminal Investigations Supervisor, Randles again had to work in close proximity to him.  She reported directly to Thompson on some issues, as he was her superior officer, and he became her formal direct supervisor.

14.   Thompson promptly made it clear to Randles that he expected to restart an intimate relationship with her.  His behavior took several forms and was always unwelcome.

15.   For instance, Thompson would go into Randles' office and spread his legs with an erection and point to his crotch.  He told her that he liked to watch "cop porn" and winked at her. He would stare at her and ask what color panties she had on.  He told her how much he thought about them having sex and that sometimes it made him want to "jerk off" at the station.  He said he liked watching her work out and imagining what he would do to her.  And so on, with many other on-going sexually explicit and unwelcome comments.

16.   In response, Randles would disengage and otherwise indicate to him that she was not interested in his attention or proposals.  She would change the subject, distract, and/or ignore him. She implored him to stop.  When he entered her office, she insisted on leaving the door open.

17.   It became obvious throughout the Department that Thompson had an intense personal interest in Randles.  He stalked Randles by going out of his way to be wherever she was - - at the gym working out, at her community presentations while on the job, during training, when she gave public talks, and on the shooting range.  When she realized he was following her, she changed her

3

schedule, which angered him. However, he would manage to find out her new schedule and start showing up once again. Thompson admitted to Randles that Chief DeBoard noticed how much he was in her office and told him to stop. However, Thompson called the Chief's instruction "stupid" and said he would not stop.

18.   Randles was unnerved by Thompson's actions and felt threatened. She worried that he seemed to get away with anything. She tried to make it obvious to everyone in the Department that she did not like his behavior and wanted it to stop. Thompson complained to Randles that she "used to be fun."

19.   Thompson continually harassed Randles from 2014 until he left the Department on July 28, 2020, although his tactics changed over time.

### Rebuffed, Thompson Intimidates Randles

20.   When Thompson realized that Randles would not go along with his demands, he was afraid that she would report him and began to deliberately intimidate her. He would stare at her intensely, a dead stare without blinking. One day in the kitchen suite, Thompson said: "You know how two people keep a secret?" Randle responded "What?" and Thompson replied: "When one of them is dead." This shook Randles to the core. She considered it a direct threat to never tell anyone about his behavior. She never forgot his warning and worried constantly what he might do if she reported his misconduct. His perverted behavior made her feel unsafe and on edge.

21.   Randles could not get Thompson's weird, obsessive unwelcomed actions out of her mind. He was determined to demonstrate his power over her and remind her that he could get to her any time he chose. For instance, when her children came into the station, Thompson made a point of talking to them and using their name. He had access to her address and other private information.

4

Randles instructed her children that if anyone from work showed up at home to not open the door and call her immediately.

22.   Randles began to adopt defensive measures to protect herself and her family.  She focused on learning more about workplace violence.  She developed training programs on active shooting scenarios as a way to help prepare herself.  Randles worried that he might shoot her at the practice range and talk his way out of responsibility for her death by claiming it was an accident. Randles was consumed with fear that he might try to kill her, and terrified that no one could really help her.

## Fearful of Being Exposed, Thompson Attacks and Undermines Randles at Work

23.   In 2018, Thompson was working on his promotion to captain.  He began a campaign to push Randles out of the Department, or at least undermine her credibility and reputation in case she reported him.

24.   He knew Randles really enjoyed her job as Crime Prevention Officer.  She was also very successful in it, within the Department and the Herndon community.  He began telling her and personnel in the Department that she would no longer be the contact person for crime prevention issues.  He convinced the Chief that Randles position was not needed until she was reassigned to patrol in November of 2018.  Randles requested days; she was assigned to nights.  Thompson said to Randles: "You are just going to have to play the game." She did not respond.

25.   In 2019, Thompson was officially promoted to Captain.  He had even more power and authority in the Department and over Randles.  He continued to exercise gratuitous control over Randles and insisted on seeing her in person even when it was not necessary.  Whenever possible, she asked another person to accompany her when Thompson wanted to meet with her.

26.   While working street patrol, Thompson began to micro-manage, harass, and try to find fault with Randles. Thompson's ongoing discriminatory harassment and retaliation was relentless. For instance, he repeatedly initiated Internal Investigations against her for minor reasons. He combed through videos of her and monitored the computer in her cruiser. He also directed two officers above her (Lt. Jim Moore and Sgt. Brian Hamilton) to monitor her all day and document everything she did. They were told to write her up for anything they could find, no matter how minor, which meant treating her more harshly than other officers who did the same thing.

27.   Thompson spearheaded the need to put Randles on a Performance Improvement Plan and ended up supervising her on it. He made Randles report her activities to him, like a child. It was humiliating. Thompson made her create a daily log containing all her actions throughout the day — how many tickets, how many stops, where she went, what she did, and who she encountered. She needed a doctor's note for sick leave. This treatment was in addition to the monitoring performed by Moore and Hamilton. It got to the point that Moore protested the unnecessary burden Thompson put on the officers. Hamilton told Randles he could see that Thompson was obsessed with her. Both men felt that Thompson was trying to find a way to fire Randles or at least make her look bad in the Department.

