IN IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

_____

|  |  |
|---|---|
| DENISE RANDLES | ) |
|  | ) |
|     Plaintiff, | ) |
|  | ) |
|        v. | )  C.A. No. 1:23cv00142 (AJT/JFA) |
|  | ) |
| THE TOWN OF HERNDON | ) |
|  | ) |
|     Defendant. | ) |

_____

## AMENDED COMPLAINT

Ms. Denise Randles, by counsel, for her Complaint in this matter states as follows:

## NATURE OF THE ACTION

This is a civil action stating claims that arose during Plaintiff Randles' employment as a Police Officer with Defendant the Town of Herndon.

## SUMMARY OF THE CASE

This case involves a continuing hostile work environment that Plaintiff Denise Randles suffered during the last part of her 21-year tenure as a police officer with the Herndon Police Department. She began to serve in 2000, loved her job, was well respected, earned much success, and was happy. Her workplace changed dramatically and adversely after one of her superior officers, Stephen Thompson, subjected her to ongoing sexual overtures that were at all times unwelcome. At first, Randles acquiesced. After she refused to engage further, Thompson began a campaign of retaliation that included intimidation, pressure to re-engage in sexual acts, taunting and threatening her.

In 2018, as Thompson jockeyed for promotions to Lieutenant and then Captain, he upped his harassment and intimidation of Randles in an attempt to make her quit - - or at least seriously damage her reputation and credibility in the department should she ever disclose his illegal conduct.  Thompson used his power and supervisory authority over Randles to carry out his ongoing harassment and punitive acts in, and away from, the workplace.

After reporting Thompson, he resigned.  Randles, however, was disciplined for having succumbed to Thompson's advances years prior, even though the Chief of Police recognized he had abused her for years even afterward.  While the discriminatory internal investigations temporarily ceased after Thompson left, they recommenced with a vengeance after Randles filed with the EEOC.   Randles tried to hang on at work with therapy and doing her best under relentless pressure and ridicule.  After yet another discriminatory accusation of wrong-doing, Randles was relieved of duty and sent home.  Randles could no longer manage the pressure and anxiety and realized the attacks on her would continue until she was forced out.  She had to take early retirement and left on November 1, 2021.

## JURISDICTION AND VENUE

1.     This court has jurisdiction pursuant to 42 U.S.C. 2000e 5(f) and 28 U.S.C. §1343 (a)(3), and further jurisdiction based on the Defendants' Removal of this case to this Court.

2.     This Court has jurisdiction over the subject matter of Randles' claims under Title VII of the Civil Rights Act of 1964, as amended, pursuant to 42 U.S.C. § 2000e-5(f).

3.     Venue is proper under Va. Code Sec. 8.01-262 and 42 U.S.C. 2000e-5(f)(3), and 28 U.S.C. §1391 because Defendants are present in and regularly conduct affairs and business activities in this judicial district, and the events described herein took place, and the causes of action arose, within this judicial district.

4.     The unlawful employment practices committed by Defendant occurred in this judicial district, employment records relevant to such practices are maintained and administered in this judicial district, and Randles would still be employed in this judicial district but for the unlawful employment practices of Defendant.

5.     The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

6.     The causes of action alleged in this action arose within the Eastern District of Virginia.

7.     Defendant is present in and regularly conducts business in this judicial district.

8.     Defendant caused tortious injury to Randles by acts and omissions in the Commonwealth of Virginia.

9.     Defendant is subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1(A)(1), (2) and (3), and voluntarily submitted to this Court's jurisdiction through the Defendants' Removal of this case to this Court.

## PROCEDURAL STATUS

10.    Randles exhausted all required administrative remedies in the U.S. Equal Employment Opportunity Commission ("EEOC") and the Virginia Office of Civil Rights.

11.    Randles timely filed her Charge of Discrimination at the EEOC on March 18, 2021.

12.    Randles timely filed her Amended Charge of Discrimination at the EEOC on September 29, 2021.

13.    On October 14, 2021, the EEOC issued Randles a Right to Sue Letter.

14.    On March 28, 2022, Randles timely filed a subsequent complaint at the Virginia Office of Civil Rights, which included Randles being relieved of duty and her constructive discharge.

15.   On January 13, 2023, the Virginia Office of Civil Rights issued Randles a Right to Sue Letter in response to her March 28, 2022, complaint.

16.   This action is timely filed.

## PARTIES

17.   Plaintiff Randles ("Randles") is an adult female citizen of this judicial district in Virginia, and at all times relevant hereto, was employed by Defendant.  Randles was an "employee" of Defendant within the meaning of 42 U.S.C. § 2000e(f).

18.   Defendant provides various services to the public and is located within this judicial district.

19.   Defendant is engaged in an industry affecting commerce and has had more than 15 employees in each of twenty or more calendar weeks in the current or preceding year, within the meaning of 42 U.S.C. § 2000e(b).  Defendant is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

20.   Defendant has had more than 200 employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, within the meaning of 42 U.S.C. § 1981a(b)(3)(D).

