THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| DENISE RANDLES, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:23-cv-142 |
| | ) | |
| THE TOWN OF HERNDON, | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant, the Town of Herndon, by counsel, and in support of its Motion for Summary Judgment, filed pursuant to Fed. R. Civ. P. 56(a), states:

## I.      STATEMENT OF PROCEEDINGS

On January 12, 2022, plaintiff, Denise Randles ("Randles"), filed a Complaint in Fairfax County Circuit Court alleging that the Town of Herndon Police Department ("HPD") and the Town of Herndon ("the Town") "discriminated against [her] on account of her sex, female, and retaliated against her because of her good faith complaints of sexual harassment and retaliation …, in violation of Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000-e *et seq.*, as amended." ECF No. 1-2, p. 8. She further asserted that she was the victim of discriminatory discharge or constructive discharge in violation of Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000-e *et seq.*, as amended. *Id.*, p. 9. On February 2, 2023, defendants removed the state court suit to this court. ECF No. 1. Thereafter, numerous motions to dismiss were filed. *See* ECF Nos. 4, 17 and 39. On May 10, 2023, the court issued its order denying the Motion to Dismiss except insofar as it sought punitive damages. ECF No. 76. Thus, the operative complaint is the Second Amended Complaint, ECF No. 31, ("SAC"). It contains four (4) counts against the Town:

- Count I – Sex Discrimination and Retaliation (Hostile Work Environment

Based on Sex and Retaliation) in violation of Title VII

- Count II – Discriminatory and Retaliatory Discharge in Violation of Title VII / Alternatively Constructive Discharge in violation of Title VII

- Count III – Sex Discrimination and Retaliation (Hostile Work Environment Based on Sex and Retaliation) in violation of the Virginia Human Rights Act/Virginia Values Act

- Count IV – Discriminatory and Retaliatory Discharge in violation of the Virginia Human Rights Act/Virginia Values Act / Alternatively Constructive Discharge in violation of the Virginia Human Rights Act/Virginia Values Act

Discovery has now closed, and it is evident that there is no basis for the claims asserted by Randles. Thus, the Town respectfully requests that the court enter summary judgment in its favor.

## II.    LISTED STATEMENT OF UNDISPUTED MATERIAL FACTS

### HIRING – POSITIONS

1.      Randles was hired by the Town as a Police Officer I in HPD, effective March 6, 2000. Ex. 1.[1] She worked as a patrol officer until March, 2005. Exs. 2-7.

2.      In March 2005, Randles was assigned to serve as the Crime Prevention Officer ("CPO") at HPD. Ex. 7. In this position, Randles developed programs and acted as a liaison to the community. Ex. 8, 86:13-87:9. She did not engage in patrol, take regular calls for service, write tickets or serve warrants. Ex. 8, 87:18-89:8.

3.      Effective May 26, 2007, Randles was appointed Corporal. Ex. 9. This change in position required her to return to patrol. Ex. 12, TOWN1016.[2]

4.      Effective September 8, 2012, Randles was moved back to the position of CPO. Ex. 8, 153:6-13; Ex. 13.[3] Randles was taken out of the CPO position and placed in patrol in November

---

[1] "Ex." refers to the exhibits appended to this pleading.
[2] From May 26, 2007 until September 7, 2012, while Randles was on patrol, she did not have an office. Ex. 76.
[3] There is a slight discrepancy as to when Randles began her second stint as a Crime Prevention Officer. *See*, Ex. 14 (reflecting a start date of June 30, 2012).

2018, and the CPO position was eliminated. Ex. 8, 210:5-11; 215:22-216:18; Ex. 15.

5.      Chief Deboard ("Deboard") [4] had no discussions with Steve Thompson ("Thompson") about moving Randles out of this position. Ex. 16, 96:4-10; 98:9-14. The decision was Deboard's alone. Ex. 16, 96:10-98:14; Ex. 17, 164:19-166:7. It was based on the fact that Deboard did not believe the CPO position provided much benefit to HPD and she was short on patrol officers. *Id*. It was not uncommon for Deboard to move people to different positions, and she had absolute discretion to do so. Ex. 17, 150:13-151:10; Ex. 20, ¶¶ 6, 8.

6.      Randles was not happy to be removed from the CPO position. Ex. 8, 216:8-219:2; Ex. 18, 86:16-87:15; 148:4-149:14; 151:14-152:4; 156:11-157:7. Accordingly, she indicated that she was looking to leave HPD. *Id*.; Ex. 15, TOWN3641; Ex. 18, 93:3:15. She was placed in dispatch rather than patrol given her expressed intention to leave. Ex. 15, TOWN3640-3641; Ex. 17, 163:11-164:18; Ex. 18, 30:1-8. When she did not leave, she was returned to patrol. *Id*.

7.      Randles continued as a patrol officer until she resigned from employment on November 1, 2021. Ex. 19, TOWN1829.

### EMPLOYMENT CONTRACT/TOWN POLICIES

8.      Randles' contract with the Town requires her "to familiarize [herself] with the contents of … publications[5] and [to …] comply with all policies, procedures, rules and regulations contained in them." *Id*., ¶ 9.

9.      Upon hiring, Randles attended orientation, at which she was provided and acknowledged receiving Town Administrative Regulation, Sexual Harassment Policy ("the AR-

---

[4] Maggie Deboard, female, has been the Chief of Police for HPD since 2012.
[5] The specifically referenced publications include the Code of the Town, which includes the Town Charter and statutes, Town's organizational structure, code of ethics, employee merit system, personnel regulations and procedures, compensation and employee benefits; Manual of Rules and Regulations of the HPD; and Operational Procedure Manual (General Orders) for the HPD. *Id*. ¶¶ 2-4.

19 Workplace Harassment Policy") and an Employee Handbook. Ex. 8, 27:1-28:1; Exs. 21, 22. The AR-19 Workplace Harassment Policy sets forth the Town's workplace harassment policy and reporting procedure. Exs. 23-25.

10.    In addition to receiving the AR-19 Workplace Harassment Policy when hired and acknowledging familiarity with it annually, Randles received employee handbooks which contain the Town's policies on workplace and sexual harassment. Ex. 8, 64:14-66:14; Exs. 26-37, 38-40.

11.    HPD's Regulations, General Orders and Standard Operating Procedures Manual, all of which Randles was required to familiarize herself with and adhere to, also contain HPD's policies on sexual harassment and prevention of the same. Ex. 41.

12.    Annually, the AR-19 Workplace Harassment Policy was reviewed with Randles, and she affirmed: (a) she had no questions about it; (b) she was aware of the Town and HPD's commitment to a harassment free workplace; (c) she was unaware of any inappropriate workplace behavior at HPD; (d) she knew how to file a workplace harassment complaint; and (e) such a complaint was to be made to her supervisor or human resources. Ex. 8, 50:16-57:17; Exs. 42, 43.

## RANDLES' SUPERVISORS AND THOMPSON'S LIMITED SUPERVISION

13.    Randles' supervisors signed off on the Sexual Harassment check-box forms, Ex. 8, 50:16-17; 57:18-22; 58:1-61:20; Ex. 43. The only form which Thompson signed was on February 24, 2008. Ex. 43, TOWN442. Thompson became Randles' supervisor for the first time on May 12, 2007. Ex. 8, 118:7-119:9; Ex. 12, TOWN1016. By September, 2008, Thompson no longer supervised Randles. Ex. 43, TOWN444; Ex. 44, TOWN989.

