# Herndon

## HERNDON POLICE DEPARTMENT

# MEMORANDUM

**TO:**       Colonel Maggie A. Deboard
             Chief of Police

**FROM:**     Captain Steven Pihonak
             Commander Support Services Division

**IA FILE:**   2020-IA-011

**DATE:**     July 9, 2020

**SUBJECT:**  Internal Investigation

## SYNOPSIS

Senior Police Officer Randles is currently on a Performance Improvement Plan (PIP), and her daily performance is monitored by her supervisors to ensure that she is meeting performance benchmarks. SPO Randles believes that she is being targeted by Captain Thompson because of their prior sexual relationship, which she ended.

SPO Denise Randles reported that she had a past sexual relationship with Captain Stephen J. Thompson.  She reports that there were several sexual encounters with Captain Thompson, some of which occurred while on duty and in uniform, dating back to approximately 2006-2007.  SPO Randles also reports having inappropriate sexual conversations and receiving sexual gestures from that time period and as recent as 2014.  The allegations align with time periods when Captain Thompson was a supervisor and had rank greater than SPO Randles.  During the time period of her allegations of a sexual relationship, Captain Thompson was SPO Randles direct supervisor.

This complaint was reported by Lieutenant Dyer, Assistant Commander of Support Services, to Chief DeBoard, who immediately recommended a review by Internal Affairs to investigate the facts of this case.  Captain Thompson was relieved from duty pending the outcome of this investigation.  Because of Captain Thompson's position of authority within the police department, the Chief assigned me to investigate this case with assistance from the Internal Affairs Commander, Lieutenant Justin Dyer.

## FINDINGS

The findings and conclusions of this investigation are based upon the interviews, statements and documents as follows:

PLAINTIFF'S EXHIBIT 1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

TOWN3889

| **SOURCE:** | **METHOD** |
|---|---|
| Senior Police Officer Denise Randles | Recorded in Person Interview |
| Interview Captain Stephen J. Thompson | Recorded in Person Interview |
| Employee Evaluations and Memos for historical reference. | Employee Personnel Files |

**INVESTIGATION:**

On July 8, 2020 SPO Denise Randles had a meeting with Captain Thompson, Sergeant Hamilton, and Lieutenant Merritt in the Chief's Conference Room at the Herndon Police Department. The purpose of this meeting was to discuss SPO Randles ongoing Performance Improvement Plan (PIP), as well as her policy violations related to the body worn and in-car camera systems. After this meeting Lieutenant Dyer served SPO Randles with a notice of Investigation Form (HP807) for a newly created internal affairs investigation, 2020-IA-010. After this meeting SPO Randles returned to her patrol duties.

Later that day, July 8, 2020, Corporal Passmore came to Lieutenant Dyer's office and reported a conversation he just had with SPO Randles. Corporal Passmore stated that he met with SPO Randles that afternoon at her request. They met at St. Timothy's Church parking lot after her meeting with Lieutenant Dyer earlier in the day. SPO Randles told Corporal Passmore about a past sexual relationship that she had with Captain Stephen Thompson. She told him in detail about sexual encounters that occurred while she and Captain Thompson were on duty. SPO Randles told him about inappropriate sexual gestures and comments made by Captain Thompson over the course of several years. She also told Corporal Passmore that she was scared for her safety because of a statement that Captain Thompson made to her several years ago. She advised Corporal Passmore that she felt that Captain Thompson was targeting her. Corporal Passmore is friends with SPO Randles and advised Lieutenant Dyer that he had suspicions of a past relationship with Captain Thompson, but SPO Randles never discussed it with him. Corporal Passmore stated that he immediately went to Lieutenant Dyer and reported this information to him.

Lieutenant Dyer contacted SPO Randles and asked her to meet him in the back-parking lot of the Herndon Police Department on this same day. SPO Randles then confirmed with Lieutenant Dyer, what she had just told Corporal Passmore. She went into detail with Lieutenant Dyer about her past sexual relationship with Captain Thompson. She described several occasions when her and Captain Thompson had sexual encounters while on duty. She also described to Lieutenant Dyer a history of inappropriate sexual conversations and sexual gestures that Captain Thompson directed toward her.

Lieutenant Dyer immediately contacted Chief DeBoard and relayed all the details of SPO Randles complaint against Captain Thompson. Chief Deboard immediately contacted me and requested an administrative investigation be initiated.

This investigation dates back from approximately 2006 to present time. This investigation is weighted heavily in personnel interviews, along with some supporting documents with historical relevance.

**CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER**

TOWN3890

### Interview with Special Police Officer Denise Randles:

Om July 9, 2020 at 0900 hours I met with SPO Denise Randles.  The interview was conducted in the conference room at 713 Station Street, the old Town Hall building. This location was chosen to provide privacy for SPO Randles. Lieutenant Justin Dyer was also present for the interview.  The interview was recorded in its entirety, and a copy is in the file. A copy of the transcript is also located in the file.

I had SPO Randles sign the Order of Confidentiality as well as a Notice of Investigation (HP 807) form.  Copies of each document were provided to SPO Randles and the original copies are in the file.  I advised her that Captain Thompson has been removed from her chain of command pending the outcome of this investigation.  I also advised her that Captain Thompson was ordered not to have any contact with her, and if he does, she was to immediately report that to Lieutenant Dyer or myself.  I advised her that this was a separate investigation from the one Lieutenant Dyer was investigating, and that I will oversee the conclusion of that investigation rather than Captain Thompson.

I asked SPO Randles if she could start from the beginning when she spoke to Corporal Passmore about this.  She stated that it all started yesterday when she was called back to the station to meet with Captain Thompson and Sergeant Hamilton. She said that they were talking about issues with her body worn camera.  She said that Captain Thompson brought up the fact that she was telling drivers that there were no points for certain violations, and this was wrong information.  She stated that she believed that he was "*nitpicking*" at her for these mistakes.  She said that she didn't agree with Captain Thompson but told him that she would "*fix it.*"

She said that at the conclusion of that meeting Captain Thompson advised her that Lieutenant Dyer now needed to meet with her.  She stated, "*I know what this is about, because Brian (Hamilton) told me that this could be, this could possibly turn into IA about me.*" She went on to say, "*So as I sign it, you know, I just start crying, not because I'm mad…just because, I mean there's so much more that nobody knows.*" She stated that she was upset after signing the IA forms with Lieutenant Dyer. SPO Randles said "*Yeah. But he kind of like, and I got so upset, I'm like you know what, like it's too much you know, in my head, you know, I'm like, you know this is just, it's too much. It's excessive, you know.*" She stated that at that moment she was telling herself that she was just going to say something to Dyer since he was the IA Commander.  She stated that she was ready to tell Lieutenant Dyer but changed her mind at the last second because she didn't feel comfortable.

After the meeting SPO Randles said that she asked Sergeant Hamilton to meet her on Coral Road. She stated they had a short conversation about the latest IA that was being initiated against her.  She stated that she told Sergeant Hamilton, "*Yeah, there's so much more to it than you guys know, and I started, you know, to get a little, I'm sorry, just because like, I'm just, it's stressful…*" She said that while talking to Sergeant Hamilton she was thinking, "*I just wish somebody would just ask me.*"  SPO Randles said that there were always rumors, referring to a relationship between her and Captain Thompson.

SPO Randles stated that she contemplated going to Human Resources and reporting this to them that day.  She stated that later that afternoon she called Corporal Passmore and asked if he was in Herndon, and could they meet?  They met at St. Timothy's Church parking lot in Herndon.  SPO Randles said that she and Corporal Passmore were very good friends. She said that she started out by apologizing to Passmore because he's asked her about her and Thompson in the past and she's always denied the fact that there was a relationship. So SPO Randles described in detail all the information about her past relationship with Captain Thompson to Corporal Passmore.