28.   Thompson's constant harassment took a serious toll on Randles' mental health. She continued to be deeply frightened that he may hurt her or her family if she reported him or did anything that negatively impacted him. She was suffering emotionally and felt that she might have to leave the Department to protect her mental health.

29.   In July of 2020, Randles broke down and spoke with Corporal Passmore about her fears and Thompson's conduct. He made a formal report to Chief DeBoard. Thompson resigned on July

6

28, 2020. Randles was investigated and on September 3, 2020, was formally disciplined by the Chief based on the sexual harassment from Thompson that occurred years prior.

30. After Thompson left the Department, the accusations against Randles poor performance subsided.

31. In March of 2021, Randles filed a Charge of Discrimination against Defendant in the EEOC. In it she said, among other things, that the write-up and performance criticism of her declined after Thompson left. After defendant received the change, write ups and performance criticism against Randles recommenced.

32. On September 29, 2021, Randles filed an Amended Charge of Discrimination against Defendant in the EEOC that provided more specific information.

33. On October 25, 2021, Randles was relieved of duty and was told to turn in her badge and other Department-issued possessions. The basis was an allegation that she failed to properly communicate to the Department regarding a citizen complaint she received, which was a pretext for discrimination and retaliation.

34. At this point, Randles could no longer emotionally manage the stress and anxiety of constant discriminating attacks on her. To prevent further damage and save her mental health, Randles was forced to leave the hostile environment she suffered at the Department.

35. On November 1, 2021, Randles submitted her resignation to Chief DeBoard after 21 years of service. She expressed deep disappointment of the treatment she suffered since she reported Thompson and that she felt she had no choice.

36. Randles asked that she be provided with retirement credentials and the opportunity to purchase her service weapon as police officers are routinely permitted to do upon their retirement.

However, Randles was denied it all under the pretext that she did not leave "in good standing." Randles asked for an explanation, but none was provided.

37.   Randles' good name and record at the Department was severely damaged by continuing harassment and retaliation, including but not limited to, Thompson's relentless attacks, discriminatory investigations, the PIP, and write-ups perpetrated and/or instigated by Thompson, as well as continuing retaliation against her after she reported Thompson.

## CLAIMS

### COUNT I
### Sex Discrimination, and Retaliation
### in Violation of Title VII

38.   The allegations of paragraphs 1-37 are incorporated as if fully realleged here.

39.   Defendant discriminated against Randles on account of her sex, female, and retaliated against her because of her good faith complaints of sexual harassment and retaliation as set forth above, in violation of Title VII of the Civil Rights Act of 1991, 42 U.S.C § 2000-e *et seq*, as amended.

40.   Among other things, Thompson subjected Randles to renewed unwelcome sexual comments and gestures, threatened and frightened her, inappropriately scrutinized her, wrote her up and placed her on a PIP discriminatorily, falsely attacked and undermined her; after Thompson left, such discriminatory and retaliatory behavior included, but is not limited to, insulting comments referring to Thompson's conduct, discriminatory write-ups, and disparate treatment.

41.   As a direct and proximate cause of Defendant's actions, Randles suffered damages, including but not limited to, intense emotional distress, fear, humiliation, lost compensation, lost benefits, lost prestige and credentials, lost opportunities, attorney's fees, and costs.

## COUNT II
### Discriminatory Discharge in Violation of Title VII, and
### Alternatively Constructive Discharge in Violation of Title VII

42. The allegations of paragraphs 1-37 are incorporated as if fully realleged here.

43. Defendant discriminated against Randles on account of her sex, female, and retaliated against her because of her good faith complaints of sexual harassment and retaliation as set forth above, in violation of Title VII of the Civil Rights Act of 1991, 42 U.S.C § 2000-e *et seq*, as amended.

44. Defendant intended to, and effectively did, terminate Randles' employment as a police officer when she was removed from duty and was ordered to turn in her badge.  The Department's above treatment of her, including the harassment and retaliation she suffered after finally reporting Thompson, created intolerable working conditions that severely impacted her mental health and justified her resignation.

45. As a direct and proximate cause of Defendant's actions, Randles suffered damages, including but not limited to, intense emotional distress, fear, humiliation, lost compensation, lost benefits, lost prestige and credentials, lost opportunities, attorney's fees, and costs.

WHEREFORE, Plaintiff Randles requests that the Court enter judgment in her favor and against Defendant, on each of the above counts, and on all counts, and further:

1. Award Ms. Randles compensatory damages up to $300,000.00, or as determined by the jury, and punitive damages as appropriate; and

2. Award Ms. Randles her back and front pay; and

3. Award Ms. Randles her attorneys' fees, costs, and expenses; and

3. Award Ms. Randles pre and post judgment interest; and

4. Award Ms. Randles all such further relief, including equitable relief, as is just and proper.

## JURY DEMAND

Plaintiff Randles demands a trial by jury on all issues so triable.

Respectfully submitted,

Mary Ann Kelly, Esq. VSB #32786
The Law Office of Mary Ann Kelly
3977 Chain Bridge Road
Suite 300
Fairfax, Virginia 22030
Phone  (703) 865-5032
makelly@kelly-firm.com

10