## FACTS SUPPORTING CLAIMS AND RELIEF

### Randles Enjoyed an Excellent Performance History

21.   Randles was hired by the Town of Herndon's Police Department in 2000. She started as a patrol officer and was promoted in 2005 to Crime Prevention Officer.

22.   A couple of years later, she received a step-up in rank when she was appointed Corporal, a position that required her to return to street patrol.  In 2013 Herndon Police Chief Maggie DeBoard

asked her to come back and again serve as Crime Prevention Officer, which she agreed to do even though it meant giving up her supervisor position.

23.   Randles was well liked, successful, and earned a history of good performance reviews. For instance, she was recognized with the Distinguished Service Award and included in the Department's 2018 Awards Ceremony publication.  As explained below, she was removed as Crime Prevention Officer and reassigned to street patrol in November of 2018 at the behest of a superior officer who sexually harassed, discriminated, and retaliated against her.

24.   Randles was still working as a Senior Police Officer on street patrol when she was forced out of the Department in November of 2021.

25.   At all times relevant to this action through his resignation, Thompson was an officer superior to Randles in rank, and for most of this time period was Randles' supervisor.

### Randles Is Sexually Harassed by A Superior Officer

26.   From about 2006 to 2008, Randles succumbed to pressure from one of her superior officers, Stephen Thompson, to have intimate relations with him. At the time, she was simply a police officer, and he was a Sergeant.  Although his advances were unwelcome, she was intimidated and feared retribution if she did not comply.

27.   After a particularly difficult sexual encounter with Thompson, Randles told him that she could not continue.  Randles made it clear to him that she wanted things to be professional only. Thompson reacted poorly and pressured Randles to change her mind.  For instance, he claimed that he moved out of his house and took an apartment so that he could have a relationship with her.  He showed her pictures of his apartment on his phone and insisted she come over.  He even reached out to Randles' sister to ask what kind of alcohol Randles liked.  Randles declined his overtures. Alarmed by his refusal to take "no" for an answer, Randles stopped all contact with him.

28.   Later Randles and Thompson were assigned to different squads which allowed her to avoid sustained personal contact with Thompson.  Nonetheless, he found ways to abuse her and make the workplace uncomfortable for her.

29.   For instance, when he encountered her at a shift change, on several occasions he quickly and aggressively walked up behind her and then, once he was right next to her, stared directly at her and walked away slowly.  In passing her, he would grimace and stare in a belligerent manner. Randles remained on guard, anxious, and uncomfortable.

**<u>Randles Is Subject to Renewed Sexual Harassment and Threats</u>**

30.   Chief DeBoard asked Randles to return to her position of Crime Prevention Officer around mid-2013.  Soon thereafter, in early 2014, Thompson joined the Crime Prevention Unit as the Criminal Investigations Supervisor, which meant she again had to work in close proximity to him. She reported directly to Thompson on some issues as he was her superior officer.  He later became her formal direct supervisor.

31.   Thompson promptly made it clear to Randles that he expected to restart an intimate relationship with her.  Thompson wasted no time creating a continuing hostile work environment for Randles with sexual harassment and retaliation.

32.   Against Randles' will, Thompson discussed sex and used explicit sexual terms with her. Thompsons persistent behavior was continuing and took several forms.  It was always unwelcome to Randles.

33.   Thompson often went into Randles' office uninvited and with no legitimate work purpose.  Randles' office was in Chief DeBoard's suite.  Thompson's abuse included spreading his legs while staring at Randles, then motioning to his crotch with a smile to trick her into looking at an obvious erection.  He told her he liked to watch "cop porn."  Thompson described in nauseating

detail the pornography he said he watched before having sex with his wife.  Thompson would wink at Randles while talking about sex acts.  He talked about "fingering" her and used words like "cock" and "pussy." He frequently stared at her.  Thompson often asked her what color panties were so that he could think about her private area and "get hard."  When she ignored him, Thompson would guess colors, as though they were playing a game, and begged her to say when it got to the right color.  She did not.  Thompson told her how much he thought about them having sex, recounted intimate details of sexual encounters, and announced that sometimes just thinking about her made him want to "jerk off" at the station.  On other occasions, Thompson would walk up behind Randles while she was at her computer, come very close to her head, and blow into her ear; when she told him to "stop" or "knock it off" he laughed and did not stop.

34.   Randles felt humiliated, frustrated, and scared.  She realized that he had a strange obsession with her and felt trapped.  The entire command staff worked near her office, saw that Thompson often came in and out of her office for no good reason, and that she was uncomfortable with his attention.

35.   Thompson did not just stalk Randles in the department.  He went out of his way to show up wherever Randles went.  He would go to her gym and later tell her he liked watching her work out through the glass and imagining what he would do to her.  Even after Randles changed her work-out time, he found out her new schedule and showed up again to watch her.  Thompson persisted in asking Randles to get coffee with him.  When she declined, he became visibly annoyed and sighed heavily.  When Randles was out in the Herndon community performing her policing duties, Thompson showed up, including at presentations, training, events, and public talks, even though he had no work need to be there.