14.    In July of 2018, Thompson was assigned to IA, public information officer and CIS. Ex. 17, 17:4-18:8. Randles was placed under his supervision, effective July 7, 2018. *Id.;* Ex. 8, 212:20-213:8; Ex. 45. This was the first time since 2008 that Thompson supervised Randles. Ex.

17, 18:9-16; 202:18-21. In early 2019, Thompson was promoted to Captain, and was no longer Randles' supervisor. Ex. 17, 20:1-9.

15.     Thompson had no ability to initiate an Internal Affairs ("IA") investigation. Ex. 16, 130:18-131:4. He also had no ability to discipline Randles, change her position, demote or promote her, change her pay, set her schedule or initiate a PIP. Ex. 17, 176:3-179:14; Ex. 19, 122:16-18.

16.     In February, 2019, Eugene B. Hamilton became Randles' supervisor. Ex. 15. From April of 2021, until she left HPD in November 2021, Saa supervised Randles. Ex. 46, 75:20-76:19.

### ALLEGED SEXUAL HARASSMENT – 2006 TO 2008

17.     In late 2006 or 2007, Randles and Thompson entered into a sexual relationship. Ex. 8, 96:8-101:21; 104:20-105:7. This sexual relationship ended in 2008. Ex. 17, 181:12-16. It started with sexual conversation. Randles never told Thompson to stop the sexual talk, never told him it was uncomfortable and herself engaged in sexual talk and flirtation with Thompson. Ex. 8, 96:8-102:18; 120:13-122:10; Ex. 17, 189:4-190:7.

18.     The first sexual encounter between the two (2) occurred in Randles' vehicle. Ex. 8, 106:4-107:7. Thompson did not force Randles to engage in sex, did not say anything that made her feel compelled to do so, and she never suggested she felt pressured to have sexual relations with him. Ex. 8, 107:13-18; 128:19-21; 129:6-16; Ex. 17, 181:6-182:18.

19.     Randles and Thompson engaged in sexual acts with one another five (5) or six (6) times, all between 2006 and 2008. Ex. 8, 122:22-123:11. Twice, these sexual acts occurred while Randles and Thompson were on duty. Ex. 8, 123:12-18.

20.     Thompson was not Randles' supervisor at the time she first engaged in sex with him. Ex. 8, 110:8-14. At the time, Randles and Thompson began their sexual affair, both were married to other persons. Ex. 8, 108:20-109:1. Randles told no one about her sexual relationship

with Thompson. Ex. 8, 102:19-103:1; 109:2-4; 129:17-22. The first time she told anyone about her sexual relationship with Thompson was during an IA investigation initiated after Randles revealed her concerns regarding Thompson to fellow officer James Passmore ("Passmore") in July 2020. Ex. 8, 109:5-15. Thompson also never told anyone about his sexual relationship with Randles. Ex. 17,111:16-112:3; 174:6-175:11.

### ALLEGED SEXUAL HARASSMENT AFTER 2008

21.     In June of 2008, Thompson was reassigned to midnight shift. Ex. 17, 154:7-157:1; Ex. 47, TOWN1987. He remained on that shift until 2012. Ex. 17, 155:21-156:2. Once on midnights, he did not supervise or work with Randles. Ex. 17, 156:3-158:14; Ex. 44, TOWN 989.

22.     During the 2008 to 2012 timeframe, the "harassment" to which Randles claims Thompson subjected her was, during shift change, Thompson walked up fast behind her and glared at her. Ex. 8, 133:2-134:11; 140:21-142:21; 147:10-18; 156:9-21; 157:19-158:13; ECF No. 31, ¶¶ 29-30. She is unable to estimate how often this allegedly happened. Ex. 8, 141:21-142:21; 147:10-148:9; 156:22-157:8. She did not report Thompson's behavior to anyone. Ex. 8, 134:12-15.

23.     Randles claims Thompson started to "harass" her again more intensely around 2013 or 2014. Ex. 8, 162:12-163:22; ECF No. 31, ¶¶ 31-32. The "harassment" took the form of Thompson making small talk and reminiscing about their past relationship. Ex. 8, 163:1-22. Randles did not report Thompson's behavior to anyone or suggest that it was bothering her or unwelcome. Ex. 8, 164:1-3. When she rebuffed Thompson, he laughed as if he thought that they were joking. Ex. 8, 170:3-171:21. Over the course of five (5) years, from 2013 to 2018, Randles contends that Thompson brought to Randles' attention that he had an erection twice, told her that he wanted to go to the mens' locker room and jerk off, spoke about having sex with his wife,

breathed on the back of her neck, and made a comment that she took as a threat.[6] Ex. 8, 170:3-173:7; 196:5-16; 200:1-16; 206:20-208:1. **All of these alleged interactions with Thompson occurred: (a) in Randles' office,** *id.***, which she no longer had after November 2018, Ex. 76; and (b) before she was reassigned to patrol in November 2018.** Ex. 8, 171:22-173:4.

## PERFORMANCE ISSUES WHEN RETURNED TO PATROL (2018) LEADING TO PERFORMANCE IMPROVEMENT PLAN ("PIP")

24.     Hamilton became Randles' supervisor in 2019. Ex. 19, 23:11-20. After working with Randles for a short period, he identified performance issues. Ex. 19, 24:10-25:2; 28:6-18; 38:9-40:17; Ex. 15.[7] To attempt to rectify the deficiencies, he met with Randles numerous times. Ex. 19, 26:2-22. The meetings did not resolve Randles' performance deficiencies. Ex. 19, 26:8-11. Randles then was placed in dispatch for a short period of time, during which Hamilton did not supervise her. Ex. 19, 27:1-12. Randles was moved out of dispatch and back under Hamilton's supervision in September of 2019. Ex. 19, 27:13-17.

25.     Hamilton discussed Randles' performance deficiencies with Captain Anzengruber ("Anzengruber"), and Anzengruber suggested that Randles be placed on a PIP. Ex. 19, 40:18-42:5. The concern was her lack of production on the street and abuse of sick leave. *Id.* Thompson had no role in placing Randles on a PIP and was not working at the station when this occurred as he was at the FBI Academy. Ex. 8, 234:17-235:10; 238:11-16; Ex. 17, 20:18-22:14; 32:1-16; 123:21-124:9; 231:21-232:17; 249:15-250:1; Ex. 18, 200:20-201:18. Hamilton drafted the PIP and gave it to Anzengruber to finalize and approve. Ex. 19, 44:19-45:17; 102:15-103:12.

---

[6] The "threat" identified by Randles is Thompson allegedly stating, "Do you know how two people keep a secret? If one of them were dead." Ex. 8, 197:3-7. No one was present when this comment was made, and Randles did not report it or take any action as a result. Ex. 8, 197:7-198:18.

[7] Hamilton began working as a police officer for HPD on March 1, 2002. Ex. 19, 14:16-15:3. He was promoted to corporal around 2015 and sergeant in 2018. Ex. 19, 15:13-18. As part of his duties as a sergeant, Hamilton is required to conduct monthly audits of the officers he supervises, to include review of at least three (3) body worn camera or in-vehicle videos. Ex. 19, 21:5-18.