I asked SPO Randles if she could start from the beginning, when the relationship between her and Thompson began.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

TOWN3891

She said that sometime around 2005 to 2006 she was assigned to Crime Prevention which was located at the Neighborhood Resource Center (*1086 Elden Street*). The Herndon Police Department at the time utilized a separate office space at this address for the Crime Prevention Officers and Bike Team (HPD records indicate that SPO Randles was temporarily moved from patrol to the Crime Prevention position in 2005, the record is in the file). She stated that Thompson was a patrol sergeant at that time, assigned to the day shift (HPD personnel files confirm that Thompson was a Sergeant assigned to patrol, dayshift).

SPO Randles said that Thompson would stop by her office frequently to talk, and that for a while it was strictly small talk, but he would come by two to three times per day. SPO Randles said that one day his conversation was a little different; he told her *"I had a dream about you last night, I don't know if I should tell you."* SPO Randles remembers this because this is where their relationship changed. She said that he started hanging around more and then the conversations changed. He started talking "*sexual dirty talk.*" SPO Randles does admit that she was a willing participant in those conversations. She stated, "I *allowed him to talk to me like that.*" When I asked her to clarify she simply stated, "*I mean I didn't say no.*" She said that Thompson would move in very close to her when she was at her desk and whisper things in her ear. He would also come up from behind her and press his body up against hers. SPO Randles said that all these things occurred at her office at the NRC. I asked SPO Randles to specify what she meant by dirty talk. She remembered that he had a sexual tone and would ask things like "*what was the color of my underwear.*" She stated that up to this point there was no sexual contact, only the behaviors described above.

SPO Randles described that there was a point in time when she worked in Crime Prevention that Thompson told her, '*You should buy a track phone.*' She described it as a throw-away phone. She stated that Thompson went with her to the Radio Shack, located next to the NRC, and she purchased a phone. She stated that Thompson already had one of these phones. The sole purpose of the phone, she explained, was so they could call each other and disguise their relationship from their spouses.

SPO Randles said that she was appointed to Corporal and transitioned to the street (HPD personnel files indicate that this occurred in April of 2005). She stated that she worked for Thompson on the same squad and he trained her to be a Corporal (A copy of the memo dated April 11, 2005, from Sergeant Thompson to Chief Summers, indicating that SPO Randles completed her Corporal training, is in the file). She stated that after the sexual relationship had begun, she and Thompson developed code words that they used on the CAD system. They would use words like "*Cardinal, Falcon, Lincoln, or the Eagle Has Landed.*" She said that they predetermined that if they were ever asked about this relationship by Internal Affairs, or if they were ever called to respond to the Internal Affairs Commander, they would use these terms to warn each other.

She said that the sexual relationship began off duty and in different locations. She described the first time they had sexual contact, they agreed to meet somewhere on the George Mason University Campus. This was the time period that Thompson was attending the Masters' of Public Administration Cohort program at George Mason University. She said that they met up in a parking lot at George Mason, inside her vehicle. She stated that she performed oral sex on Thompson. At the time of this encounter they were off duty, and Thompson was a Sergeant and her direct supervisor.

An encounter that SPO Randles discussed was out of chronological order but she could not place a date on it. For a date reference she remembered it was the night that the Police Department earned the CCPC or Certified Crime Prevention Community Program certification. She remembers going out to dinner with Chief Summers, Brad Anzengruber, and the DCJS staff to the Icehouse Café in Herndon. She said that after the dinner she met Thompson at her parent's house on Madison Street in Herndon. She stated that they were both off-duty at the time. She says that this was the first time she had sexual intercourse with Thompson. She could not remember if she was just finishing her assignment in Crime Prevention or if she had already transitioned to patrol, but Thompson was a Sergeant at the time.

**CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER**
**TOWN3892**

She described another off-duty incident that occurred at Thompson's residence. Again, she stated that this may have been the timeframe where she was just coming out of crime prevention, or she was just back in patrol. She stated that she was with her au pair and her kids and added that they were all going to go to the zoo on that day. She stated that she and Thompson engaged in sexual intercourse prior to leaving for the zoo. She said they were alone in the house and everyone else was waiting in the car for them. At the time of this incident, they were off duty, and Thompson was a Sergeant and Randles was a Corporal or lesser rank.

She described another off-duty encounter that occurred at the Fair Oaks Mall in Fairfax, Virginia. She stated that it was the same as the encounter which occurred at George Mason University. They met in the parking lot, this time in his van, and she performed oral sex on Thompson. At the time of this encounter Thompson was a Sergeant and her direct supervisor.

SPO Randles stated that the next encounter occurred at the Target located just outside of Herndon on Sunset Hills Road. She stated that they met up there just after their shift ended and they met in the parking lot and sat in her car. She stated that she performed oral sex on Thompson. At the time of this encounter Thompson was a Sergeant and her direct supervisor.

She stated that the next encounter occurred on duty while they were in uniform. She stated that she went over to her parent's house, which used to be located on Madison Street in Herndon. She could not remember the exact timeframe but believes that it was just before the house was demolished, because there was no furniture in the house. She stated that she performed oral sex on Thompson while in uniform and on duty. At the time of this encounter Thompson was a Sergeant and her direct supervisor. I asked her who suggested that you meet at the house. She said that no one really suggested the idea. She thinks that she said, "*I'm going to go check out my old house.*" She didn't invite him, but he just showed up.

SPO Randles recalled that the next encounter also occurred on-duty while they were in uniform. She says that she and Thompson met at the Herndon Municipal Center (HMC) parking garage. They were going to walk around a bit and do foot patrol. She believes that she marked out at this location in the CAD. She wasn't sure on the timeframe but believes it was a weekend. She said that it had to be a weekend because there were no cars in the lot and no people around. She described a "side-room" under the garage in the area across from the court entrance near the glass doors. She described a room behind a locked door with no windows and added that Thompson had a key to this room.

She remembered that once inside the room she performed oral sex on Thompson while they were on-duty and both dressed in uniform. She remembered that this was a point where she felt that Thompson was expecting her to perform these acts now. She said "*Okay, so it just felt like it was being expected. I didn't like…I just didn't like the feeling.*" I asked her if she believed that when he unlocked that door that he had clear intentions. She replied "*oh, you can feel it…I just felt it was being expected.*" Again, she wasn't sure of the exact timeframe but believed it was warm because she was wearing patrol shorts. At the time of this incident, Thompson was a Sergeant and SPO Randles direct supervisor.

This is the time that SPO Randles started describing how she began to distance herself from Thompson. She stated, "*it was getting uncomfortable...like I said the expected part.*" Although she described feelings of discomfort, SPO Randles has always maintained that she was a willing participant during all sexual encounters. She then told me that she found a whole bunch of pictures of herself on Thompson's computer. She said that they were looking at his computer, searching for a picture of another employee. She said she saw a lot of pictures of herself. She remembered saying, "what are all these?" She stated "*Shame on me for not saying anything, but it just, I just don't... You know what I mean? It just felt weird at the time.*"

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

**TOWN3893**

SPO Randles stated that she began to distance herself from Thompson and decided that she wanted to work on her marriage. She remembered an event that occurred at work with her then husband Justin Williams, also a Herndon Police Officer at the time. They got into an argument at work that day. She stated that she had a thought "*I'm just done with everything*." She recalled that on that day she rode to court with Thompson and she thought to herself, "I *don't want to be in the fucking car with you." I never said that to him, but I'm just saying that is when I started to just completely distance.*"

SPO Randles said that Thompson was at some point assigned to the midnight shift. She believes that this was the time period that he was personally struggling at home and moved out of his house. She said that Thompson's wife called her one day and asked if she was having an affair with her husband. SPO Randles stated "*obviously I denied it.*"

SPO Randles spoke about the phone that she purchased, used solely for the purpose of talking to Thompson. She said that this was another thing with him that became expected. She stated that they would always talk on the way home from work and it was always sexual talk. She said that Thompson told her that he used to do the same thing with another girl, prior to being a police officer, when he worked in loss prevention. She said, "*At the time, you know, I didn't really know how to talk like that.*"

She described an event where she went to a Motley Crue concert with Dispatcher Michelle Walsh, Officer Chris Farbry and Thompson. She said in a later interview that Thompson was behaving oddly at the concert. She said he was "*well, touchy feely, trying to get close instead of ... I was just being mean. I remember him picking me up, over his shoulder. I got pissed about that. I told you that Michelle was there and Farbry was there.*" Later after the concert SPO Randles said that she went back to Michelle's apartment. She said that she was staying in the spare bedroom. She said Thompson asked if he could sleep on the couch that night. SPO Randles recalled that Thompson came into her room several times that night asking if they could talk. She stated that she told him no several times and he left. She believes he left the apartment that night and did not sleep there.