36.    In response, Randles would ignore him, disengage, and otherwise indicate to him that she was not interested in his attention or proposals.  Randles would change the subject, distract, and/or ignore Thompson.  Randles implored him to stop.  Whenever Thompson entered Randles' office, she insisted on leaving the door open.  Randles removed the guest chair from her office so that Thompson had nowhere to sit when he came in; undeterred, he got a chair from the Chief's conference room and demanded to know who took the other chair out.

37.    Randles felt angry and helpless.  She could see that Thompson was exploiting his superior rank and authority to discover details about her life and off-duty activities.  She could see Thompson wanted to demonstrate his control over her.  The message Thompson sent her was that she could do nothing to stop him from doing exactly as he pleased, no matter what she did.

38.    It became obvious throughout the Department that Thompson had an intense personal interest in Randles.  Thompson stalked Randles by going out of his way to be wherever she was - - at the gym working out, at her community presentations while on the job, during training, when she gave public talks, and on the shooting range.  When Randles realized Thompson was following her, she changed her schedule, which angered Thompson.  However, Thompson would manage to find out her new schedule and start showing up once again.  Thompson admitted to Randles that Chief DeBoard noticed how much he was in her office and told him to stop.  However, Thompson called the Chief's instruction "stupid" and said he would not stop.

39.    Randles was unnerved by Thompson's actions, felt threatened, and worried that Thompson seemed to get away with anything in the Department.

40.    Recognizing that his conduct was unwelcome, Thompson complained to Randles that she "used to be fun."

41.   Thompson continually harassed Randles from 2014 until he left the Department on July 28, 2020.

**Rebuffed, Thompson Escalates His Intimidation of Randles**

42.   When Thompson realized that Randles would not go along with his demands, he was afraid that she would report him.  Throughout 2016, Thompson escalated his intimidation of Randles and continued to create an intensely hostile environment for her.  Thompson would intensely stare at Randles, a dead stare without blinking.  One day in the kitchen suite, around mid-2016, Thompson said: "You know how two people keep a secret?"  Randles responded "What?" and Thompson replied: "When one of them is dead."  This shook Randles to the core.  Randles considered it to be a direct threat to never tell anyone about his behavior, or else risk her and her family's physical safety, security (even in their own home), and the risk of death from Thompson.  Randles never forgot Thompson's death threat, and worried constantly what he might do if she reported his misconduct.  Thompson's perverted behavior made Randles constantly feel unsafe and on edge, regardless of where she was or who she was with.

43.   Randles could not get Thompson's weird, obsessive, dangerous, unwelcome, and threatening actions and statements out of her mind.  Thompson was determined to demonstrate his power over Randles, and to constantly remind her that he could get to her and her family any time he chose.

44.   For instance, in November of 2017, the Chief asked Randles to participate in a charity event called "Dancing with the Services."  When Thompson found out, he convinced the Chief to allow him to take part even though only one person was supposed to do so.  When Thompson found out that he would be paired with a professional dancer, he was angry.   He told Randles the only reason joined the event was to dance with her.  When Randles realized he scheduled his practice

time to coincide with hers, she went out of her way to find out the dancers' schedules so that she could schedule her practice time to avoid him.

45.   When Randles' children came into the station, Thompson made a point of addressing them personally by name.  Thompson had access to Randles' personal address and other private, personally identifying information.  Alarmed, Randles felt compelled to instruct her children that if anyone from work, *a police department*, showed up at home *not* to open the door, and instead call her immediately.  Despite Randles being a police officer herself, being forced to instruct her children to not trust any police officers knocking at the door, for fear of her family's physical safety, affected her deeply, and is the exact opposite message she should have been able to send to her children regarding law enforcement in her community.

46.   Randles began to adopt defensive measures to protect herself and her family.  She focused on learning more about workplace violence and developed training programs on active shooting scenarios as a way to help prepare herself.  Randles worried that Thompson might shoot her at the practice range and talk his way out of responsibility for her death by claiming it was an accident.  Randles was completely consumed with fear that he might try to kill her, and terrified that no one could or would ever help her.

47.   The continuing hostile work environment was abusive and affected the terms and conditions of Randles' employment.  Randles' workplace changed dramatically.  She always loved her work and had been consistently very successful before the continuing harassment.  After, she struggled with constant anxiety.  She could not get Thompson's behavior out of her mind and found herself beset with thoughts of what he might do next.  She became distracted.  Randles was depressed and was unable to focus in the same manner as she had in the past.  She felt unsafe at work and at times physically sick.  She was jumpy and fearful.