26.     Randles was placed on a PIP on November 8, 2019. Ex. 48. The PIP identified "factors for improvement." *Id.* These factors were tailored to the issues which HPD had with Randles' performance. Ex. 18, 188:1-189:8. Through the PIP, Randles was advised that she would be monitored daily and reviewed monthly. *Id.;* Ex. 48. She was instructed to complete a daily performance log to allow her progress to be monitored. Ex. 8, 244:15-17; Ex. 48.

27.     While on the PIP, Randles was not asked to perform in excess of expectations of other officers. Ex. 19, 120:10-13.

28.     Moore and Hamilton were directed to monitor Randles' while under the PIP and make regular reports. Ex. 17, 20:18-24:8; 250:9-251:5; Ex. 19, 46:9-14. Randles signed the PIP, acknowledging her awareness that she would be regularly monitored. Ex. 17, 34:9-14.

29.     Thompson began monitoring Randles' PIP in January 2020. Ex. 8, 243:14-19. Deboard directed him to because Moore/Hamilton were doing a poor job monitoring Randles on the PIP.[8] Ex. 16, 131:5-136:10; Ex. 17, 229:18-230:10; 230:18-231:2; 249:18-250:8; Ex. 60, TOWN3249. Even had Randles not been on a PIP, Thompson's monitoring of Randles was not unique to her. Ex. 18, 252:15-254:14; Ex. 19, 121:14-122:13.

30.     The PIP was suspended on March 31, 2020 due to COVID, Ex. 50, and reinstated on June 15, 2020. Ex. 51; Ex. 19, 57:21-6. It continued until August 15, 2020. Ex. 51. Randles successfully completed the PIP without any change in rank, position or pay. Ex. 8, 252:7-253:5.

### INTERNAL AFFAIRS' INVESTIGATIONS

31.     When a complaint is made which involves an officer, HPD conducts its own investigations through the Internal Affairs' process. Ex. 16, 47:3-13.

32.     General Order 204 pertains to Internal Affairs and Discipline. Ex. 8, 256:18-257:5;

---

[8] Hamilton was subjected to an IA which was sustained as a result of his failure to properly supervise Randles while she was on the PIP. Ex. 16, 131:5-136:10; Ex. 17, 230:11-17; Ex. 49.

257:16-258:4; 258:15-259:3; 259:17-260:19; Exs. 52, 53. General Order 204 requires that all complaints be investigated. Exs. 52, 53. Page 13 provides when relief from duty pending the conclusion of an IA investigation may occur. Exs. 52, 53.

33.    An IA investigation cannot be authorized by anyone other than the Chief. Ex. 54, 33:14-34:7. Once an IA investigation is authorized, it is assigned to an investigator. Ex. 54, 34:8-22. The investigator reports his findings to the employee's commander. Ex. 54, 35:11-36: 8. The investigator does not make recommendations as to what discipline to impose on the person subject to the IA investigation. Ex. 54, 37:13-16. The Chief decides on punishment. Ex. 54, 37:17-38:4.

34.    The only IA investigation against Randles in 2019 was 2019-IA-012, initiated by Anzengruber. Ex. 8, 281:9-282:16; Exs. 55, 56. Thompson had no role in initiating or investigating this IA. Ex. 17, 235:12-237:19; Ex. 74.

35.    The first IA investigation against Randles in 2020, requested on January 19, 2020, was 2020-IA-001. Exs. 55, 75. It was requested by Hamilton due to Randles being late for work. Ex. 19, 83:4-15; Ex. 57, TOWN 3651. Being late for work is a violation of General Orders. Ex. 8, 291:12-18; 292:2-293:5; Ex. 19, 123:8-19; Ex. 58, p.3, ¶ A-9. Randles was on a PIP when this IA investigation was initiated. Ex. 8, 291:8-11; Ex. 19, 123:8-19. Moore, then Sergeant Hamilton's lieutenant, agreed with the request for an IA investigation. Ex. 18, 174:4-16; 255:2-17; Ex. 19, 90:9-18. Thompson agreed with the request for this IA investigation given the ongoing performance issues with Randles. *Id*.; Ex. 17, 237:20-240:6; Ex. 57. Randles was given an oral reprimand as a result of this IA, Ex. 57, TOWN3656, which had no effect on her pay, rank or position. Ex. 8, 290:1-13.

36.    The second IA investigation against Randles in 2020, requested on February 13, 2020, was 2020-IA-002. Exs. 55, 59. This is one of only two IAs which Thompson requested. Ex.

17, 240:11-241:18; Ex. 59. He requested it because Randles was failing to meet the requirements of the PIP and having ongoing performance issues. Ex. 17, 241:10-18. Pihonak was the investigator. Ex. 10, 65:4-7; 67:11-13. His investigation revealed that Randles was not compliant with the PIP, and he sustained the charge. Ex. 10, 69:16-70:5; Ex. 59, TOWN3370. Randles did not grieve the decision or request a hearing with the Chief. Ex. 8, 299:7-300:10.

37.     On May 13, 2020, Rider was assigned an IA investigation for Randles which involved a cruiser accident. Ex. 61, 30:5-15; Exhibit 62. A cruiser accident requires an IA investigation. Ex. 61, 30:22-31:2; Exs. 52, 53. Rider felt that Randles should be exonerated, and Thompson disagreed. Ex. 61, 31:12-19. Rider went to Deboard and she agreed with him. Ex. 61, 32:12-18. The IA was withdrawn. Ex. 8, 276:7-277:4; Ex. 55.

38.     The third IA investigation against Randles in 2020 was 2020-IA-009. Exs. 55, 60. This was requested by Thompson on June 30, 2020, after Hamilton advised him that after conducting **regular** quarterly audits for the second quarter of the year, he located **no** in-car videos for Randles. Ex. 17, 233:16-235:3; 246:9-248:10; Ex. 60, TOWN 3246. Thompson looked into the report and identified numerous concerns with Randles' performance, many of which had previously been discussed with her and for which she was under an active PIP. *Id*.; Ex. 51. The investigation was assigned to Dyer. Ex. 54, 38:16-6. Dyer reviewed all body-worn video footage from Randles going back six (6) months. Ex. 54, 41:4-7. He found that she had improperly turned off her camera or provided improper information to citizens on multiple occasions. Ex. 54, 41:4-12; 41:19-42:5; 42:15-43:6. Dyer sustained the charge against Randles. Ex. 54, 44:5-7. He had no involvement in imposing discipline. Ex. 54, 44:11-13. A written reprimand was imposed. Ex. 55.[9]

---

[9] There was a fourth IA investigation in which Randles was involved in 2020, 2020-IA-011, which was launched to investigate complaints which Randles made about Thompson. This is addressed further below.

10

39.     Jay Carson ("Carson") joined HPD as Internal Affairs Commander on October 2020. Ex. 65, 13:22-14:15. Carson was assigned two (2) IAs for Randles in 2021. Ex. 65, 24:13-22; Exs. 66, 67. When Carson conducted his IAs of Randles, he did not know Thompson and barely knew Randles. Ex. 65, 50:3-51:12; 54:21-55:4.