SPO Randles described an event in this time period where Thompson called her sister and asked her what kind of alcohol SPO Randles liked. SPO Randles says that she never confided any details of her relationship with Thompson with her sister, and she doesn't know how Thompson would even have her telephone number. She said that these things occurred at a time when Thompson was now aware that she didn't want anything to do with him. She described that he appeared to be having a "*little mental episode.*" SPO Randles said that Thompson started acting "*mean towards her.*" She said that he never said anything, but he had an "*aggressive demeanor towards me.*"

SPO Randles said that she was later assigned to Crime Prevention again. (A memo is in the file indicating that SPO Randles was assigned to Crime Prevention in September of 2012). She believes that Thompson was assigned as the CIS Sergeant around that same time period. She stated that by this time she believed that she and Thompson could be friendly in the office. Thompson used to come by her office a lot, which was located directly across from the Captain's offices. She said that Thompson would come and sit in a chair next to her desk. She recalled a specific time when Thompson came into her office and sat down in the chair, and his legs would be open. He would say '*Hey Hey*' and try to get her attention. When he did get her attention, he would motion her eyes to his groin area. She stated, "*he would, you know, sit there and, basically, try to get me to look because he had, like, a hard-on, okay?*" She described to me that Thompson had an obvious erection. She stated at that point she said "*Hey, no Steve, Knock it off.*" SPO Randles said it was uncomfortable, but she didn't want to create a scene. She stated that this occurred a couple times in her office. She said, "*But I, I mean, you're (Thompson) sitting in my office not giving two shits about my captains who are sitting' back there.*"

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

**TOWN3894**

SPO Randles stated that when Thompson and she were in a relationship there were two songs that they liked. She stated that one was by U2 and the other was by someone named Ingred. She could not recall the exact songs. She stated that Thompson was constantly walking past her office to get ice in the Chief's kitchen, and he would walk past her singing those songs. She believes this was an intentional act to get her to think about their past relationship. SPO Randles stated "*Um, you know, I just, I was like, dude, what the fuck? But Steve's a little crazy like that anyway. So, I kind of brush it off. I'm like, you know what? Let me just play the game, you know, just... Unfortunately, you know, do not take offense to this, but you're in a male dominated field. You have to play the game. I mean, to a point, you know what I mean? I mean, I joke, this and that, but, I mean, that's clearly... Steve knew at that time to stop. All right?*" SPO Randles said that she rarely if ever went to Thompson's office, and she always ensured her office door was open, she stated "*I made sure of that.*"

She stated that there was a point in time where the Chief or the Captain told Thompson to stay out of her office. I spoke to Chief DeBoard about this statement from SPO Randles. Chief DeBoard advised that she noticed Thompson spending too much time in Randles office. Chief DeBoard ordered Captain Anzengruber to have Thompson stay out of her office. The Chief did not know about any of these issues outlined in SPO Randles complaint until this Internal Affairs investigation began recently. She stated that she believed that Thompson was just not focused on his job.

SPO Randles spoke about his continued behaviors in the office. She stated that while she was assigned to Crime Prevention around 2012, she liked to work out in the HPD gym one hour before the end of her shift. She stated that Thompson also started working out at that time. She said that she then changed to working out in the mornings, and then Thompson also started working out at the same time. She said, "*I started getting pissy with him. I used to play music, I used to be obnoxious in there, I don't know if anybody heard it, but I used to play the music really loud.*" At some point in time she started working out in the middle of the day with Captain Anzengruber to avoid Thompson.

She then described a day that she was working and was standing in the kitchen area in the Chief's Suite. Thompson was standing in the kitchen with her telling her about a book he was writing or reading. According to SPO Randles, he said, '*You know how two people keep a secret? If one of them is dead.*' SPO Randles stated that she shoved the comment aside at the time, but it always bothered her. She said that she never told anyone about that comment before now. She now believes now that this statement was a threat.

SPO Randles then started talking about the present issues with Captain Thompson. She advised me that all her recent issues with the BWC system is because she feels that Thompson is reviewing her videos to watch her. She said "*What I'm doing now is I'm keeping that camera on, because I don't, I don't like Steve, he's watching me without being close to me. That's how I'm taking it. I know it sounds crazy…*" She stated that she is leaving the camera on, but she covers it with her clipboard on traffic stops so Thompson can't watch her.

SPO Randles talked about why she came forward with this complaint now. Part of her reply was "*since we had that type of relationship, why are you involving yourself, that is not ethical. Why are you involving yourself in something that deals with me? If I'm fucking up, okay. Have somebody else do these fucking I.A.s.*" She went on to say, "*but it's coming to the point where I'm just like, it's like obsessive. And someone, another officer said that to me. It's like he's obsessed.*"

SPO Randles maintains that she never told anyone about the relationship she had with Captain Thompson, or any of the incidents she described in her statement, other than a marriage counselor. She said that there were always people asking her about a rumored relationship with Thompson, but she never admitted it to anyone.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

TOWN3895

**Interview Captain Stephen J. Thompson:**

I had the opportunity to interview Captain Stephen J. Thompson on July 15th, 2020 at 0900 hours. The interview was conducted at 713 Station Street, the old Town Hall building. This location was chosen for confidentiality concerns in mind, due to Captain Thompsons position within the police department. Lieutenant Justin Dyer was also present for the interview.  The interview was recorded in its entirety, and a copy is in the file. A copy of the transcript is also located in the file.

Captain Thompson signed the Order of Confidentiality as well as a Notice of Investigation (HP 807) form.  Copies of each document was provided to Captain Thompson and the original copies are in the file.

For historical reference I asked Thompson to provide his past assignments, dates of promotions, and shifts that he was assigned to. He stated that he was promoted to Captain in August of 2019. His prior assignment was a Lieutenant in the Criminal Investigations Section, and before that Emergency Management.  He stated that he was promoted to Lieutenant around 2014.  He said that prior to that, he was a Sergeant assigned to the Criminal Investigations Section and believes he was promoted to Sergeant in 2003.

I asked Thompson if he knew what the nature of the complaint might be.  He responded *"Uh, I don't really know any that, what the allegations are. So… if you could tell me, it would be appreciated."* I advised him that SPO Randles made an allegation of a prior sexual relationship with him. I then asked Thompson to describe, in detail, his relationship with SPO Randles.

He stated that they began this relationship back when he was working with the day-labor site in Herndon. He said that they got started by hanging out and became friendly. He went on to say, *"I just want to preface this too here, you know, this is over a decade ago…so I'm going to try to re- to tell you the things I can in the best in detail… I'm not trying to hold any back, I'm not going to lie… Obviously if I lie, I'm fired. I know that. Um, so, so I'm going to tell you the best I can in my recollection."*

Thompson stated the following before continuing,  *"and let me just preface the time period we're getting ready to get into here, a little, with a little bit more, so, this is a time period where, I was going through a period of depression, alcoholism I would say. I mean, I think I drank a, I drank a lot. Uh, I was having problems with my wife. I know that I've come through a period at some point in there I was actually separated from my wife, living out of the house. That's right, I had a lot of stress, between work and school, I was going to school full time at some point during the, during this time period. Um, so it was a very bad time for me. So, and I'm not saying that as an excuse or, or whatever, but I'm just telling you that's a time period I've actually spent time trying not to remember. Okay?"*

He stated that they became friendly at one point and started meeting up after work.  He said that Randles suggested that they meet after one of his classes.  (Thompson was attending a cohort program at George Mason University at that time).  He says that they met up in a parking lot across the street from the school and she performed oral sex on him.  He didn't know the exact time frame but said that it may have been winter because there was snow on the ground.