**Fearful of Being Exposed, Thompson Attacks and Undermines Randles at Work**

48.    In mid-2018, Thompson was promoted to Lieutenant and became Randles' direct supervisor.

49.    Throughout 2018, Thompson worked on being promoted to captain.  Thompson feared that Randles would report his illegal behavior and interfere with his promotion.   He therefore began a campaign to push Randles out of the Department, or at least undermine her credibility and reputation in the event she reported him and his conduct.

50.    Thompson also continued his campaign to unnerve Randles and cause her distress.  For instance, in or about July of 2018, Thompson, who did inspections of the women's lockers, told Randles that he always goes to her locker first to see if she left any panties in sight.  Randles was disgusted and felt violated – not only did she have to protect herself from him at the gym, the shooting range and elsewhere.  Thompson made sure she knew that he could still invade her privacy in the most intimate way, even at work.

51.    Thompson knew Randles really enjoyed her job as Crime Prevention Officer.  She was also very successful in it, within the Department and the Herndon community.  Thompson began telling Randles and other personnel in the Department that she would no longer be the contact person for crime prevention issues.

52.    In late 2018, Thompson told Randles: "You are just going to have to play the game." Randles knew that Thompson was vindictive.  She took his comment to mean that she should have complied with his sexual demands and, because she didn't, he would abuse his power and position to make her life hell.  Randles did not respond.

53.    Thompson consistently questioned and undermined the work Randles was performing in the Crime Prevention Section.  He persuaded the Chief to eliminate the program and reassign

Randles to street patrol.  The loss of Randles' administrative position and reassignment to street patrol meant Randles lost the flexibility she needed and disadvantaged her.  It also caused widespread suspicion in the Herndon community and the department that Randles was demoted because she had committed some wrongdoing.

54.    In 2019, once Thompson was officially promoted to Captain, he had even more power and authority in the Department and over Randles.  Thompson exploited his authority and discretion to continually harass Randles, rattle her, and damage her career.

55.    Thompson exercised gratuitous control over Randles.  He created opportunities to encounter her.  He insisted on seeing her in person, even when it was not necessary.  When possible, she asked another person to accompany her when Thompson asked her to meet with him.

56.    While on street patrol, Thompson began to micro-manage, harass, and try to find fault with Randles.  Thompson's ongoing discriminatory harassment and retaliation was relentless.  For instance, around January of 2019, Thompson repeatedly initiated Internal Investigations against her for minor reasons, constantly combed through video footage of her, and monitored the computer in her cruiser.  Thompson also directed two officers superior to Randles (Lt. Jim Moore and Sgt. Brian Hamilton) to monitor her all day, and to document everything she did.  Thompson instructed Lt. Moore and Sgt. Hamilton to "write up" Randles for anything they could find, no matter how minor, singling Randles out for treatment and discipline that was harsher than what was imposed on other officers who engaged in the same or similar conduct.

57.    Thompson also spearheaded the need to put Randles on a Performance Improvement Plan and ended up supervising her on it.  Randles was forced to report her activities to him, which was humiliating.  Thompson demanded that Randles prepare a daily log of her actions throughout the day – how many tickets, how many stops, where she went, what she did, and who she encountered.  He

made Randles provide a doctor's note for sick leave.  Thompson's direct pressure on Randles was in addition to the intense monitoring of her that Thompson directed Lt. Moore and Sgt. Hamilton to do.

58.   Thompson's obsession with, and his discrimination, harassment, and retaliation against, Randles was so obvious that others in the Department noticed it.  Moore even protested the unnecessary burden Thompson put on the officers regarding his treatment of Randles, and Sgt. Hamilton told Randles he could see that Thompson was obsessed with her.  Lt. Moore told Randles that he and Sgt. Hamilton discussed the fact that they felt Thompson was trying to find a way to fire Randles, or at least make her look bad in the Department.

### Broken by the Continuing Hostile Environment, Randles Reports Thompson

59.   Thompson's constant harassment took a serious toll on Randles' mental health.  Randles continued to be deeply frightened that Thompson may hurt her or her family if she reported him or did anything that negatively impacted him.  Randles was also suffering emotionally and felt that she may need to leave the Department to protect her mental health.

60.   In July of 2020, Randles reached a breaking point.  In tears, she recounted to Corporal Passmore  her history with Thompson, including his unwelcome sexual advances to her, his renewed pressure on her to have intimate relations with him, his unrelenting stalking of her, his threatening comments, and his obsessive control over her everyday work activities.

61.   Corporal Passmore was taken aback by the obvious fear and anxiety Randles displayed when she told him of Thompson's abuse.  He tried to reassure Randles, but he let her know that Thompson's conduct had to be reported to Chief DeBoard.  First, however, he said he would report it to Lt. Dyer, the then-head of Internal Affairs ("IA").  Randles panicked.  She feared Thompson would lose control and come after her.  Dyer wanted Randles to meet him behind the station.

Randles begged him to let her get home safely before he reported Thompson up the chain.  Dyer agreed but repeated that the Chief would have to be told.