40.     IA 2021-IA-06 was initiated on August 26, 2021 after a Fairfax County Detective received a report that a citizen was being extorted and threatened and that the citizen had previously reported it to HPD. Ex. 65, 25:5-27:3; Ex. 67. Randles had taken the citizen report at HPD, but failed to write a report. *Id.* Reports are mandated when there is a citizen complaint. Ex. 10; 22:20-38:16; Ex. 46, 102:10-103:18; Ex. 68. Pihonak assigned Carson to investigate why a report had not be prepared. *Id.*; Ex. 65, 27:1-9. During Carson's investigation, he discovered that Randles had cleared several cases without writing reports, in violation of HPD Orders and direction from Saa. Ex. 46, 106:4-108:16; Ex. 65, 35:2-37:6. Randles' explanation for not filing a report required by General Order 322, Ex. 68, is that she thought the citizen report was a scam. Ex. 8,  339:18-347:9.

41.     Carson's second IA investigation was 2021-IA-09. Ex. 66. It involved Randles' mishandling of a stolen car which had been recovered. *Id.* This IA was requested by Sergeant Sorg ("Sorg"). Ex. 66, TOWN 3019. Randles was served with a notice of charge on October 25, 2021 Ex. 66, TOWN3030. This was before IA 2021-IA-006 was concluded. Ex. 67. When served with the notice of charge, Deboard placed Randles on administrative leave with pay because Randles' "continued failure to perform her duties according to departmental policies and procedures has created a substantial liability for the town and necessitated her immediate relief from duty." Ex. 66, TOWN3014. Randles resigned from HPD the night before Carson was set to interview her on the 2021-IA-09 IA investigation. Ex. 65, 42:19-43:3.

42.     Neither 2021-IA-06 or 2021-IA-09 had been concluded when Randles resigned,

11

and discipline was not imposed. Ex. 8, 347:11-348:17; Ex. 66, TOWN3012; Ex. 67, TOWN3123.

## REPORT OF SEXUAL HARASSMENT – JULY 2020

43.     On July 8, 2020, Randles told Passmore about her sexual relationship with Thompson, which had occurred years earlier. Ex. 54, 44:14:46:4; Ex. 60, TOWN3342; Ex. 69, 57:19-58:7. She told him the relationship had been consensual. Ex. 69, 79:18-80:4.[10] She also told him that she had engaged in sex with Thompson while they were working, which was a policy violation. Ex. 69, 80:14-81:1. Upon receiving the report from Randles, Passmore drove directly to the station and reported it to Dyer, the IA Lieutenant. Ex. 69, 92:14-94:16.

44.     Randles' report regarding Thompson was made right after Dyer served her with a notice of violation and order of confidentiality in 2020-IA-09. Ex. 54, 44:14:46:4; Ex. 60, TOWN3243 and 3342. Passmore came to Dyer's office and advised that Randles had met him at a church parking lot and expressed that she was upset about receiving a notice of violation in 2020-IA-09. Ex. 54, 45:19-47:4. As she spoke with Passmore, she revealed that she had a past sexual relationship with Thompson and thought that 2020-IA-09 was brought as a result of that past relationship. *Id.* Dyer contacted Randles' supervisor, Hamilton, and asked that he have Randles meet with him that afternoon. Ex. 8, 320:17-321:12; Ex. 54, 48:1-5. He then did so. Ex. 54, 48:12-14. During the meeting, Randles revealed that she and Thompson had a consensual sexual relationship in the past that lasted several years, after which they remained friends. Ex. 54, 48:15-49:13. She indicated that she thought that Thompson was initiating IA investigations against her because their relationship had ended. Ex. 54, 50:13-22. Immediately after the meeting ended, Dyer contacted Deboard and relayed what Randles had told him. Ex. 54, 52:4-53:7. This was the first time that Deboard learned of Randles' allegation that Thompson had behaved inappropriately

---

[10] Randles later told Deboard the same thing. Ex. 16, 82:11-84:21.

toward her. Ex. 16, 80:7-81:14. Deboard expressed the need to remove Thompson from the building as soon as possible. *Id.* The next day, at 6:00 a.m., Dyer, Deboard and Pihonak met at the station to insure that Thompson would be intercepted upon arrival and relieved of duty. Ex. 54, 54:7-56:20. Deboard immediately relieved Thompson of duty and stripped all of his law enforcement powers. Ex. 10, 153:12-154:1; Ex. 16, 84:12-15; 99:6-19; Ex. 17, 44:4-45:3; 66:2-17; 68:15-69:1; Ex. 70, 96:15-18; 151:5-16. Randles never saw Thompson again. Ex. 8, 323:2-10.

45.     An investigation into Randles' complaints against Thompson was immediately launched (2020-IA-011). Ex. 63. On July 28, 2020, while on administrative leave and under investigation, Thompson resigned. Ex. 71. Deboard would have recommended Thompson's termination had he not resigned. Ex. 16, 109:7-22.

46.     Due to Randles' admitted on-duty, consensual, sexual relationship with Thompson between 2006 and 2008, which she acknowledged was wrong, she was given an oral reprimand, which is not formal discipline. Ex. 8, 322:19-333:12; Ex. 16, 118:7-18; 119:6-120:19; Ex. 64.

### LACK OF KNOWLEDGE

47.     Until July 8, 2020 when Randles told Passmore about Thompson's alleged discrimination and harassment of her, she had not reported it to anyone. Ex. 8, 45:8-14.

48.     No person has been identified who ever saw Thompson engage in behavior toward Randles that was inappropriate. Ex. 18, 79:15-20; 122:8-15; Ex. 46, 75:3-11; Ex. 61, 40:12-19; Ex. 69, 74:9-13. Their relationship has been described as "chummy, friends, buddies" and very friendly. Ex. 10, 139:7-17; Ex. 16, 77:10-80:3; Ex. 18, 77:6-11; 16-20; Ex. 54, 64:14-22; Ex. 73, 38:10-14; 40:19-42:4.

49.     Prior to Randles' complaint against Thompson, he had not been the subject of any IA investigation or human resources' complaints. Ex. 16, 99:20-100: 8; 117:3-17.

50.     During Deboard's tenure, Randles is the only person who has made a complaint of sexual harassment, gender discrimination or retaliation. Ex. 16, 47:14-17; 48:9-17.

## EEOC CHARGES

51.     Randles filed her initial Charge with the EEOC on March 19, 2021. Ex. 8, 337:8-14; Ex. 74. She filed an Amended Charge on September 29, 2021. Ex. 19. She continued as a patrol officer after filing her EEOC charge. Ex. 8, 339:9-12.

## RESIGNATION

52.     Randles resigned on November 1, 2021. Ex. 8, 348:12-13. She had already made the decision to leave HPD and had a job offer as of October 21, 2021. Ex. 8, 349:9-351:15.; Ex. 75, TOWN6334. If Randles had not resigned, Pihonak would have recommended termination due to the recent sustained violations in 2021-IA-006 and the egregious nature of her continued violations, but that recommendation would have had to have been approved by Deboard and the Town Manager. Ex. 10, 126:22-128:11; 154:20-158:1.

### III.     LAW AND ARGUMENT

#### A.  Standard of Review

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Evans v. Techs. Apps. & Serv. Co*., 80 F.3d 954, 958-59 (4th Cir. 1996). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

14

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no ***genuine*** issue of material fact."). Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc*., 947 F.2d 115, 119 (4th Cir. 1991) (citations omitted).