He described another occasion where he met Randles at her parents' home in Herndon.  He said that she was at work one night for something to do with Crime Prevention.  He said that she invited him to come over to her parent's house afterward.  He remembers that it may have been vacant at the time,

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

**TOWN3896**

because her parents weren't there.  He stated that he and Randles had sexual intercourse that night at her parent's house.

I asked Thompson what his rank was at the time he began this relationship with Randles.  He stated that he was a Sergeant.  He said that he believes Randles was assigned to Crime Prevention at that time.  I asked him if she was a supervisor at the time?  He responded, "*No. In fact, at the time, she was not, um, she was not under my supervision.*"  I asked him if he trained Randles to be a Corporal, and was the relationship going on during the time that he trained her? He stated, "*Uh, I don't know. I can't recall that... Details of that, I don't know. I'd have to, I don't know, I- I- I'm sure, I do recall that I signed, uh, I'm pretty sure I signed off on her being a corporal.*"  I asked if they were assigned to the same shift? He said that they were assigned to the same squad and she was his Corporal.  I asked Thompson if he ever completed annual or interim employee evaluations for Randles during the time he was having a sexual relationship with her.  He replied, "*I would imagine I probably did. I don't know.*"

I asked him if Randles ever threatened that she would make a formal complaint about their past relationship, either past or present? He replied "*no.*" I asked Thompson to think back to the 2006 timeframe to see if he remembered meeting up with Randles when she worked at the Neighborhood Resource Center.  He said that he did meet with her there, and he thinks that he was assigned to work on the day-labor issues at that time.  He said, "*and a lot of my work kept me in that area.*" He stated that he would meet with Randles daily at that location.  I asked Thompson if he remembers having a conversation with Randles about a dream that he had about her? He replied, "*A dream, um, I don't know, I- I- I can't specifically recall that.*" So, to refresh his memory I read him from Randles statement which said, '*I had a dream about you last night. I don't know if I should tell you about it.*' He replied, "*I am not, I'm not saying it- it didn't happen. I- I- I don't recall that.*"

I asked Thompson if he recalls having inappropriate conversations, sexual in nature, with Randles? He stated that they did have conversations that were sexual in nature.  I asked if he specifically remembers leaning in close to Randles and whispering sexual conversations in her ear? He said, "*Uh, I- I don't recall exactly, but...*"  I asked if he recalled pressing up against her while she was seated at her desk, in a sexual manner? He stated, "*Um, that- that may have occurred, yes.*"  I asked him if he purchased, or did he ask Randles to purchase a track phone, or burner phone, and if so, what was the purpose?  He replied, "*a burner phone? No...did I ask her to?*"  He then said that he didn't ask her to purchase a phone.  I asked if he had a separate phone from Radio Shack that would be used specifically between, he and Randles?  He replied, "*I mean I don't remember what phones I had at the time, you know.*"  Lieutenant Dyer told Thompson that Randle's allegation was that he said that she should buy a phone so that you guys could talk.  He replied, "*Well, I'm sure, I mean, we- we were certainly being secretive about our relationship... So, that's entirely possible we'd do that.*"

I then told Thompson that we would fast forward in time to the period where they worked together on the dayshift and Randles was assigned to be his Corporal.  He replied, "*Yes. Well, so, my, yeah, so I was on, I went on day work, and, you know, any corporal, any sign off on a corporal would have been also approved by a lieutenant.*" I asked him if he and Randles developed code words on the CAD system, and if so, what was the purpose?  He said, "*Uh, yeah, we had places we would meet.*"

I asked if that's what the code words would mean. He said "*Um, it was, yeah, that's what I remember.*"

I advised Thompson that Randles advised us that these code words were used to signal to each other if Internal Affairs ever questioned their relationship.  He replied, "*Um, so, I- I- I again, I don't recall what the code words would have been... but I know we discussed that, you know, at the time, we said we should not tell anybody what we're doing.*"

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

TOWN3897

I asked Thompson if there were other places that he and Randles would meet besides the parking lot at George Mason University. He stated that there was a time that they went to the zoo.  He said that they went with his kids and her kids and maybe her nanny.  He remembered going to the zoo and then coming back and having dinner at his house.  I advised Thompson that he previously told us that the first sexual encounter he had with Randles was in the parking lot at George Mason University.  I then asked him if he could recall the second sexual encounter that they had. He said that the second encounter occurred at Randles parents' house.

I told him that Randles told us that one of the sexual encounters was in his van at the Fair Oaks Mall, in Fairfax.  He replied, "*Okay. Yeah. I do remember a time in the van, yeah… Uh, I, I mean I think we met somewhere in a parking lot, uh, instead of parking garage and, um, I don't remember what, I mean I don't remember exactly what we did in the car but it was of sexual nature.*"

I asked him if he could confirm that another encounter happened at the Target parking lot, just outside of Herndon. He replied, "*I mean, I don't recall that specific instance… I don't know. I mean, I'm not, again, I'm not saying these incidents didn't happen.*"  I asked him how long their relationship of a sexual nature lasted.  He said that they both came to an agreement to stop the relationship. He said that they remained friends after that for a while.  He said that they had a friendly relationship until he was assigned to IA (Internal Affairs). He said that the sexual affair lasted only a few months.

I asked Thompson if there was ever a time when he had sexual contact with Randles while they were on duty and in uniform?  "*Um, yeah, you know, we would, like you said, we would bump up against each other in the NRC.*"  He then stated, "*Um, I don't… do you have a ... Anything specific? Again ...*"

I asked if was there was an occasion that they were working on the same squad, where he was the Sergeant and she was a Corporal, during working hours and you went to her house on Madison Street? He replied "*Yeah, she did. She gave me oral sex in uh, yeah, now that you mention that. She was giving oral sex in her parents' house.*" Thompson did affirm that they were both on duty at that time.

I then asked if there was another occasion where he met Randles at the HMC (Herndon Municipal Center) in uniform and on duty and had a sexual encounter.  He replied "*I don't recall that. I don't know.*" I said it was a room at the HMC, she said you needed a key to get in. It was not where the courtrooms are but on the other side through those glass doors.  Again, Thompson replied, "*I don't know.*" I said she performed oral sex on you that day. He replied, "*I haven't recalled that specific event… And I, I mean, like I said, I- I'm trying to remember these things the best I can.*"  He stated that he would think about it and call me or let me know if he can remember.

I again brought up another encounter they had at Randles parents' house on Madison Street.  I asked him if he was on duty and in uniform at the time of that encounter.  He replied "*no.*"  I asked him if this time coincided with the time period that he was a Sergeant. He replied, "*Yeah. Yeah. Probably. Yeah. I would think so.*"

I then asked Thompson if there were any other occasions that he had sexual contact with Randles while they were on duty or on official town business. He replied, "*I don't think so, no.*" He continued by saying, "*I'm going to say, I mean, I met, we were, I mean, we made a point in general not to do that, not to have these encounters on duty.*" I asked him, "But as you recall, there might have been one or two then? He replied, "*Sure.*"

**CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER**

**TOWN3898**

I asked him about the time that he told us that they all went to the zoo together. I asked him if there was any type of sexual contact that day. He stated, "Um, *I think she did, yeah, she gave me oral sex on that day.*" I told him that Randles stated that they had intercourse in your house. He replied, "*It was oral sex…not intercourse.*"

We then spoke about the night that he attended a Motley Crue concert with Randles. I asked him if the sexual relationship had ended by this time period. He stated that he believed that it had ended and thought that it might have been around 2009. He said that he may have been a Sergeant at the time assigned to the midnight shift. He told me earlier in the interview that he might have been living outside of his home at that time. He said that he moved to an apartment. I asked him where he stayed after the concert. He said he stayed at Michelle Walsh's apartment, and slept on the couch. I asked if he remembered walking into Randles room that night, several times, to speak with her? He replied, "*I don't recall that… I know we'd been drinking at that concert, so …*"

I then asked him if he ever had any pictures of Randles and himself on his desktop computer. He said "*I'm just trying to think, yeah. Uh, I mean I have some pictures of her. And in fact, I think there's one on my computer right now, um, that we, that, uh, you know, gosh, back when she did crime prevention.*" I asked if he ever had a whole folder or a collage of pictures of Randles. He said, "*I don't, I don't recall that. I don't know.*"

I asked him about the times that they would talk on the phones. He said that they probably talked on the phone daily. I told him that Randles told us in her statement that you would call after leaving work and have conversations often with graphic sexual content. He confirmed that they did have those conversations.