62.    The following day, Randles met with Captain Pihonak and Lt. Dyer, who interviewed her at length about her history of Thompson's abuse, including his continuing sexual harassment and retaliation against her that included sexual demands, stalking, personal surveillance, scrutiny, and threatening behavior.   Pihonak humiliated Randles by questioning her and pressing her to say whether Thompson "raped" her.

63.    To Randles' knowledge, Human Resources did not perform the investigation into Randles' complaints of sexual harassment and retaliation against Thompson.

64.    On July 16, 2020, the Department announced that Thompson was "on extended leave and not available."  Pihonak and Dyer were going to cover his duties.

65.    On July 28, 2020, a department email announced that Thompson had resigned.

66.    In response to Randles' report of Thompson's sexual harassment and retaliation, Internal Affairs opened an investigation against her.  She was charged with "conduct unbecoming an officer."

67.    September 3, 2020, Randles was informed that this IA charge against her was sustained. Randles was disciplined for having "willingly engaged" in sexual relations with Thompson "dating back to 2006-2008."  Defendant took this action, *even though* it recognized it had "discovered during the investigation, however, that SPO Randles was subject to more serious misconduct on the part of Captain Thompson that spanned over a period of several years after these incidents occurred."  This discipline was improper retaliation.

68.    After Thompson left the Department, the trumped-up accusations against Randles for poor performance temporarily subsided.

14

69.   Nonetheless, Randles had to continue dealing with a number of Internal Investigations that began under, and at the behest of, Thompson while he was still with the department.

**After Randles Filed with the EEOC, Retaliatory Harassment Recommenced**

70.   In March of 2021, Randles filed a Charge of Discrimination against Defendant in the EEOC. The Charge included the fact that the write-up and performance criticism of Randles declined after Thompson left.  But after Defendant received the Change, write ups and performance criticism against Randles suddenly recommenced.

71.   In June 2021, Chief DeBoard intentionally embarrassed Randles in a room full of officers, communication technicians, the town manager, command staff, and human resources personnel.  In front of about 20 people, during an ethics training session, the Chief singled Randles out and commented that her "morals" were different than those of Officer Phelps.  Shocked and humiliated, Randles wanted to scream and cry.  Instead, she said nothing.

72.   On September 29, 2021, Randles filed an Amended Charge of Discrimination against Defendant in the EEOC, providing additional specific facts and information.

73.   On October 25, 2021, Randles was called into the department to discuss the results of another IA investigation that had been lodged against her for "performance of duty."  She was told that the violation was sustained.  Later, she met with Pihonak and Carson and notified that, yet *another* IA investigation was being opened, again for "performance of duty."  Randles was relieved of duty and directed to surrender her police credentials, gun, and other department-issued possessions.  These IA investigations were a pretext for discrimination, harassment, and retaliation. Defendant intended to terminate Randles' employment.

74.    Randles felt utterly betrayed by Defendant.  She was convinced that the department would continue to harass and burden her with discriminatory "performance" investigations and IAs. She knew they wanted her out and that they had been setting her up for termination.

75.    Randles could no longer endure the psychological and emotional stress and anxiety of the continuing harassment she had suffered for years.  She realized that she would not receive support and help from her employer, as was her right.  To prevent further damage and save her mental health, Randles was forced to leave the hostile workplace she suffered at the Department for years.

76.    On November 1, after 21 years of service, Randles tendered a written notice of retirement to the Chief.  Randles explained that "due to the unhealthy work conditions which are deeply affecting my mental health, I have no choice but to leave the Department and retire.  I do not feel safe while at work with the constant unwarranted criticism . . .  due to the long-standing harassment I experienced, how it was handled, and more ongoing internal investigations, my work conditions are extremely unhealthy and taking too much of a toll on my mental and physical health."  She also noted that when she "reached out for help to try and protect [herself]. . . those who I should be able to trust to PROTECT ME and my wellbeing let me down.  I still had to struggle and did not get the help I needed. . ."

77.    Even then, the retaliation did not cease. Randles asked the department to issue her the standard retirement credentials that police officers receive when they retire.  And to purchase her service weapon, which is also commonplace.

78.    On November 2, Pihonak emailed Randles' and denied her request.  Pihonak stated "Retirement credentials are issued to those who are first, eligible to retire, and second, are in good standing with the department.  You do not meet either of these requirements and thus will not be issued retirement credentials."  This alarmed Randles and caused her to spend considerable time

confirming with Virginia's retirement system that she was, in fact, eligible to retire (albeit early). Also, she was eligible for a retirement credential (badge).  Pihonak's statements were both false. Defendant's stated reasons for denying Randles these work benefits was a pretext for illegal retaliation.

79.    In the same email, Pihonak went on to state that the Chief would not allow Randles to purchase her service weapon because "it is her position that [Randles] did not leave in good standing."  Randles was shocked as no one in the department had ever suggested this to her.  She followed up with Pihonak twice asking for information and an explanation of the "not in good standing" characterization.   Defendant refused to answer her further. Defendant's stated reasons for denying Randles this work benefit was a pretext for illegal retaliation.