## B.  Randles' claims are Time Barred.

Title VII requires a plaintiff to "exhaust [her] administrative remedies by filing a charge with the EEOC before pursuing a suit in federal court." *Sydnor v. Fairfax Cty*., 681 F.3d 591, 593 (4th Cir. 2012) (ADA and Title VII lawsuits); *see also Jones v. Calvert Grp., Ltd*., 551 F.3d 297, 301 (4th Cir. 2009) (ADEA lawsuits).[11] Failure to exhaust administrative remedies deprives the Court of subject matter jurisdiction. *Jones*, 551 F.3d at 300. Because Virginia is a deferral state, claimants have 300 days to file a claim with the EEOC. *See Tinsley v. First Union National* Bank, 155 F.3d 435 (4th Cir. 1998). The Supreme Court has recognized, for HWE cases, that if "***an act contributing to the claim*** occurs within the filing period, the entire time period of the hostile

---

[11] A similar requirement exists under the Virginia Human Rights Act/Values Act. Virginia Code §§ 2.2-3907-3908.

environment may be considered by a court for the purposes of determining liability." *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).

In the instant case, the date 300 days prior to Randles' initial EEOC charge is May 22, 2020. The record in this case makes clear that the last date on which Thompson made **sexually** suggestive comments or engaged in **sexually** inappropriate conduct toward Randles was in November 2018, when she was removed from CPO and placed back on patrol. Randles herself has testified to this. Given that Randles failed to file her EEOC charge within 300 days after the last alleged instance of **sexual harassment**, any claim for HWE sexual harassment is barred and should be dismissed. *See Houston v. City of Atlanta*, 2015 U.S. Dist. LEXIS 174652 (N.D. Ga. Dec. 7, 2015) (finding a HWE sexual harassment claim time barred when the last sexually-suggestive comment or provocative act occurred more than 180 days before a charge was filed with the EEOC), *citing Chambers v. Wal-Mart Stores, Inc*., 70 F. Supp. 2d 1311, 1314 (N.D. Ga. 1998) (when last incident of alleged sexual harassment occurred in February 1994, and plaintiff's EEOC charge was not filed until October 1994, sexual harassment claim dismissed for failure to file timely charge), aff'd, 193 F.3d 523 (11th Cir. 1999). Since every claim which Randles raises is premised on the sexual harassment occurring in the first place and those claims are time barred, all other clams are similarly time barred and should be dismissed.

### C. The evidence in this case fails to establish Randles was subjected to a hostile work environment based on sex and/or retaliation (Counts I and III).

To establish a HWE claim, Randles must show that: (1) she experienced "unwelcome harassment;" (2) the harassment was based on her sex; (3) the harassment was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere;" and (4) there is "some basis for imposing liability on the employer." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003). To establish a retaliatory, hostile work environment,

16

Randles must show that not only was she subjected to a hostile work environment, but that it "resulted because of...[her] prior protected activity." *Pueschel v. Peters*, 577 F.3d 558, 565 (4th Cir. 2009). Stated differently, if Randles can establish a *prima facie* case of HWE, which she cannot, she also has to establish a *prima facie* case that she was subjected to retaliation. Randles has no evidence which establishes a HWE claim and, thus, the court should grant the Town summary judgment on these claims.

### "Unwelcome Harassment" – Element One

Randles entered into a secret, consensual, sexual relationship with Thompson during the 2006-2008 time period. During that time, Randles engaged in flirty, sexual banter with Thompson and engaged in sex with him. She never instructed him to stop the sexual conversations, nor did she ever express to him that his actions toward her or with her were unwelcome. Conduct is "unwelcome" when it continues after the employee sufficiently communicates that it is unwelcome. *See Scott v. Ameritex Yarn*, 72 F. Supp. 2d 587, 591 (4th Cir. 1999) (*citing Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68-69, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)). The Court must inquire "whether respondent by her conduct indicated that the alleged [sexual harassment was] unwelcome . . ." *Meritor*, 477 U.S. at 68. Here, Randles' willingly participated in the sexual affair with Thompson from 2006-2008 and cannot be heard to claim the behavior by Thompson during this period was "unwelcome." *See Pridgen v. Goodyear Tire & Rubber Co.*, 2007 U.S. Dist. LEXIS 112705 (E.D. N.C. Oct. 29, 2007) (*citing Hartsell v. Duplex Prods., Inc.*, 123 F. 3d 766, 774 n.7 (4th Cir. 1997) (when a plaintiff is a willing participant in the conduct about which she complains, "[s]he cannot now cry 'foul' for conduct that was, at the time, not 'unwelcome'")).

From 2008 to 2012, Randles and Thompson did not work together. She worked patrol during the day, and he worked nights. The only time they encountered each other was during shift

change, when he would reportedly walk up behind her quickly and glare at her. If she considered this behavior "unwelcome," she did not express that to him. Instead, she ignored Thompson.

Starting in 2013, Randles maintains that Thompson started to "harass" her more intensely. This reportedly continued until she was transferred from CPO to patrol in November 2018. The harassment consisted of sexual talk, innuendo and breathing on the back of her neck. There was no sexual relationship or touching. When Thompson acted in the ways which Randles describes, she told him to essentially, "knock it off." She claims he laughed, as if he thought that they were joking with one another. To the extent that Randles claims that Thompson's behavior during this time was unwelcome and that she conveyed that to him, by her own account she did not do that in a way which was sufficient to alert Thompson.

After November 2018, when Randles was transferred from CPO to patrol, the "harassment" to which Randles claims Thompson subjected her to was not sexual. What occurred during that time, according to Randles, is Thompson monitored her too intensely and seemed obsessed with her. She did not convey to Thompson that she felt this way. She did express her concerns to her sergeant and lieutenant, but those expressions are not imputable to the Town as they were not her "supervisors" for purpose of Title VII liability, because neither of them had the power to hire, fire, demote, discipline or reassign any employee. *See, e.g., Mikels v. City of Durham*, 183 F. 3d 323 (4th Cir. 1999) (holding that officer higher in chain of command is not a "supervisor" for Title VII purposes where he has no ability to take tangible employment action against subordinate officer).

Thus, the evidence which is uncontradicted in this case reflects that Randles was never subjected to "unwelcome" conduct, and element one cannot be met.

### Harassment was based on sex – Element Two

The issue in the "because of sex" inquiry is "whether members of one sex are exposed to

disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (internal quotations omitted). Only harassment based on an employee's gender is actionable. *Hartsell*, 123 F.3d at 772. In this case, not unlike in *Pridgen*, "it is clear that something other than [Randles'] gender motivated [Thompson's alleged] actions-namely personal animosity following a failed intimate relationship." *Id*. at *11 (*citing Succar v. Dade County School Board*, 60 F.Supp.2d 1309, 1314 (S.D. Fla. 1999) (granting summary judgment in a hostile work environment case, where co-workers engaged in a "love affair gone awry," because, among other reasons, the harassment did not occur on account of gender but rather because of the termination of the relationship)). There is no evidence that Thompson's alleged targeting of Randles had anything to do with her sex, rather, "her gender was incidental to the conduct." *Succar* , 60 F. Supp. 2d at 315. As stated in *Pridgen*, Randles, "must show that she was the target of open hostility because of her sex or has been harassed in some sex-specific manner. (*citing Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003)). Randles cannot show that "but for" her sex, Thompson would not have subjected to her to the "harassment" about which she complains. Because "[p]ersonal animosity is not the equivalent of sex discrimination . . . [Randles] cannot turn a personal feud into a sex discrimination case by accusation." *McCollum v. Bolger*, 794 F.2d 603, 610 (11th Cir. 1986).