I asked him if there was an occasion that he contacted Randles sister by telephone to find out information about Randles. He replied, "*I don't recall that. I don't know why I wouldn't just ask Denise.*" I advised Thompson that in Randles statement she said that you called her sister to find out what alcohol she likes. He replied, "*I can tell you like, um, that there did come a point where, like I said before, we decided to, that we should stop.*" I asked if that was a mutual decision. He replied, "*yeah, I think so.*" I asked him again if he recalled contacting her sister. He replied, "*Uh, I don't know. I talked to her sister a couple times; I mean like… in person, and, uh, on the phone. I don't… I don't recall.*"

I advised Thompson that I wanted to discuss more recent events. Specifically, the later years when Randles was assigned back to crime prevention and her office was in the Chief's Suite. I asked Thompson if he visited Randles in her office. He said that he did stop by regularly. He said that they were friendly and would talk. He said at that time he was the Sergeant overseeing CIS (Criminal Investigations) and Randles was no longer a Corporal.

I asked Thompson if he ever engaged in any inappropriate sexual behaviors or actions while visiting Randles in her office. He replied, "*Uh, No... No, I mean, um, well... no… Because we... you know, we... I mean, we would have conversations... not...we may discuss... we may discuss... had conversations of a sexual nature about our own lives.*" He said that Randles would talk about her sexual relations with her boyfriend with him. I asked Thompson if she initiated these conversations, or did he ask directly. He replied, "*I don't recall.*"

**CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER**

TOWN3899

I asked Thompson if there was ever an occasion where he sat in Randles office and directed her attention to your groin area and point the fact that you had an erection?  He replied, "*I don't recall that.*"

I asked him if he was directed at some point in time by a supervisor not to spend time in Randles office? He stated that Lieutenant Moore suggested that he stop spending so much time in her office.  I asked him if Moore explained why.  He replied, "*he said because the Chief said.*"

I then asked about a comment that he made to Randles one day in the Chief's Suite kitchen area. I asked him if he stated the following to Randles, '*You know how two people keep a secret," and then ended with, "... if one of them is dead.*' He stated that he didn't remember that. After a few moments he stated "*All right, so I have... I... okay. I wanna... all right, I've said this to several people, like, when they talk about secrets, you know, that there's a book... there's a book I read, uh, years and years ago about the Hell's Angels... it was called 'Two Can See, Three Keep a Secret, Two Are Dead.' And- and I- I've mentioned that to people before.*" He continued to say, "*I mean, I would not tell her that, you know... I mean, implying that there's, like, some threat or something, no.*"  Thompson emphatically denied that this was any type of threat toward Randles.

I asked Thompson if he ever coincided his gym workout times with Randles purposely, or did he ever view her BWC or in-car-camera footage when it wasn't in his official capacity to do so? He stated no, to both questions.

I asked Thompson if as you were being promoted from sergeant through the ranks of captain, was there ever a time where he felt like this relationship could affect his ability to lead and supervise the employees?  He replied, "*Um, that's a good question. I would say, in my mind, no. in my mind, uh... look, in my mind, I know what I did do is wrong and it was stupid, and I'm embarrassed by my... very, very embarrassed by this... but I feel like I was able to lead and that did not influence me.*"   He went on to discuss two specific examples times where he had to deal with Randles as a supervisor. He discussed an occasion where he questioned her time sheets and conducted an investigation to see if she was at work when she said she was.  He also stated that he confronted her about how she spent her time during the day while assigned to Crime Prevention.  He said, "*so I did my job as a supervisor, and called her on it, and... which, you know, that fixed the problem. But now apparently it looks like I'm... you know, had some sort of ulterior motive.*"

I asked Thompson if he ever thought he should have disclosed his past relationship with Randles to his supervisors, as he came up through the ranks? He replied, "*I understand your question. Um, you know, uh, I don't know that it did, but like any human being, I think fear probably prevented me from doing it.*"  I asked him if he was fearful that Randles would disclose the relationship to someone while he was dealing with her performance and internal affairs issues? He stated that he started to get a bad feeling. He went on to say, "*maybe she might, I guess, to sort of mitigate her own circumstances, you know, for lack of a better term, just drag me down with her.*"

I asked Thompson if he was aware of the Town of Herndon's sexual harassment policy, AR-19. He stated, "Yes, I am." I asked if he wanted to see a copy of the policy and he advised me that he brought a copy with him, despite not being asked to do so by me at any time.  I asked him if he believed the behavior that Randles described in her statement constituted a hostile work environment, in part due to his supervisor subordinate relationship with her, according to the general orders or AR-19?  He replied, "*Well, here's what I feel. I feel like we had a... I mean, I... yes, it is wrong that I had a relationship with her as a supervisor.*"  He added, "*But as far as I recall, and as far as I'm... in my*

**CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER**

**TOWN3900**

*mind, it was, um... you know, nobody was in... forced into anything, you know, there was... it was all, um, consensual, you know..."*

I asked Thompson if he was aware of the General Responsibilities section of the General Orders, specifically A5 Standards of Conduct. He stated, "*Yes.*" I asked him if he believes that as a supervisor, having sexual relations on-duty with a subordinate violated the department's standards of conduct, specifically relating to conduct unbecoming. He replied, "Well, *I would say yes.*"

That was the conclusion of my questions for Thompson. He asked if he could read some prepared statements that he wanted to share. I have included portions of his direct quotes below. The full statements can be reviewed in the transcript.

*"First off, uh, as we've mentioned here during this interview, time frame between whenever this re when this relationship occurred and now with this complaint, um, I guess my question would be why is this complaint being made now... as opposed to a decade ago?"*

*"Um, this was with just one person. Um, and I think you'll find that of the females that I have supervised since then, that there have been no complaints, and they would say that we had a- a favorable, you know, supervisor relationship... supervisor and subordinate relationship."*

*"Um, as I've mentioned before, I think the timing of her complaint is clearly retaliatory. And as I have said, yes, I had an inappropriate relationship with her, but the fact that she's complaining now about it and bringing it forward... bringing it to light now, I feel, is completely retaliatory. Um, some others may disagree, but, uh, that's my thought on that. Um, I don't have any pattern on my behalf of any retaliation or targeting behavior. In fact, the last evaluation I gave her when I was in crime... when I supervised crime prevention, was, uh, I believe, a fairly, um, uh, satisfactory review. It was probably the last one she's ever gotten."*

*"Uh, and then her... obviously, her performance and, uh, production significantly dropped off when she left crime prevention and went to patrol. Um, there was never a time where her being, uh... her... or- or her submission to my... to our relationship, uh, was a con- condition of her employment. It didn't affect any of her employment decision, uh, as far as where or what track she was on, as far as I'm aware of."*

*"Um, uh, I mean, Randles has made comments of a sexual nature in the past with- with other employees, um, and I- I'm not... this isn't a... this isn't a time where I'm trying to throw people under the bus. I'm just saying, she... I have heard her make comments before at other employees, okay? And so obviously not to the extent that we've had, but..."*

*"Um, Randles... we, uh, in the past, uh, she's... we have... we- we can document that she hasn't been entirely truthful in the past. And I... for example, like, Lieutenant Ahmad's case, she, um, you know, like, I- I believe she told him that she had, you know, done something in reports, but then she'd done something different. Uh, I mean, even just in these video violations where she's telling people that there's no points on their license, and, uh, we don't give warnings, and those are just very recent examples. So, uh, she has a poor work performance history, you know, prior to... prior to me dealing with her. Um, as far as... as far as me, uh, my work performance is... has been above par, I feel like, uh, I've had to work through many issues for the department, and including, you know, numerous projects, disciplinary actions against employees, and in difficult situations, I've to help work through."*

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

TOWN3901

*"Um, uh, what else here? Uh, okay. Sexual harassment forms, we... there was a point we went over those annually-... and there was a form you signed. Have you gone back and looked and see if she signed those forms? Okay. So, she did sign those forms then? So, it wasn't a problem then, is what I'm saying, I guess. And she didn't wanna- wanna-... report it."*

Thompson came prepared with the above statements written in his notepad.  The full statements on transcript are available in the file.  I asked Thompson for a copy of the prepared statements, but he declined.