80.    Randles' mental health, along with her good name and record at the department, was severely damaged by continuing harassment and retaliation, including but not limited to, Thompson's relentless attacks and sexual abuse, discriminatory and constant scrutiny and disparate discipline, the PIP, and continuing IAs and investigations perpetrated and/or instigated by Thompson, as well as continuing retaliation against her after she reported Thompson and he left the department.

81.    Thompson exploited the power and authority given to him by Defendant.  He used and abused his supervisory authority to carry out sexual abuse, harassment, and retaliation of Randles and create a continuing hostile work environment for her at the Hendon Police Department.

## CLAIMS

### COUNT I
### Sex Discrimination and Retaliation
### (Hostile Work Environment Based on Sex and Retaliation)
### in Violation of Title VII

82.    The allegations of the foregoing paragraphs are incorporated as if fully realleged here.

83.   Defendant, through its agents, officers and employees, discriminated against Randles and subjected her to a hostile work environment on account of her sex (female), through the conduct summarized above, which further evidenced a pattern of antagonism and continuing action against Randles.  This discrimination was severe and pervasive and affected the terms, conditions, and privileges of Randles' employment, and violated Title VII of the federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

84.   The discrimination and hostile environment based on Randles' sex (female) and in retaliation for her good faith complaints of discrimination, affected the terms, conditions, and privileges of Randles' employment and included, but was not limited to, continuing sexual harassment; threats that caused her to fear for her life; holding her up to ridicule and shame; turning a blind eye to Thompson's behavior and stalking; failing to prevent Thompson's harassment; failing to prevent retaliation after Randles complained of Thompson, Thompson's trumped-up IAs and investigations; forcing her to endure improper and harassing scrutiny from Thompson and others acting for him; subjecting her to disparate discipline and performance criticism; recommencing trumped-up IA, performance criticism, and of Randles (which had subsided temporarily after Thompson's resigned); relieving her of duty on October 25, 2021 (including ordering Randles to turn in her badge and other Department-issues possessions); creating intolerable work conditions the constructively discharging Randles from her employment; claiming that Randles did not leave the police department "in good standing" to improperly deny her post-employment benefits routinely provided to officers who retire; along with attendant consequences as outlined above and otherwise; and the overall hostile and abusive work environment and pattern of antagonism summarized in this Complaint.

85.   Defendant, through its agents, officers and employees, retaliated against Randles and subjected her to a continuing hostile work environment, after she engaged in the protective activities of rebuffing Thompson's demands for sexual favors; reporting Thompson's sexual harassment and retaliation to Passmore, Pihonak, Dyer, and other agents of Defendant; filing a Charge of Discrimination and an Amended Charge of Discrimination with the EEOC about the discriminatory and harassing conduct was forced to endure while employed by Defendant, violating Title VII of the federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

86.   Defendant's retaliatory conduct demonstrates a pattern of antagonism and continuing action against Randles, and resulted in adverse actions against Randles and actions that would dissuade a reasonable worker from reporting sex discrimination and retaliation and filing a complaint in an attempt to stop the illegal behaviors.

87.   Defendant subjected Randles to a discriminatory hostile work environment for years beginning in 2006.

88.   Defendant further subjected Randles to a retaliatory hostile work environment and pattern of antagonism for years.

89.   The acts and omissions contributing to this hostile work environment and pattern of antagonism include, but are not limited to, Thompson's sexual harassment, abuse, and retaliation against Randles; an irregular and improper investigation into Randles's reports and complaints about Thompson's illegal conduct; continuing to pursue discriminatory IAs and investigations against Randles commenced by or under Thompson; subjecting Randles to humiliation and ridicule in the workplace; re-commencing IAs, writeups and performance criticism of Randles (which had temporarily ceased after Thompson resigned); relieving her of duty on October 25, 2021 (including ordering Randles to turn in her badge and other Department-issues possessions); continually

19

harassing her and creating intolerable work conditions; seeking to force Randles out of the department; constructively discharging Randles' employment; denying Randles routine post-employment benefits; claiming that she did not leave the police department "in good standing" and its attendant consequences as outlined above.

90.   This conduct was severe, pervasive, and endured for years, significantly altering the terms and conditions of Randles employment and creating an abusive work environment, to the point that Thompson's abuse of Randles *became* a term and condition of her employment for the Defendant.

91.   Defendant is responsible for the conduct Randles endured, and it is imputable to the Defendant.  Defendant gave Thompson the power and authority to use and abuse in carrying out his acts of sexual harassment and retaliation; Defendant turned a blind eye to the obvious discrimination and harassment he carried out against Randles in the workplace; Defendant failed to exercise reasonable to create a workplace where discrimination is in fact prevented and promptly corrected; Thompson carried out  sexually harassing behavior and retaliation against Randles while he was her supervisor and had power over the terms and conditions of her employment; it failed to sufficiently train the Herndon Police Department on discrimination, including preventative, corrective, and how to handle and redress employee complaints.  Defendant further failed to sufficiently train all of its officers on sexual harassment in the workplace and how to handle it.