### The harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere – Element Three

The Fourth Circuit has established a high bar for plaintiffs to meet the severity/pervasiveness prong of HWE claims. *See E.E.O.C. v. Sunbelt Rentals, Inc*., 521 F.3d 306, 315 (4th Cir. 2008) ("Even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard.). A plaintiff must first

show that she subjectively perceived the environment to be abusive. *Id.* Then, a plaintiff must show "that the conduct was such that a reasonable person in the plaintiff's position would have found the environment objectively hostile or abusive." *Id.* There must be evidence of something more than "rude treatment by coworkers, callous behavior by one's supervisors, or a routine difference of opinion and personality conflict with one's supervisor." *Id.* The Fourth Circuit has described sufficiently severe behavior creating a HWE as conduct having a "particularly threatening character," "degrading," and "humiliating." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015).

In this case, from 2006 through 2008, Thompson did not engage in any behavior which was severe. Instead, Thompson had a consensual, sexual relationship with Randles, which she never rebuffed. There is no evidence that this relationship had any adverse impact on Randles' employment, at all. From 2008 to 2012, Randles and Thompson did not work together. They passed in the hall on shift change. All that Randles attributes to Thompson during this time is that he walked up fast behind her and glared at her. This behavior can hardly be characterized as "severe," and, again, there is not a shred of evidence in the record which demonstrates that this behavior altered the terms of Randles' employment[12] or created an abusive atmosphere.

That takes us to 2013 through November of 2018, a period of **five** years. During this timeframe, there are no allegations that Thompson touched Randles or engaged in any sexual acts with her. What we have is Thompson bringing to Randles' attention that he had an erection twice,

---

[12] To the extent that Randles would argue that the decision to move her from CPO to patrol in November 2012 was a "tangible employment action," the Town submits that it was not. It was a discretionary move by Deboard, pursuant to the contract which Randles was under with the Town. Further, to impute liability to the Town on this ground, Randles must demonstrate that Thompson was "'principally responsible for,' or the 'actual decisionmaker behind,'" the tangible employment action. *Hill v. Lockheed Martin Logistics Mgm't, Inc.*, 354 F.3d 277, 288-89 (4th Cir. 2004) (*quoting Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151-52, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). She cannot do so, because Thompson had no part in that decision.

a statement that he wanted to jerk off in the mens' locker room, discussions about sex with his wife, breathing on the back of Randles' neck, and a comment By Thompson (not sexual) that Randles took as a threat. None of these alleged behaviors, alone or in combination, are "sufficiently severe." *See Baskerville v. Culligan Intl'* Co., 50 F.3d 428, 430 (7th Cir. 1995) ("The concept of sexual harassment is designed to protect working women from the kind of male attentions that can make the workplace hellish for women….It is not designed to purge the workplace of vulgarity…."). Thompson's described behavior is not sexual harassment. At best, he engaged in occasional vulgarity, tinged with sexual innuendo. Further, Randles has adduced no evidence to suggest that the behaviors attributed to Thompson from 2013 to 2018 altered the terms of her employment. It was not until after she left the CPO position in November 2018 and returned to patrol, that Randles started to demonstrate consistent deficiencies in work which led to IA investigations. And, after November 2018, there is not a single comment or behavior by Thompson which show any sexual harassment at all. In fact, Randles acknowledges **that the sexually harassing behavior stopped when she was removed as CPO in November 2018.** Thereafter, what she complains about is Thompson's alleged micromanagement and discipline of her, none of which constitutes sexual harassment.

Additionally, the comments made to Randles by Thompson were not pervasive. Comments in a HWE claim must be repetitive, "resulting in significant emotional distress." *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 336 (4th Cir. 2010). Courts have found conduct pervasive when it is "habitual," not "single or scattered incidents." *Sunbelt*, 521 F.3d at 318. Here, Randles has identified only scattered instances, over the period 2013 to 2018, of what she now contends was unwelcome behavior. *See Baskerville,* 50 F.3d at 431 ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage.")

(internal citation omitted). The conduct complained of by Randles "merely tell[s] a story of a workplace dispute" insufficient to describe severe or pervasive sex-based actions necessary to state a HWE claim. *Bass*, 324 F.3d at 765.

### There is "some basis for imposing liability on the employer" – Element Four

The fourth element of a HWE claim requires a basis for imputing liability to the employer. *Strothers v. City of Laurel,* 895 F.3d 317, 332 (4th Cir. 2018), Different standards exist for evaluating the conduct of a co-worker versus a supervisor. An employer may be liable where the victim is harassed by a co-worker only when the employer "knew or should have known about the harassment and failed to take effective action to stop it." *Id.,* 895 F.3d at 333 (alteration in original) (*quoting Vance v. Ball State Univ.*, 570 U.S. 421, 424, 133 S. Ct. 2434, 186 L. Ed. 2d 565 (2013)). Effective corrective action means discipline that is reasonably calculated to end the behavior. Here, the evidence establishes that the first time the Town knew or should have known of any allegedly inappropriate behavior by Thompson was on July 8, 2020 when Randles disclosed it. Prior to that, there is nothing in the extensive record which put anyone on notice of potential sexual harassment of Randles by Thompson. The fact that he may have "hung out" in her office or, while supervising her work and PIP, monitored her cannot plausibly have put anyone on notice of the sexual harassment to which she claims to have been subjected.

Further, the evidence clearly reflects that the Town took immediate corrective action as to Thompson. He was relieved of duty and an IA investigation was opened. During the course of that investigation, Thompson resigned. He never returned to HPD. The action taken was effective to stop the behaviors about which Randles complained. Thus, Randles cannot establish the fourth prong of her HWE claims.

Surely, Randles will argue that Thompson was her "supervisor," and that the fourth prong

should be evaluated with that in mind. But that is wrong. As a starting point, Thompson only

"supervised" Randles from May 2007 until the fall of 2008 and from July 7, 2018 until early 2019.

During this time, and at all times, Thompson lacked the ability to discipline, demote, fire, reassign,

or make any decision which would cause a change in Randles' benefits. As such, he was not her

"supervisor" for purposes of evaluating a HWE claim. *See Howard v.* Winter, 446 F.3d 559 (4th

Cir. 2006) (declining to find a superior at the Naval Air Systems Command Center to be the

"supervisor" of a staff member, where he had the ability to direct her operational duties, but had

no ability to take tangible employment action against her); *Mikels v. City of Durham*, 183 F. 3d

323 (4th Cir. 1999) (affirming summary judgment in favor of the City of Durham (police

department) and finding a corporal who sexually harassed a subordinate officer was not her

"supervisor" for purposes of Title VII, despite the higher rank, because the corporal had no ability

to take tangible employment action against the subordinate).

Even if the court was to analyze this case by treating Thompson as Randles' supervisor,

the Town has no liability for his alleged behavior. An employer's liability for a supervisor's

harassing conduct turns on whether or not the supervisor's harassment leads to a tangible

employment action —hiring, firing, failing to promote, reassignment with significantly different

responsibilities, decision causing a significant change in benefits, or any other significant change

in employment status. *Vance v. Ball State Univ.*, 570 U.S. 421, 133 S. Ct. 2434, 2442, 186 L. Ed.