### Follow Up Interview with SPO Randles

I conducted a follow up interview with SPO Randles on July 22, 2020. The interview was recorded, and a copy of the interview and transcript is in the file. Lieutenant Dyer was also present.  The purpose of the follow up interview was to clarify a few points and ask a few additional questions.

I began with some questions targeted at the timeframe that she was working in Crime Prevention in the NRC.  She stated that the relationship with Thompson started out friendly. She said that he would stop by and make small talk during his shift as a Patrol Sergeant.  She again told me about the statement that Thompson made to her about the dream he had about her. She stated, *"It was odd. I was like, "Oh, what?" But again, I just remember that's when it started. So, I can't tell you exactly word for word, but I remember those certain things, but yes, that's when it started. And that's when he started coming into my office."*

She stated that he would visit often, sometimes two or three times per day and would stay at least 20 minutes per visit.  I asked her how long it took before the nature of the relationship changed, when the conversation became more sexual.  She replied, *"Not very long. It was pretty quick."*

I asked Randles if she could identify who initiated the relationship, or who the aggressor was in the relationship. She replied, *"Oh, Thompson was. Yeah."* I asked SPO Randles several questions about the phone she purchased at Radio Shack, because this was one of the topics that Thompson did not recall in the first interview.
 I asked SPO Randles who's idea it was to buy the "throw away, or burner phone." She stated, *"It was Thompson's idea. He already had a phone."* She said, *"Actually I didn't really know about those phones. I didn't know they were called throwaway phones or burner phones or whatever. But he showed me that they had them at Radio Shack at the corner down the street."* She said that Thompson walked with her to the Radio Shack where she purchased a phone and minutes.  I asked who would call her on that phone?  She said only Thompson called her on that phone, because she had another phone for all other calls.

I asked her how frequently Thompson would call her on that phone?  She said it was almost every day.  She said that there was sometimes just small talk, but it inevitably would turn to sexual talk.  She guessed that ninety percent of their calls turned to sexually graphic related conversations.

I asked SPO Randles specifically about the on-duty sexual encounter that occurred at the Herndon Municipal Center. This was one of the topics that Thompson did not recall in his first interview.  She again affirmed that there were only two on-duty sexual encounters.  She stated that the encounter at

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

TOWN3902

the HMC was the last time she had a sexual encounter with Thompson on-duty because "*it just didn't feel right. It just felt, it was expected and just felt like planned.*" I asked her if these encounters were pre-planned. She said that they were not planned. She described the on-duty encounter at her parent's old house. She said, "*Yeah. So, I'm walking through, just looking through the house because they moved everything out. And then he asked to see where my bedroom was. I was like, "Oh, it's up here." I was like, "Oh, take a look up there," whatever. And then that's how that began.*"

I asked her if the encounter at the HMC was pre-planned. She stated that it was not planned, they parked at the HMC while on duty to walk around and do foot patrol. SPO Randles described in detail, the room Thompson unlocked with a key. Her description of the room and the encounter was full of detail. SPO Randles described her feelings at the time of the encounters. She said, "*Yeah. I felt a little weird. Well, for one, I know it was wrong, especially on duty, but I didn't plan that. I didn't go there for that. So, I did feel weird when that happened at my house. And then, yeah. And so that second time, that's when I was... Like I said, it felt like it was expected. It's hard to explain what I... It just felt odd.*"

I asked SPO Randles to again describe the pictures she saw on Thompsons computer. In her initial statement Randles said that he had multiple pictures of her on his computer. Thompson admitted to having one single picture of her on his computer and doesn't recall having multiple images. She said that they were on his desktop computer which was in the CIS offices. Thompson was the CIS Sergeant at that time. She said that they were looking for pictures of another employee and he clicked on a folder and there were multiple pictures of her.

I then asked SPO Randles about the incidents that occurred while she was assigned to Crime Prevention around 2012. In his first statement Thompson stated that he had no recollection of this event occurring. I had SPO Randles clarify again, what happened that day. She stated, "*Yeah, it happened a few times. Not a lot, but it happened a few times. He would come in because he's really good about just coming in and making like small talk. I'm like, "Okay whatever." But on these occasions, I'm going to say, at least I know of two occasions. But I remember the first one, he came in there and he was talking and then he had his hands up like this. I wasn't really paying that much attention to him. I was typing on my computer, this and that. He was trying to get my attention. He cleared his throat and I was like, "What?" He motioned his eyes down... Well, he was sitting there with his knees spread apart, legs open. Obviously, when he cleared his throat, I looked at him like, "What?" You look down and obviously, I mean, it was very clear that he had an erection.*" I asked if she could have mistaken this gesture for something else. She emphatically stated, "*No.*"

I asked if anything like this happened again. She said, "*Yeah, I know it happened twice. But that first one, that's exactly what he did. I want to say the other time he was standing up, because my desk was an L-shape. I want to say one occasion, he was standing up, when we would bring in papers and it'd be right there.*" I asked if he brought attention to it (his erection). She replied, "*of course.*" She said on each occasion that this occurred, she did tell him to stop, or knock it off.

I asked SPO Randles if she ever considered coming forward with this information in the past as Thompson was promoted through the ranks especially knowing that you work for a female Chief? She replied "*And like I said, when I told you I was thinking about leaving, yeah, I was going to ... because I just didn't want to deal with all this stress I'm dealing with now and stuff. I was going to lay it all out to her when I ... my exit interview.*" I asked her if she believed that the Chief would appropriately deal with a situation like this, especially after seeing that Thompson has not been allowed in the building pending the outcome of the investigation. She replied, "*I don't know.*"

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

TOWN3903

I asked SPO Randles if she ever told anyone about her relationship with Thompson, or the issues she told us about after the relationship ended.  She stated, "*No, I didn't tell anybody*."  I told her that I knew she was close friends with co-worker Michelle Walsh and asked if she ever confided in her.  She stated that she did not.

**Follow up Interview with Captain Thompson:**

I set up a follow up interview with Captain Thompson on July 23, 2020.  The interview was conducted at 713 Station Street, the old Town Hall building. This location was chosen for confidentiality concerns in mind, due to Captain Thompsons position within the police department. Lieutenant Justin Dyer was also present for the interview.  The interview was recorded in its entirety, and a copy is in the file. A copy of the transcript is also located in the file.