92.   Defendant was on notice of the discriminatory, retaliatory, harassing, and hostile work environment Randles was forced to endure for years, and was on notice well before Randles July 2020 complaint to Corporal Passmore, including but not limited to Randles' constantly informing her supervisor Thompson that his conduct was unwelcome and pleading with him to stop; it being obvious throughout the Department that Thompson had an intense, obsessive, and inappropriate

personal obsession with Randles; failing to react to Randles' actions that alerted command staff that Thompson's attention was unwelcome, including leaving her door open when Thompson entered it, removing the chair from her office, asking a third person to be present when she had to meet with him, working to avoid having contact with him in the workplace and when engaging in work-related duties, such as at the shooting range and when participating in the dance competition; her uncharacteristic struggles to focus and concentrate; and otherwise.

93.   Defendant had actual or constructive knowledge of Randles' multiple instances of protected activity, and actual or constructive knowledge of Thompson's discriminatory, harassing, and retaliatory conduct towards Randles.

94.   Chief DeBoard noticed how much time and inappropriate attention Thompson paid to Randles in her office and told him to stop; she did not make him stop; she admitted to Randles that she knew something was going on; she knew that Thompson was trying to charge Randles with IAs on a trumped-up basis; allowing Thompson to exercise a punishing degree of scrutiny over Randles that far exceeded any normal standard, even if an employee needs performance supervision; allowing Thompson and others to instituting discriminatory IAs, "write ups" and internal investigations against only Randles, when other officers were not likewise written up and/or disciplined like Randles; allowing Thompson to direct two other officers (Lt. Moore and Sgt. Hamilton) to monitor Randles all day and document everything she did, and Thompson instructing these officers to write Randles up for anything they could find, no matter how minor or trivial; Lt Moore protesting these directives from Thompson against Randles; failing to react to command staff under her who saw that Thompson was obsessed with he, searching for a way to damage Randles in the department and ultimately fire her, including damaging her prestige and credibility in the department.

95.   Defendant failed to exercise reasonable care to prevent and promptly correct the sexually harassing behavior Randles endured.

96.   Thompson, as Randles' supervisor and a member of the commend staff and management, also condoned, tolerated,  and encouraged his own discriminatory and retaliatory acts against Randles, and instead of properly responding to and investigating Randles' complaints, instead failed to address and repeatedly ignored them.

97.   In discriminating, subjecting her to a hostile work environment, and retaliating against Randles in violation of federal law, Defendant evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Randles.

98.   Defendant engaged in these practices with malice and with reckless indifference to the federally protected rights of Randles, within the meaning of Title VII of the federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

99.   Due to the conscious disregard for Randles' federally protected rights, and the severity of Defendant's conduct, Randles is also entitled to, and requests, punitive damages.

100.  As a direct and proximate cause of Defendant's actions, Randles suffered damages, including but not limited to, intense emotional distress, fear, humiliation, insomnia, anxiety, exhaustion, stress, headaches, sick to her stomach, panic attacks, loss of enjoyment of life, humiliation, depression, and fear, lost compensation, lost benefits, lost prestige, reputation, and credentials, lost opportunities, attorney's fees, and costs.

## COUNT II
### Discriminatory and Retaliatory Discharge in Violation of Title VII
### Alternatively Constructive Discharge in Violation of Title VII

101.  The allegations of the foregoing paragraphs are incorporated as if fully realleged here.

102. Defendant, through its agents, officers and employees, discriminated and retaliated against Randles creating a continuing hostile work environment on account of her sex (female) and motivated by retaliation.

103. Defendant subjected Randles to a discriminatory hostile work environment for years that included a retaliatory hostile work environment and pattern of antagonism for years.

104. The acts and omissions contributing to this hostile work environment and pattern of antagonism include, but are not limited to, Thompson's sexual harassment, abuse, and retaliation against Randles; an irregular and improper investigation into Randles's reports and complaints about Thompson illegal conduct; continuing to pursue discriminatory IAs and investigations against Randles commenced by or under Thompson; subjecting Randles to humiliation and ridicule in the workplace; re-commencing IAs, writeups and performance criticism of Randles (which had temporarily ceased after Thompson resigned); relieving her of duty on October 25, 2021 (including ordering Randles to turn in her badge and other Department-issues possessions); continually harassing her and creating intolerable work conditions; seeking to force Randles out of the department; constructively discharging Randles' employment; denying Randles routine post-employment benefits; claiming that she did not leave the police department "in good standing" and its attendant consequences as outlined above.

105. The harassment and hostile work environment were based on Randles sex (female), which was at all times unwelcome, and in retaliation for her good faith complaints of illegal discrimination.

106. This conduct was severe, pervasive, and endured for years, significantly altering the terms and conditions of Randles employment and creating an abusive work environment, to the point that the hostile workplace *became* a term and condition of her employment at the Defendant.