2d 565 (2013). If the supervisor's harassment does not lead to a tangible employment action, the

employer may be vicariously liable unless the employer can establish a *Faragher—Ellerth*

affirmative defense. *Id.* at 2439 (first citing *Faragher v. Boca Raton*, 524 U.S. 775, 807, 118 S.

Ct. 2275, 141 L. Ed. 2d 662 (1998); and then citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S.

742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)).

Here, when applying these principles, the Town is not strictly or vicariously liable for Thompson's conduct. At the outset, because Thompson never took any tangible employment action against Randles, the Town is not strictly liable for any of his alleged actions. *Vance*, 133 S. Ct. at 2448. Additionally, the Town has no vicarious liability arising from Thompson's alleged conduct, because it satisfies the two prongs of the *Faragher—Ellerth* affirmative defense. A valid *Faragher—Ellerth* affirmative defense exists if: (1) "the employer exercised reasonable care to prevent and correct any harassing behavior," and (2) "the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id*.

As to the first prong, the Town exercised reasonable care first to prevent and then to correct any harassing behavior by Thompson. The Town has a comprehensive anti-harassment policy that was disseminated to its employees and enforced. *See EEOC v. Xerxes Corp*., 639 F.3d 658, 669 (4th Cir. 2011) ("The institution and enforcement of [an anti-harassment] policy, in conjunction with an adequate complaint procedure, aid the employer in establishing that it has exercised reasonable care to prevent discrimination." (internal quotation marks omitted) (*quoting Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 187 (4th Cir. 2001)). Randles received the Town's policies and procedures that cover sexual harassment at the start of her employment and every year thereafter. She acknowledged that she understood them, knew how to make a report and knew of no workplace sexual harassment that had occurred at HPD. In addition, the Town enforced its policies and took corrective actions in the wake of Randles' allegations. Thompson was immediately placed on leave, investigated, and in the midst of that he resigned and never again returned to employment at HPD. The Town's actions show that its policies were not mere promulgation of an anti-harassment policy nor administered in bad faith. *Spriggs*, v. *Diamond Auto Glass*, 242 F.3d 179, 187 (2001). Therefore, the Town exercised reasonable care to prevent and

correct Thompson's harassing conduct, satisfying the first element of the affirmative defense to Randles' HWE claim.

As to the second prong of *Faragher—Ellerth,* the Town also meets its burden in showing that Randles unreasonably failed to take advantage of the preventive or corrective opportunities that the Town provided as she made no complaint of behavior which she contends dated back to 2006 until July 8, 2020. "[P]roof that a plaintiff employee failed to follow a complaint procedure 'will normally suffice to satisfy the employer's burden under the second element of the defense.'" *Brown v. Perry*, 184 F.3d 388, 395 (4th Cir. 1999) (*quoting Ellerth*, 524 U.S. at 765).

### There is no evidence of a retaliatory hostile work environment.

The lack of a HWE claim necessarily negates a retaliatory HWE claim. But, there is also no evidence that Randles was subjected to retaliation by the Town after reporting Thompson's behavior on July 8, 2020, which is the first date on which she engaged in protected activity. To establish a retaliation claim, Randles has to demonstrate: (1) that she engaged in a protected activity, as well as (2) that the Town took an adverse employment action against her, and (3) that there was a causal link between the two events." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015) (internal quotation marks omitted).

As for adverse action, prong (2), Randles identifies a number of things which she claims qualify: (a) placing her on a PIP; (b) institution of IA investigations; (c) write ups and performance criticism; (d) excessive monitoring of her work; (e) placement on administrative leave during an IA investigation; and (f) a constructive discharge. With the exception of the claim of constructive discharge, none of the other identified actions constitutes an adverse action. *Handley v. Baltimore Police Dep't*, 2022 US Dist LEXIS 154373 * 22 (Md. Aug. 26, 2022); (holding an IA investigation is not an adverse employment action); *Ellis v. Kanawha Cty. Pub. Library*, No. 2:15-cv-05698,

25

2018 U.S. Dist. LEXIS 153549, 2018 WL 4293137, at *3 (S.D.W. Va. Sept. 10, 2018), aff'd, 756 F. App'x 323 (4th Cir. 2019) (holding a written warning, suspension, and failure to interview plaintiff prior to his suspension were not materially adverse employment actions); *Ellis v. Kanawha Cty. Pub.* Library, 2018 U.S. Dist. LEXIS 153549 *7 (S.D. W. Va., Sept. 10, 2018) (holding administrative leave with pay during an IA investigation is not adverse action in a retaliation case); *Lacasse v. Didlake, Inc.*, 194 F. Supp. 3d 494, 504 (E.D. Va. 2016), aff'd, No. 16-1896, 712 Fed. Appx. 231, 2018 U.S. App. LEXIS 626, 2018 WL 345064 (4th Cir. Jan 10, 2018) (noting that neither placing an employee on administrative leave with pay for a short time to allow investigation nor written or verbal reprimands that do not lead to further discipline constitute adverse employment actions); *Jones v. Constellation Energy Projects & Servs. Grp., Inc.*, 629 F. Appx 466, 468 (4th Cir. 2015) (holding placement on a PIP is not an adverse action); *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 430-31 (4th Cir. 2015) (holding a reprimand was not an adverse employment action because it did not change the plaintiff's employment conditions); *Grice v. Baltimore County*, 2008 U.S. Dist. LEXIS 91114, 2008 WL 4849322, at *8 (D. Md. Nov. 5, 2008) (finding that suspension with pay of a county employee pending investigation did not constitute an adverse action for a retaliation claim).

Regarding the constructive discharge claim – allegedly supporting prong 2 of the retaliatory HWE claim - it occurred on November 1, 2021, long after the July 8, 2020 report of Thompson's behavior and long after the filing of the March 19, 2021 charge of discrimination. Inasmuch as a passage of three (3) months between the protected activity and adverse action is too long to establish a causal relationship on temporal proximity alone, *Wilson v. City of Gaithersburg*, 121 F. Supp. 3d 478, 485 (D. Md. 2015), no such connection can be made between these protected activities and the "constructive discharge." There is absolutely no other evidence tying Randles'

voluntary departure from HPD during valid IA investigations to the July 8, 2020 report or March 19, 2021 charge. The time between filing of the amended charge on September 29, 2021 and the November 1, 2021 resignation is short enough to establish *prima facie* evidence as to prong two, but there is no evidence which would allow the court to find that there was a causal link between the September 29, 2021 EEOC filing and the "constructive discharge."

Randles suggests that the "constructive discharge" is supported by the fact that her work conditions were made so intolerable that a reasonable person in her position would have no choice but to quit. But, by November of 2021, Thompson had been gone from HPD for sixteen (16) months and Randles had gone without an IA investigation until August 2021, her last one prior to that having been requested in March of 2020. She was, as of August 16, 2021 under an IA investigation for serious allegations of dereliction of duty. Inasmuch as that IA was initiated **before** Randles filed an amended charge of discrimination, Randles cannot establish it would not have been initiated "but for" the filing of her amended charge of discrimination. The second IA investigation opened in October 2021, 2021-IA-09, was requested by Sorg, a sergeant with no prior involvement with Randles and no awareness that an EEOC charge had even been filed.[13] As with IA 2021-IA-06, 2021-IA-09 documented a very serious dereliction of duty by Randles, which caused Deboard grave and appropriate concerns. There is nothing factually which can tie the opening of this IA to Randles' filing of an amended charge of discrimination.