I advised Thompson that I had a few follow up questions for the investigation.  SPO Randles was very detailed about the phone that she purchased at Thompsons recommendation. The purpose of the phone was to enable them to speak without fear of being discovered by their spouses.  In the first interview, Thompson stated that he did not recall asking SPO Randles to purchase a phone.  I asked him if he had time to think about that and have any recollection of that occurring.  He replied, "*I still don't remember that… I mean, if she's got proof or details, then I guess she does. But I mean, I can't recall that.*"

I again asked Thompson to tell me how many on duty sexual encounters occurred.  He replied, "*As far as I can remember, there's just that one in her parent's house.*" I advised him that SPO Randles provided a very detailed description of a sexual encounter that occurred at the HMC in a basement computer room.  He said, "*I don't remember any incident in the computer room, no.*" I told him that it may not have been a specific computer room, but did he remember any encounter at the HMC. *He said, "Steve, I don't remember."*

I told Thompson that SPO Randles described that she ended the relationship, but in his previous interview he stated that they mutually decided to end the sexual relationship. I asked him if the way she characterized the end of the relationship was a fair statement? He replied, "*All right. You asked me specifically to recall it. I don't know. I know we had a discussion about focusing on our issues at home. And then at some point, I'm sure we talked about that and what that actual structure, that conversation was, I couldn't tell you. But I know at some point we were like, "Yeah, we need to stop doing this. We need to focus more on what we got going in our own lives." We shared a lot of details of our lives. And I think that's part of the whole basis of this relationship was that we were both going through difficult times at home in our marriages, and bad things were going on in our lives. But ultimately, I ended up making a decision to stay with my wife and go home and she made a decision to do something else, but, yeah.*"

I then advised Thompson that SPO Randles described that she felt that he was obsessed with her. I again asked if that was a fair statement.  He replied, "*I mean, I don't think so. No.*"

We then spoke about the pictures of SPO Randles on his computer.  At the first interview Thompson stated that he had one picture of SPO Randles on his work computer.  He denied having a folder or a bunch of pictures of SPO Randles.  He stated, "*I don't remember a specific folder. Like I said, I believe I said in our last interview I did keep folders or collections of pictures of people in my computer. Sometimes we use these pictures at retirements and sometimes we use them in other things. So, I may have had some pictures of her. Yeah, I had pictures of other people on my computer as well.*"

**CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER**

I asked if he had a specific folder with just pictures of her. He stated, "*I don't recall a specific folder.*" I asked him if he removed or trashed any files that contained pictures of SPO Randles. He said, "*I would regularly clean my computer. I mean, it's possible. Yeah.*"

I then advised Thompson that I wanted to again discuss the timeframe when SPO Randles was assigned to Crime Prevention when her office was in the Chief's Suite. I read SPO Randles account of the incidents to Thompson that occurred in her office directly from her transcript. These incidents involved Thompson drawing her attention to his erection while in her office. After reading the transcript he replied, "*I did not. And I mean, she said I was standing outside of the office?*" I said no you were sitting in a chair located next to her desk. He replied, "*There was a chair right inside the office I believe. Yeah, I don't recall that specific incident.*" I asked him if he feels that SPO Randles was lying about these incidents? He responded, "*I'm not going to sit here and accuse her of lying, okay? But I mean, like I said, I had a previous interview. I'm trying my best to recall these things that happened over a decade ago in a time in my life, that really don't want to recall.*" I asked him if there was any other plausible explanation for what she witnessed. He replied, "*I'm not sure why I would have an erection at work. I don't know.*"

I told him that SPO Randles also told us about a separate incident where he brought some papers into her office and directed her attention to his erection. He replied "*Steve I don't recall that. No.*"

I told Thompson that he said in the last interview, that he questioned why she would make a complaint now. I asked Thompson to clarify how the timing of her complaint was relevant, and if he thinks he should have disclosed his relationship to the Chief or Command Staff as he rose through the ranks? He replied, "*Well, all right. So, two things here. First off, should I disclose this? Yes. I should have disclosed it. An inappropriate relationship with a subordinate and yes, I should have disclosed that. I mean, the timing, that was one of the ... I mean, the timing of it is the timing of it, right? It doesn't mean it didn't happen and it doesn't mean it's not a serious matter, but she reported this to the Chief on the same day that her and Brian and I had just had a meeting about her issues with some violations of video policy. And at the end of the meeting, I informed her that there's going to be another IA and Lieutenant Dyer, you can confirm that you did go in afterwards and advise her that she did have another IA on her that day and that's the same day that she went to the Chief.*"

At this point I had no further questions for Thompson, however he had some prepared statements in his notepad, as he did during the first interview. Thompson talked about SPO Randles performance issues and stated that "*I would say overall, our relationship did not impact her career.*" He went on to say "*I was looking at our administrative regulations on sexual harassment here. I understand what you said. Okay. But on page two here, it says sexual harassment is constituted by when, and these are on page three, talks about the criteria and submission to such conduct is made either explicitly or implicitly, a term of condition of an individual's employment. That was never the case. Her employment was never the case of our relationship. Submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual. Okay. That was never a decision for employment decisions.*"

I asked Thompson to look at this from her perspective. All these performance issues and internal affairs cases are coming down on her, and she has been suspended and possibly facing future suspensions, she believes that her career is now on the line because of this undisclosed relationship, and you were her supervisor. He replied, "*I understand that. I understand that.*"

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

He concluded by stating, "*I guess my bottom line here is I understand what you're saying. I know what I did was wrong. I should've reported it a long time ago. Not just now, but I should have reported a long time ago, I get that. But the investigations that she's under, the IAs are investigations that I mean would have happened whether I investigated them or not. And I know for a fact that some members of staff have referred to her as a liability and that's based on their own decisions as well. Their own observations. So, in the end, what I was doing was, the investigations are what was good for the agency and the department. There was no intent to harm the department. There's no intent to target Denise and quite frankly, none of this would have even come about if she wasn't being investigated. I don't think so.*"

The interview ended at 0924 hours.

## Computer and Network Forensic Investigation:

SPO Randles reported that she saw multiple pictures of herself on Captain Thompson work computer. I met with Detective Choi and gave him an Order of Confidentiality Form. The signed order is in the file. I turned over Captain Thompson's tablet computer and asked Detective Choi to perform a search for any images or files related to SPO Randles. I also asked him to search for any deleted pictures or files related to SPO Randles. Detective Choi performed a forensic examination of the computer and did not find any files or pictures of SPO Randles.

I met with Police Network Engineer Luis Pavese on July 14, 2020. I gave him an Order of Confidentiality which he signed. The order is in the file. I asked Pavese to check the network drives to see if Captain Thompson had recently deleted, manipulated or moved any folders or files recently. Pavese was able to look back to approximately July 7, 2020. He compared Captain Thompsons files on the Town of Herndon's H: drive from July 14, 2020 to how they appeared back to July 7, 2020. Pavese found that there was no data deleted between those dates. He stated that the file structures appear to be the same between those dates.

## CONCLUSION:

There is no dispute that an inappropriate sexual relationship occurred between Captain Stephen J. Thompson, and SPO Denise Randles. SPO Randles provided detailed accounts of two on duty sexual encounters between herself and Thompson. These events began approximately fourteen years ago. The exact dates cannot be verified, but SPO Randles provided great details and historical references which are confirmed by personnel records and other documentation in the file. These on duty sexual encounters occurred during a timeframe when Captain Thompson was a Sergeant. It occurred at a time where he was the direct supervisor of SPO Randles, who was appointed as his Corporal. Captain Thompson confirmed these allegations and does not dispute the on duty sexual encounters. Throughout the interviews Captain Thompson stated that he does not recall specific events, but he does not deny that they occurred. He conveniently does not recall the specific sexual encounters and inappropriate sexual behaviors that occurred inside Town of Herndon government buildings.

SPO Randles provided statements that she and Captain Thompson had multiple **off** duty sexual encounters. She described several encounters that occurred in parking lots, her parents' home in Herndon, and Captain Thompsons home in Fairfax County. Captain Thompson confirmed in his statements that these off duty sexual encounters did occur.

SPO Randles provided a statement that she and Captain Thompson had two **on** duty sexual encounters. One of these encounters occurred at her parent's residence on Madison Street in Herndon.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

She provided a detailed account describing that they were both on duty at the time and dressed in their Herndon Police uniforms.    SPO Randles provided a statement that she performed oral sex on Thompson at that time.  Captain Thompson affirms that this event did occur.

SPO Randles described a second **on duty** sexual encounter she had with Captain Thompson at the Herndon Municipal Center, 777 Lynn Street.  SPO Randles stated that she and Captain Thompson went to the Herndon Municipal Center and parked in the underground garage area.  They were both on duty and dressed in their Herndon Police uniforms at this time.  SPO Randles stated that she performed oral sex on Thompson.  Captain Thompson was asked about this encounter during his interview.  His statement is that he does not recall this event happening.

SPO Randles accounts of these two on duty sexual encounters are detailed and credible. I do believe that Captain Thompson's lack of ability to recall the on-duty encounter at the Herndon Municipal Center is not plausible given the facts and circumstances, especially since he was able to recall all other sexual encounters.  Both employees in this case violated the Standards of Conduct of the Herndon Police Departments General Orders, section A-5, specifically as it pertains to Conduct Unbecoming.  Although they have both admitted to violations of this general order, Captain Thompson's position of authority as SPO Randles direct supervisor and superior, creates a condition of greater culpability on his part.