107.  Defendant is responsible for the conduct Randles endured, and it is imputable to the Defendant.  Defendant failed to exercise reasonable, or any, care to prevent and promptly correct and prevent continuing retaliation against Randles and failed to sufficiently train its employees and officers on how to recognize, prevent, or correct illegal discrimination, and how to proper address employee complaints.

108.  Defendant failed to exercise reasonable care to prevent and promptly correct the sexually harassing behavior Randles endured.

109.  Defendant was on notice of the discriminatory, retaliatory, harassing, and hostile work environment Randles was forced to endure for years, and was on notice well before Randles July 2020 complaint to Corporal Passmore, including but not limited to Randles' constantly informing her supervisor Thompson that his conduct was unwelcome and pleading with him to stop; it being obvious throughout the Department that Thompson had an intense, obsessive, and inappropriate personal obsession with Randles; failing to react to Randles' actions that alerted command staff that Thompson's attention was unwelcome, including leaving her door open when Thompson entered it, removing the chair from her office, asking a third person to be present when she had to meet with him, working to avoid having contact with him in the workplace and when engaging in work-related duties, such as at the shooting range and when participating in the dance competition; her uncharacteristic struggles to focus and concentrate; and otherwise.

110.  Defendant's acts and omissions towards Randles culminated in the ultimate adverse employment action.  Defendant intended to, and effectively did, terminate Randles' employment as a police officer when she was removed from duty and ordered to turn in her badge and equipment for discriminatory and retaliatory reasons.

111.  The Department's above treatment of her, including the harassment and retaliation she suffered after finally reporting Thompson, created intolerable working conditions that severely impacted her mental health, created intolerable working conditions, and justified her constructive discharge.

112.  No reasonable person could have continued to endure this conduct, which now included the Department taking further adverse actions against Randles following her July 2020 complaint to Corporal Passmore, and any reasonable person would have felt compelled to resign to protect their mental health and physical safety of both themselves and their families, especially when police officers and a police department are the individuals and entities engaging in this conduct.

113.  In discriminating, subjecting her to a hostile work environment, and retaliating against Randles in violation of federal law, Defendant evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Randles.

114.  Defendant engaged in these practices with malice and with reckless indifference to the federally protected rights of Randles, within the meaning of Title VII of the federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

115.  Due to the conscious disregard for Randles' federally protected rights, and the severity of Defendant's conduct, Randles is also entitled to, and requests, punitive damages.

116.  As a direct and proximate cause of Defendant's actions, Randles suffered damages, including but not limited to, intense emotional distress, fear, humiliation, insomnia, anxiety, exhaustion, stress, headaches, sick to her stomach, panic attacks, loss of enjoyment of life, humiliation, depression, and fear, lost compensation, lost benefits, lost prestige, reputation, and credentials, lost opportunities, attorney's fees, and costs.

WHEREFORE, Plaintiff Randles requests that the Court enter judgment in her favor and against Defendant, on each of the above counts, and on all counts, and further:

1. Award Randles compensatory damages in the full amount permitted under the law and as determined by the jury, and punitive damages as appropriate; and

2. Award Randles her back and front pay; and

3. Award Randles her attorneys' fees, costs, and expenses; and

3. Award Randles pre and post judgment interest; and

4. Award Randles all such further relief, including equitable relief, as is just and proper.

## JURY DEMAND

Plaintiff Randles demands a trial by jury on all issues so triable.

February 21, 2023                                            Respectfully submitted,


/s/ MARY ANN KELLY_____
Mary Ann Kelly, Esq. VSB #32786
The Law Office of Mary Ann Kelly
3977 Chain Bridge Road
Suite 300
Fairfax, Virginia 22030
Phone  (703) 865-5032
makelly@kelly-firm.com

/s/ CARLA D. BROWN
Carla D. Brown, VSB #44803
Charlson Bredehoft Cohen
 Brown & Nadelhaft, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
cbrown@cbcblaw.com

*Counsel for Plaintiff, Denise Randles*

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on the 21st day of February, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

      Heather K. Bardot, Esq.
      Kara A. Schmidt, Esq.
      McGAVIN, BOYCE, BARDOT
        THORSEN & KATZ, P.C.
      9990 Fairfax Boulevard, Suite 400
      Fairfax, Virginia 22030-2514
      (703) 385-1000 Telephone
      (703) 385-1555 Facsimile
      hbardot@mbbtklaw.com
      kschmidt@mbbtklaw.com
      *Counsel for Defendant The Town of Herndon*

                /s/ CARLA D. BROWN
                Carla D. Brown, VSB #44803
                Charlson Bredehoft Cohen
                 Brown & Nadelhaft, P.C,
                11260 Roger Bacon Drive, Suite 201
                Reston, Virginia 20190
                (703) 318-6800 Telephone
                cbrown@cbcblaw.com
                *Counsel for Plaintiff, Denise Randles*