Considering the above, a HWE claim, based on sex and/or retaliation, has not been demonstrated, and summary judgment should be entered on Counts I and III.

### D.  The uncontradicted evidence in this case fails to establish that Randles was constructively discharged (Counts II and IV) [14]

---

[13] It is notable that this IA was initiated **after** Randles had already advised her counselor that she had decided to leave HPD and had another job offer.

[14] It is beyond question that Randles was not discharged before she resigned, and no decision had been made on the two (2) open IA investigations. Thus, these counts have to be premised solely on a claim of constructive discharge.

To establish constructive discharge, Randles must show "something more" than what is required for a HWE claim. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004) (holding that "one making a 'constructive discharge claim entails something more' than one claiming a hostile work environment"); *Nnadozie v. Genesis Healthcare Corp.*, 730 Fed. Appx. 151, 162 (4th Cir. 2018) (unpublished) ("[B]ecause Nnadozie cannot maintain a hostile work environment claim, the district court properly dismissed her claims of constructive discharge."). To establish a constructive discharge claim, Randles must show "that [s]he was discriminated against … to the point where a reasonable person in h[er] position would have felt compelled to resign." *Green v. Brennan*, 136 S.Ct. 1769, 1777, 195 L. Ed. 2d 44 (2016) (*citing Suders*, 542 U.S. at 148). "'Unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.'" *Suders*, 542 U.S. at 147 (*quoting Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997)).

"'Intolerability' is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign . . . ." *Blistein v. St. John's Coll.*, 74 F.3d 1459, 1468 (4th Cir. 1996), overruled on other grounds by *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 118 S. Ct. 838, 139 L. Ed. 2d 849 (1998)). Instead, intolerability "'is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign,' . . . that is, whether he would have had no choice but to resign." *Id.* (internal citations omitted) (emphasis in original) (*quoting Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)).

Here, insofar as Randles cannot establish a HWE claim and must establish more than is required for that claim to make out a constructive discharge claim, this claim necessarily fails.

28

Additionally, the conditions which Randles was experiencing at work when she resigned (two open IA investigations and placement on leave without pay) do not establish "intolerability." Her complaints are nothing more than a disagreement over discipline which is insufficient to state a constructive discharge claim. *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006) (feeling of being unfairly criticized is insufficient to establish constructive discharge claim).

Further, even if Randles could make out a *prima facie* constructive discharge claim, the Town has legitimate, nonretaliatory reasons for all of the actions taken against Randles. *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001). Randles was violating General Orders, procedures and policies, which placed HPD and the public at risk. She refused to write mandatory reports, including one where a citizen made a complaint that his life was in danger. This was despite the fact that she had been on a PIP in 2019 for dereliction of duty and had a prior IA investigation in 2019, specifically related to her failure to complete reports. She also completely botched the handling of a stolen vehicle which was recovered, completely compromising all evidence related to that matter. As a veteran of more than twenty (20) years, her actions were inexcusable. By the time the final IA investigation was opened, what had become apparent is that once Randles was returned to patrol in November 2018, she refused to do her job. She did not want to be in patrol where tickets have to be written, warrants have to be served, and reports have to be prepared. No matter how the HPD tried to redirect Randles' dereliction of duty, which started almost as soon as she returned to patrol, Randles refused to bring her performance in line with what HPD required. HPD's decision to initiate IA investigations to look into Randles' clear policy violations was legitimate and bears no resemblance whatsoever to a retaliatory act.

      **E.  In the event that the court does not grant summary judgment based on the arguments raised above, it should reconsider whether sovereign immunity bars the claims based on the Virginia Human Rights Act/Virginia Values Act (Counts III and IV)**

In its Motion to Dismiss, ECF No. 39, the Town argued that the claims against it brought pursuant to the Virginia Human Rights Act/ Virginia Values Act ("VHRA") are barred by sovereign immunity. This argument was fully briefed at ECF No. 40, pp. 23-27, and the Town incorporates those arguments fully herein by reference. In the court's order denying the Motion to Dismiss, ECF No. 76, the court apparently found the Town's claim of sovereign immunity to be without merit. Since that time, this very issue has come before the Circuit Court of the City of Norfolk. *See*, *Jordan v. Sch. Bd. of Norfolk*, 2023 Va. Cir. LEXIS 84 (2023). In direct contrast to this court's ruling, denying the request for dismissal of the VHRA claims on the basis of sovereign immunity, the *Jordan* court held that sovereign immunity barred any such claims against the school board. The *Jordan* court cited to two other cases, which stand for the same proposition; that sovereign immunity bars VHRA claims against the Commonwealth of Virginia and its agencies when acting in governmental capacities. *See Mais v. Albermarle Cnty. Sch. Bd.*, 2023 U.S. Dist. LEXIS 29298 (W.D. Va. Feb. 21, 2023) (holding that the VHRA does not contain an explicit waiver of sovereign immunity for Commonwealth agencies, nor does it create a private cause of action against a School Board, which is not a "person" under the VHRA); *Patel v. Commonwealth*, 2021 Va. Cir. LEXIS 150 (2021) (holding that there is no cause of action against the Commonwealth under the VHRA as the Commonwealth is not a "person" against whom suits are authorized, and sovereign immunity also bars such claims). The Town submits that there is ample authority, as previously cited and cited herein, which make clear that any claim brought against it herein under the VHRA is barred by sovereign immunity. Thus, to the extent that the court does not grant the Town's motion for summary judgment on the other grounds cited herein, it should be granted as to the VHRA claims (Counts III and IV) as the Town is not a "person" against whom suit is authorized under the VHRA, and it is immune from suit, as well.

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons and any additional reasons to be argued at any

hearing, the defendant, the Town of Herndon, by counsel, respectfully requests that the court grant

its Motion for Summary Judgment and dismiss this case with prejudice.

**TOWN OF HERNDON**
**By Counsel**

_____/s/_____
Heather K. Bardot, Esquire (VSB #37269)
McGAVIN, BOYCE, BARDOT
  THORSEN & KATZ, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030-2514
(703) 385-1000 Telephone
(703) 385-1555 Facsimile
hbardot@mbbtklaw.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of September, 2023, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Mary Ann Kelly, VSB 32786
The Law Office of Mary Ann Kelly
3977 Chain Bridge Road, Suite 300
Fairfax, Virginia 22030
703.865.5032 / Fax: 703.865.5832
makelly@kelly-firm.com
*Counsel for Plaintiff*

Carla D. Brown, VSB 44803
Jessica L. Sartorius, VSB 68622
Charlson Bredehoft Cohen
 Brown & Nadelhaft, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
cbrown@cbcblaw.com
jsartorius@cbcblaw.com
*Counsel for Plaintiff*

/s/
Heather K. Bardot, Esquire (VSB No. 37269)
McGAVIN, BOYCE, BARDOT,
  THORSEN & KATZ, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030-2514
(703) 385-1000 Telephone
(703) 385-1555 Facsimile
hbardot@mbbtklaw.com
*Counsel for Defendant*