SPO Randles in her statements provides detailed and credible information about a pattern of harassing behaviors exhibited by Captain Thompson. According to SPO Randles, Thompson engaged in both verbal and physical conduct of a sexual nature while she was working at the Neighborhood Resource Center. She described occasions where Thompson would press his body up against hers while she was seated at her desk.  She also recalled inappropriate sexual comments, like when he asked her what color underwear she was wearing. SPO Randles also described constant phone calls she had with Thompson where he would inevitably turn the topic of the conversations to sex or "dirty talk," as referenced in SPO Randles statement.

Some of these inappropriate actions occurred during a period when Thompson was a Sergeant assigned to the Criminal Investigations Section, and SPO Randles was assigned to the Crime Prevention Office located in the Chief's Suite.  SPO Randles reported that on one occasion Thompson sat in the chair located in her office.  Using hand gestures, Thompson drew her attention to his groin area.  SPO Randles reported that Thompson clearly had an erection and was showing it to her.  She also described a second occasion where he entered her office and handed her some papers.  He again drew her attention to his groin area where she described that he had an erection.  SPO Randles stated that she did not invite these interactions and adamantly told him to "Knock it off."

SPO Randles discussed several behaviors exhibited by Thompson during this period.  She described odd statements that he made to her in the Chief's kitchen. She described how he seemed to modify his workout schedule to coincide with her schedule, and she said that he would often walk through the Chief's Suite singing two songs that they enjoyed together when they were having an affair. She interpreted his behavior as being obsessive.

In statements given by Captain Thompson, he simply denied, or didn't recall if these events occurred. SPO Randles statements have remained consistent that she was admittedly a willing participant in the sexual relationship with Thompson dating back to 2005.  However, she says that she was not a willing participant on the occasions where Thompson came to her office and directed her attention to his erection.  In both statements, Captain Thompson denies that these events occurred.  SPO Randles provided detailed descriptions of these inappropriate actions and backed them up with historical references that can be verified. After being assigned to CIS, Thompson did hang out in SPO Randles office so much that Chief DeBoard noticed and had the Captain order him to stop.  The Chief was obviously unaware at the time that these harassing behaviors were occurring. I do find that SPO

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

TOWN3907

Randles accounts of these behaviors to be credible and I do not find it plausible that Captain Thompson could not recall if they occurred.

I do find that Captain Thompsons behaviors described in this investigation clearly violate the Town of Herndon's Administrative Regulation 1-19, specifically section C.  The regulation states in part that, *'Sexual harassment is a form of employee misconduct which undermines the integrity of the employee relationship. Unwelcome sexual advances, requests for sexual favors, and other verbal, non-verbal or physical conduct of a sexual nature constitute sexual harassment when: (3) such conduct has the purpose or effect of unreasonably interfering with an individuals work performance or creating an intimidating, hostile or offensive working environment.'*

During the course of this investigation I found Captain Thompson's lack of candor and failed ability to recall certain events unsettling.  I found that he was not forthcoming about many of the events detailed by SPO Randles.  Thompson would provide information about an event, but only if I asked him directly.  For example, during our first interview I asked him if he knew the nature of the complaint against him.  He replied, (*"I don't really know any that, what the allegations are. So... if you could tell me, it would be appreciated."* After I told him that SPO Randles made a complaint against him in reference to their past sexual relationship, he then provided more details.  He initially told me that he did not know what the nature of the complaint was, yet at the end of the interview he read from several pages of notes that he prepared, describing his relationship with Randles, and her past issues with the Herndon Police Department. He also brought copies of the Sexual Harassment Administrative Regulations with him. If he was truly unaware of SPO Randles allegations prior to this interview, there would be no plausible explanation for him to bring a copy of the sexual harassment policy with him.  Instead of being forthcoming about his own inappropriate actions outlined in this report, he came to the interview prepared with pages of notes discrediting SPO Randles.

I find that Thompson violated General Responsibilities, specifically, truthfulness. The General Orders read as follows: 'A-1 *Truthfulness: Personnel shall be truthful and forthright when questioned by competent authority, conveying full details of actual events. Personnel shall not practice deceptive conduct to include lying, making material omissions, or engaging in other unacceptable and deliberate acts of dishonesty. Personnel shall be trustworthy and act with integrity in the exercise of authority and discretionary power.'*

I find that it is implausible for Thompson not to be able to recall these significant events without being prompted by interviewers. It is highly convenient that he could not recall any sexual encounters or inappropriate sexual behaviors that occurred in the town government buildings, but had no problems recalling any of the sexual encounters that occurred off duty. It would be more likely that he would remember the on-duty sexual encounters. Thompson willingly made material omission's during this interview. The examples I provided above are clear examples that Thompson did lie by omission during an internal affairs investigation.  There are a multitude of examples in this investigation where Thompson denies an allegation, or states that he does not recall the events, for which I could not sustain a truthfulness violation.  The examples above demonstrate that his failure to recall certain events is not reasonable, and there is clear evidence that he did violate the truthfulness order.

Captain Thompson held a prominent position of authority within the police department, with the ability to influence decision making at the highest levels.  Captain Thompson engaged in a sexual relationship with SPO Randles while he was her direct supervisor.  Although both parties were willing participants in this relationship, this is a clear violation of the supervisor/subordinate relationship.  Captain Thompson had an absolute obligation to

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

TOWN3908

disclose the details of this past relationship with SPO Randles to the Chief of Police prior to being further promoted.

Captain Thompson was ordered to report to the Fairfax County Police Department to take a polygraph exam on July 30, 2020.  The request came from concerns that Captain Thompson was being less than forthcoming during his recorded interviews.  On July 28, 2020 Captain Thompson submitted his resignation to Chief DeBoard by email.  A copy of the letter of resignation is in the file.


**FINDINGS:**

SPO Denise Randles: **General Orders A-5, Standards of Conduct**, specifically as it pertains to **Unbecoming Conduct.**  SPO Randles self-reported that she had engaged in sexual acts while on duty. Unbecoming conduct is any behavior which brings the Department into disrepute; or any behavior which reflects discredit upon an employee as a member of the Department; or any behavior which impairs the operation or efficiency of the Department. **SUSTAINED**.

Captain Stephen J. Thompson: **General Orders A-5, Standards of Conduct**, specifically as it pertains to **Unbecoming Conduct.**  Captain Thompson admitted that he had engaged in sexual acts while on duty. The regulation clearly states that unbecoming conduct is any behavior which brings the Department into disrepute; or any behavior which reflects discredit upon an employee as a member of the Department; or any behavior which impairs the operation or efficiency of the Department. **SUSTAINED.**

Captain Stephen J. Thompson: **Administrative Regulation 1-19**, specifically **Sexual Harassment**. Captain Thompson engaged in a pattern of inappropriate workplace behaviors of a sexual nature. These comments and gestures were directed to and occurred in the presence of SPO Randles.  The regulation states in part that, *'Sexual harassment is a form of employee misconduct which undermines the integrity of the employee relationship. Unwelcome sexual advances, requests for sexual favors, and other verbal, non-verbal or physical conduct of a sexual nature constitute sexual harassment when: (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.'* **SUSTAINED.**

Captain Stephen J. Thompson: **General Order, A-1 Truthfulness** under General Responsibilities. Captain Thompson made several material omissions during this investigation. Captain Thompson does not ever deny SPO Randles claims, he conveniently used "I don't recall" throughout the interview when asked about specific events, especially when related to events that occurred in the town government buildings. SPO Randles statements were found to be detailed and credible, and I find that it is not plausible that Captain Thompson would have forgotten these events. The order states in part, *'Personnel shall not practice deceptive conduct to include lying, making material omissions, or engaging in other unacceptable and deliberate acts of dishonesty.'* **SUSTAINED.**

**CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

TOWN3909