```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                  ALEXANDRIA DIVISION

 3   DENISE RANDLES,              )   Case 1:23-cv-142
                                  )
 4              Plaintiff,        )
                                  )
 5        v.                      )   Alexandria, Virginia
                                  )   October 4, 2023
 6   THE TOWN OF HERNDON,         )   10:01 a.m.
                                  )
 7              Defendant.        )
     _____)   Pages 1 - 78
 8

 9                 TRANSCRIPT OF MOTIONS

10        BEFORE THE HONORABLE ANTHONY J. TRENGA

11          UNITED STATES DISTRICT COURT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25     COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

2

```
1   APPEARANCES:

2   FOR THE PLAINTIFF:

3         MARY ANN KELLY, ESQUIRE
          LAW OFFICES OF MARY ANN KELLY
4         3977 Chain Bridge Road, Suite 301
          Fairfax, Virginia  22030
5         (703) 865-5032

6         CARLA D. BROWN, ESQUIRE
          CHARLSON, BREDEHOFT, COHEN, BROWN & NADELHAFT, PC
7         11260 Roger Bacon Drive, Suite 201
          Reston, Virginia  20190
8         (703) 318-6800

9   FOR THE DEFENDANTS:

10        HEATHER K. BARDOT, ESQUIRE
          MCGAVIN, BOYCE, BARDOT, THORSEN & KATZ, PC
11        9990 Fairfax Boulevard, Suite 400
          Fairfax, Virginia  22030
12        (703) 385-1000

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                   P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Civil Action 23-142,

3   *Randles v. The Town of Herndon*.

4              Would counsel please note your appearances

5   for the record.

6              MS. KELLY:  Good morning, Your Honor.  Mary

7   Ann Kelly appearing on behalf of the plaintiff, Denise

8   Randles.  And with me is Carla Brown, also representing

9   Ms. Randles.

10             THE COURT:  All right.  Welcome.

11             MS. BARDOT:  Good morning, Your Honor.

12  Heather Bardot on behalf of the defendant, The Town of

13  Herndon.

14             THE COURT:  All right.  We're here on a

15  number of motions *in limine*.  What I'd like to do is

16  first take up the defendant's motion *in limine* with

17  respect to the internal reports and also, coupled with

18  that, plaintiff's motion *in limine* to exclude evidence

19  inconsistent with what's in those reports.  All right.

20             MS. BARDOT:  Yes, Your Honor.  I think we've

21  briefed this pretty thoroughly.

22             THE COURT:  Yes.

23             MS. BARDOT:  My position is -- and I think

24  the case law supports it -- that certainly facts from

25  the internal reports are admissible.  But to the extent

1   that there's credibility determinations or conclusions

2   which aren't, you know, factual in nature, those would

3   not be admissible.  I'd be happy to work with counsel

4   to try to do a redacted document that actually just has

5   the facts.

6          THE COURT:  Well, it seems to me the reports

7   fall squarely into at east 801(d)(2)(D) as statements

8   relating to a matter within the scope of the speaker's

9   employment.  These people were specifically tasked with

10  doing this investigation, and this certainly relates to

11  that investigation; doesn't it?  Doesn't this come down

12  to whether portions of it should be excluded under 403?

13         MS. BARDOT:  Well, I mean, there's that as

14  well.  But I mean, my reading of the case law is either

15  it's within the scope of what you can speak to in the

16  course of your employment, it still doesn't allow for

17  credibility determinations and for opinions or

18  conclusions.  It's still factual in nature.  You know,

19  if the Court disagrees with me outside of the case law

20  that I think supports that proposition --

21         THE COURT:  Well, I've looked at the case

22  law.  I think the exception is pretty broad.  If it

23  relates to a matter within the scope of their

24  employment or concerns a matter to which they were

25  tasked, the exclusion is pretty broad.  Again, it gets

1  down to 403 concerns.

2           MS. BARDOT:  You'll note my exception to your

3  ruling as far as that.

4           THE COURT:  All right.

5           MS. BARDOT:  I do think there are the 403

6  concerns, and I've noted those as well.  I mean,

7  certainly to the extent we're talking about an internal

8  policy versus Title 7, supervisor means different

9  things under both.

10          THE COURT:  Right.

11          MS. BARDOT:  You know, what could be

12  interpreted by their conclusion -- which is not a legal

13  conclusion on a Title 7 basis -- would be very

14  prejudicial, and it -- you know, when they're finding

15  that there's harassment, you know, they don't go into

16  whether it's pervasive.  They don't go through the

17  elements that Title 7 requires because they're lay

18  people and they're making conclusions based on their

19  internal policy.

20          I mean, the fact of the matter is because

21  Steve Thompson was a superior officer at the time he

22  had sexual relations with Denise Randles back in the

23  2006-2008 time frame was enough for the chief to find

24  there was harassment in any event.  So it just doesn't

25  meet the elements under Title 7.

1           And so for that reason, I would submit that
2  those conclusions, especially based on credibility and
3  so forth, should be excluded.
4           THE COURT:  Well, I agree the 803 exceptions
5  are narrower and more demanding.
6           MS. BARDOT:  Yes, sir.
7           THE COURT:  Let me hear from the plaintiff on
8  this.
9           In the briefing you've highlighted portions
10 of the reports.  Are those the portions that you want
11 in?
12          MS. BROWN:  Well, I think it's going to be
13 broader than that quite frankly.  We highlighted those
14 in response to the motion for summary judgment as
15 you -- because the defendant submitted their brief for
16 summary judgment, we submitted ours.  There's a little
17 bit more in the reports, including factually, that may
18 come in through the different witnesses.
19          I have so say, Your Honor, I'm not shocked
20 that you're taking up these two motions together.  I
21 thought your ruling last Wednesday was very clear,
22 frankly, that you weren't persuaded that these issues
23 were going to be foreclosed prior to trial and we'd
24 probably be heard by the jury in some respect.
25          We noted in our brief *Slaby*, which is Your

1  Honor's own opinion, which I think clearly says if it's

2  within the scope of their employment as to the reports,

3  that there would be pieces of it that are admissible.

4           We noted some other case law in there.

5  Frankly, yes, we think it's admissible, again, but -- I

6  would just say, we filed our motion *in limine* prior to

7  the summary judgment motion, in part, because we didn't

8  know how summary judgment would go.

9           THE COURT:  Right.

10          MS. BROWN:  Having heard it, frankly, again,

11  I'm not surprised that you're taking these both up

12  together having, in my view, already ruled on those and

13  issued an order on those.  But it should be the same as

14  to the arguments that they are making here.  The Court

15  should hear how the facts come in and how the evidence

16  comes in on these issues.

17          THE COURT:  What I'd like to do is for you to

18  provide in advance of trial and to counsel those

19  portions of the reports that you want admitted so the

20  Court can make any 403 judgments.

21          MS. BROWN:  We will do that, Your Honor.

22          THE COURT:  All right.

23          MS. BROWN:  Okay.  Thank you.

24          I don't know.  Is there anything else I can

25  answer for you on those motions?

1          THE COURT:  No.  I think the briefing was
2  pretty fulsome.
3          All right.  Let's take up the experts.  All
4  right.  The motion to exclude the economics expert, why
5  don't we start with that one.
6          MS. KELLY:  Okay.  I'm sure that Your Honor
7  has gone through the briefing, which is pretty
8  extensive.
9          THE COURT:  Yes.
10          MS. KELLY:  As a summary, I could just go
11  through the requirements of Rule 702 and how
12  Mr. Staller doesn't meet three out of four of them.
13          THE COURT:  All right.
14          MS. KELLY:  The first is that he appears to
15  be qualified by his education, but he fails on the
16  next.  He does not rely upon sufficient facts or data.
17  He relied upon data published in a news release
18  reflecting a Department of Labor survey that had
19  nothing to do with Ms. Randles.
20          It was a worker displacement theory.  The
21  definition of displaced worker is narrow and does not
22  include the circumstances of Ms. Randles' -- and I'll
23  quote, Displaced workers are defined as persons 20
24  years and over who self-reported that they lost or left
25  their jobs because their plant or company closed or

1  moved, there was insufficient work for them to do, or

2  their position or shift was abolished, end quote.

3       It also covered the time period of COVID.

4  And the introduction and the comments throughout that

5  news release make it pretty clear that they were trying

6  to look at that time period and how these workers were

7  affected by the COVID shutdowns and the very different

8  economy that exists going forward from November 1,

9  2021, when Ms. Randles left.

10       So the time period has nothing to do with it.

11  Just literally, by definition, the circumstances in

12  that study with respect to how COVID impacted the

13  economy are very different and irrelevant to an economy

14  going forward.

15       THE COURT:  Right.

16       MS. KELLY:  The third factor under 702, his

17  testimony is just not the product of reliable

18  principles and methods.

19       THE COURT:  All right.

20       MS. KELLY:  As I set forth in our motion, he

21  cites a theory of economics and then the data.  But

22  neither one of those is -- a theory is not a reliable

23  method to calculate what he was asked to do here, what

24  the value of damages would be for Ms. Randles, and he

25  used hypothetical facts.  He used speculation, and he

1  simply didn't do what an economic expert in his

2  position should have done.

3      I'll just go through briefly.  I mean, there

4  is just literally no data for him to use for

5  Ms. Randles.

6      THE COURT:  All right.  I understand.

7      MS. KELLY:  Scenario 1 -- I mean, I've given

8  the Court good case law about how you cannot just

9  speculate -- you can't -- hypothetical facts.  I mean,

10  it's just untethered to what's going on here.

11      In Scenario 1, he doesn't even follow his own

12  logic.  He says zero damages when indisputably the

13  record is that Ms. Randles accepted a job about a month

14  after she left.  So, clearly, she mitigated her

15  damages, and under no concept in any respect would she

16  have zero damages.

17      With respect to Scenarios 2 and 3, we're back

18  to Staller's inexplicable reliance on the human capital

19  model, and I've addressed that in my brief.  The one

20  case that the defendant cites doesn't help at all.  It

21  just refers to this theory in economics that just helps

22  inform other steps.  It has nothing -- it's no kind of

23  method.  It's nothing that anybody can rely upon to

24  come up with something in this case.

25      And Staller says literally, "Based on this

1  data," meaning the irrelevant survey and only that and

2  his reference to the human capital model, "for our

3  second and third scenarios of loss, we assume," full of

4  assumptions that are unsupported, "that Ms. Randles

5  mitigation salary subsequent to the separation will

6  achieve earnings parity with her expected earning with

7  Herndon by November 1, 2026."

8          I mean, there's just no support for that at

9  all.  The only thing he cites is the displaced workers,

10  again, that just weren't reflective of Ms. Randles'

11  circumstances by definition, her job, how she lost it,

12  what kind of job, or the time period at issue.  It's

13  just too great a gap -- even if the data were relevant,

14  which it isn't -- between whatever he cited and what he

15  comes up with as a conclusion.

16          And I would cite Your Honor's case in *Slaby*

17  for this as well, the *Lee* case that Judge Payne issued,

18  and the *Yang* case.  All of those reflect similar

19  circumstances to what Mr. Staller is trying to do here.

20  He just comes up with something, based on national

21  statistics, that are not tethered to the facts of the

22  case and do not reflect the circumstances of

23  Ms. Randles.

24          THE COURT:  All right.

25          MS. KELLY:  If I could answer any questions

1  the Court has --

2           THE COURT:  No.  That's fine.

3           MS. KELLY:  I think it's pretty clear in the

4  brief, and we do ask that all of his testimony, the

5  report in its entirety be excluded.

6           THE COURT:  All right.

7           MS. KELLY:  He used the same defective

8  methodology throughout.

9           THE COURT:  All right.  Ms. Bardot.

10          MS. BARDOT:  Your Honor, briefly, I've

11  addressed this in our brief that I filed.  The

12  allegation or argument that there's no coherent

13  rationale for a zero damages value and no factual

14  basis, as Mr. Staller states in Scenario 1, is just not

15  true.

16          I mean, plaintiff has some facts that they

17  intend to rely upon, and there are facts within the

18  record clearly that support his opinions.  There is a

19  report from April 26, 2021, where the plaintiff

20  indicates that she's seeking to leave police work.  And

21  then there is a report from October 21, 2021, where she

22  indicates she's already obtained another job, and it's

23  not police work.

24          So this suggestion that she, you know, fully

25  mitigated and so forth is very much in dispute.  Our

1    position is -- and the record supports it -- that she

2    never looked for police work.  She never looked for

3    work as a certified law enforcement officer.  She never

4    looked for work which would have allowed her to

5    continue with her VRS benefits and suffer no loss.  And

6    Dr. Borzilleri, the plaintiff's own expert, agrees that

7    if those were the facts, there would be zero loss.

8            So to suggest to the Court that there's no

9    facts to support that conclusion is just not true.

10           With regard to Scenarios 2 and 3, I hear what

11   Ms. Kelly is saying, and what she's saying is basically

12   this Department of Labor census bureau data that

13   Mr. Staller relies upon, in her opinion, is not

14   reliable.

15           But Mr. Staller has indicated in his report

16   that there's no perfect fit for this case -- and when

17   there's not a perfect fit, what economist in his field

18   do is try to find the best fit -- and that it is his

19   opinion -- and he will testify to this at court and lay

20   the foundation for it -- that this is an appropriate

21   dataset relied upon by experts in his field in a

22   scenario like this where there's no perfect fit.

23           So I would submit to the Court that what this

24   attack goes to really is whether or not, you know --

25   it's not a methodology.  It's like we don't believe

1  what you used is the best fit, and that's subject to

2  cross-examination, not exclusion.

3          So that would be our position on that.

4          I would also note that the motion does not

5  address the rebuttal opinions that Mr. Staller gives

6  where he talks about the reason that Dr. Borzilleri's

7  numbers are not correct.  So, for instance, where he

8  suggests that -- not suggest.  It's his opinion that

9  Dr. Borzilleri uses too high of a figure in an increase

10 in salary, that he misreads the data that is available

11 and says that her income would increase by something

12 like 7 to 9 percent per year when on average it never

13 increased more than 1.98 percent.  That inflates the

14 numbers quite a bit.

15         He also provides some other rebuttal

16 testimony that has not been challenged in the motion.

17         THE COURT:  All right.  The Court is not

18 going to make a final determination on this until I

19 hear some evidence, including what evidence is actually

20 presented and admitted with respect to mitigation and

21 what the legal requirements for mitigation are in this

22 case.

23         I will just give you my initial impressions.

24 I do have some problems with Mr. Staller's opinion.

25 The first opinion just strikes me as not an expert

1    opinion at all.  It simply says that if the plaintiff,

2    in order to mitigate damages, was required to get a job

3    as a police officer, then there's no damages.  I'm not

4    sure that's an expert opinion.

5             With respect to his second and third

6    opinions, what jumps out at me is that there's no

7    direct connection to her current position.  There's no

8    analysis of wage growth with respect to that specific

9    position or that type of position, no history of

10   earnings within that job, and so on.

11            So I think plaintiff's objection has some

12   substantial weight with respect to whether these

13   national statistics as such can really be the basis for

14   any kind of a specific opinion about when she in her

15   existing job is going to get up to where she was when

16   she left the police force.

17            Again, I want to hear Dr. Borzilleri's

18   testimony.  I want to hear some of the evidence.  We're

19   not going to get to Mr. Staller until the defendant's

20   case in any event.  So those are my preliminary

21   thoughts on it.

22            Let's hear about Dr. Fiester.

23            MS. BARDOT:  Fiester, yes, Your Honor.

24   Again, I've briefed this as thoroughly as I can, and I

25   know the Court has taken a look at that.  Our position,

16

1   number one -- which I don't think it's been addressed

2   at all, frankly, in the response -- is that the

3   plaintiff did not comply with --

4           THE COURT:  I understand.  Was there any real

5   prejudice to you?

6           MS. BARDOT:  I mean, the prejudice is, you

7   know, once I have the case list and can look into her

8   other testimony -- and I've cited a case in particular

9   where she's given completely contradictory testimony.

10          THE COURT:  Right.

11          MS. BARDOT:  I wasn't in a position to ask

12  her about these things during her deposition.  I don't

13  really want to wing it when she's on the stand and

14  figure out what her explanation is going to be.  It is

15  prejudicial to my client.  I'll look like a fool in

16  front of the jury trying to figure out, you know, why

17  the contradiction.  She may have an explanation that I

18  don't want to ask her about if it's valid, but I don't

19  know.

20          THE COURT:  Other than that one case, is

21  there anything else you found that you would have

22  followed up with?

23          MS. BARDOT:  There's not.  I haven't done

24  extensive research into those other cases, in part,

25  because we've had some other things going on.  I just

1   put that by way of example.

2             THE COURT:  All right.

3             MS. BARDOT:  And it is the plaintiff's

4   burden, not my burden, to show lack of prejudice.  I

5   mean, it's their burden.  They just haven't even tried

6   to address that.

7             Then, as I indicated as well, Dr. Fiester's

8   testimony is based entirely on, "I sat down with Denise

9   Randles.  I interviewed her.  I took out my book, and I

10  said, 'Have you had one or more of these symptoms, you

11  know, for six weeks for the last, you know, 30 days or

12  whatever.'"

13            "Yes, check, check, check, check.

14            And she's relied on nothing else.  She hasn't

15  even looked at the testimony in this case, which

16  clearly indicates a different explanation for any

17  mental health issues she was having.

18            So, for instance, there's testimony from Jim

19  Moore, who will be a witness for the plaintiff, that

20  what happened with regard to her mental health happened

21  because she had a change in her position -- which had

22  nothing to do with Steve Thompson -- that when she went

23  back to the street, she was depressed.  She had

24  declined.  She went from jovial to sad.  She didn't

25  want to do her job.

1           It seems to me where you've got a forensic
2   expert who has never treated her, not talked to a
3   single doctor, not reviewed any medical records, not
4   even all the records that are available in this case,
5   and simply is going to get up here and put a stamp of
6   approval on what the plaintiff told her, that it's not
7   a reasonable or reliable methodology.  It's not a
8   differential diagnosis at all.
9           So I won't belabor the point because I think
10  I've briefed it fully.  I'd be happy to answer any
11  questions if you have any.
12          THE COURT:  All right.  Thank you.
13          MS. BROWN:  Your Honor, we've also briefed
14  it, so I'll try to be brief.
15          THE COURT:  All right.
16          MS. BROWN:  All of the criticisms that they
17  have of Dr. Fiester's report are issues that they would
18  address on cross-examination.  It's no surprise that
19  their expert is opining the exact opposite of what
20  Dr. Fiester is opining.  That's how experts work.
21          THE COURT:  Is there a defense expert that's
22  going to testify?
23          MS. BROWN:  Absolutely, Dr. Anand, who is
24  going to say the exact opposite of what Dr. Fiester
25  says.

1          MS. BARDOT:  Dr. Anand is not going to

2   testify.

3          MS. BROWN:  Well, they've designated him as

4   an expert.

5          THE COURT:  All right.

6          MS. BROWN:  As to the case list, Your Honor,

7   we did provide that.

8          THE COURT:  At the deposition?

9          MS. BROWN:  That's true, Your Honor.

10         As the defendants indicated in their opening

11  brief, that they didn't have the case list at the time

12  of her deposition, we included the pages that show,

13  frankly, that they did.

14         I would just note it was a short deposition.

15  We would've stayed.  It's three months since we took

16  the deposition.  We didn't hear at the time of the

17  deposition that that was objectionable.  We haven't

18  heard in the three months intervening after the

19  deposition that that was objectionable.  They never

20  asked to reopen the deposition to the extent that they

21  thought there was something in appropriate there.

22         And we just don't see any harm -- although,

23  Your Honor, we recognize that it was provided at the

24  start of the deposition.  You know, I'm reminded that I

25  was once here in front of Judge Cacheris, and he said,

1    "It's your deposition.  If you wanted to do something

2    else in the deposition, then you control the timing of

3    it."

4            I'm not excusing it.  I'm just merely saying

5    they had it.  They asked her specifically about it.

6    They asked her questions about it.  They ended the

7    deposition early.  In the intervening time, we've heard

8    nothing about it.  We heard nothing about the objection

9    at the time of the deposition.

10           We don't -- there's no harm as a result of

11   that.  They can cross-examine Dr. Fiester on whatever

12   it is they feel they need to examine her on.

13           THE COURT:  Well, what would you intend to

14   ask her about?  What would be the scope of her

15   testimony?

16           My concern is that if she testifies, she's

17   not going to be a summary witness in terms of all the

18   complaints that Ms. Randles has.  It seems to me that

19   to the extent her opinions are admissible, it's going

20   to simply be her diagnoses that she's identified, the

21   three or four that she's identified without getting

22   into all of the statements that Ms. Randles has given

23   her that would support those.

24           MS. BROWN:  She's going to testify on the

25   prognosis and on the diagnosis.  And as a psychiatric

1  expert, she is entitled to opine whether the response

2  is proportional to the underlying conduct.  Obviously,

3  if it is out of whack, she would be able to issue that

4  opinion.  But she's not going to issue any opinions

5  beyond that.

6          She's a psychiatric expert.  The defendants

7  noted that she had a conversation and she went through

8  a checklist.  It's a psychiatric checklist.  That's how

9  diagnoses are determined.  So she did exactly what

10 she's supposed to do, as a psychiatric expert, with

11 regard to Denise Randles.

12         I would just note she also reviewed the

13 records of Milloy and May, who were the psychiatric

14 practice that saw Ms. Randles during the time that she

15 was going through this retaliation at the workplace.

16         We've cited *Smith v. Ray*, which is Judge

17 Miller's case where he looked at the same question.  In

18 *Smith*, they tried to strike the forensic expert saying

19 that his opinions were just based on what was told to

20 him.  But the court there also noted that he was

21 relying on a psychiatric evaluation, which is what

22 psychologist do and what Dr. Fiester has done.

23         The medical records that are underlying -- in

24 the intervening time since her deposition, there's

25 another -- there's additional psychiatric records that

1   she could -- that would support this situation.

2          But with respect to what Dr. Fiester did, she

3   did exactly what psychiatrists are supposed to do.

4   She's not rendering any other opinions.

5          We concluded from her deposition testimony

6   that she's not doing that.  She even says, "I don't

7   know whether other documents might say something

8   different."  All she's doing is determining is she a

9   credible informant and then performing psychiatric

10  testing rendering a diagnosis and rendering a

11  prognosis.  That's all she's done in this case.  That's

12  all she intends to do in this case.

13         THE COURT:  So you're not going to try to use

14  her to repeat all the information that Ms. Randles gave

15  her?

16         MS. BROWN:  No.  Ms. Randles will be here,

17  and she will testify herself.  And the town's witnesses

18  will testify themselves on what happened during that

19  time.  She's really just going to opine on the

20  psychiatric pieces that result and help the jury

21  understand that Denise Randles' medical -- the

22  resulting medical symptoms -- the resulting medical, I

23  guess, problems as to Denise Randles, the prognosis

24  that results, and the diagnosis.  That's what forensic

25  psychologists do.

1            I'm sorry I'm tongue-tied this morning, Your

2   Honor.

3            But, you know, defendants mention that she

4   had never seen Ms. Randles before.  Of course not.

5   That's what forensic people do.  They look -- they act

6   retroactive.  But she does have the testimony and

7   records that she can look to that corroborate the

8   diagnosis and prognosis that she came to.

9            So for that reason --

10            THE COURT:  Well, I guess what I'm asking is

11   would you attempt to have her opine on whether she was

12   subjected to a severe and pervasive hostile work

13   environment?

14            MS. BROWN:  No.  That's up to the jury.

15            THE COURT:  Right.

16            MS. BROWN:  That's the jury's determination

17   to decide, and she says that in her testimony that we

18   included in the brief.  That's up to the jury at the

19   end of the day.  So she's not opining on those anyway.

20   She didn't in her report either.  So...

21            THE COURT:  All right.  Ms. Bardot.

22            MS. BARDOT:  Your Honor, a couple of things I

23   heard that I want to touch on that Ms. Brown said.

24            First of all, to the extent she's just said

25   that there are additional psychiatric records since

1   Dr. Fiester's deposition that she may rely upon, she

2   may not.  I don't even have those.

3          THE COURT:  Right.

4          MS. BARDOT:  They haven't been produced in

5   discovery.  She hasn't relied upon them for her report.

6   So I hope we're not going down that path when we get to

7   trial.

8          Ms. Brown also said that she's going to

9   testify, Dr. Fiester, that the plaintiff is a credible

10  informant.  That's exactly one of the things I've

11  suggested -- not suggested but argued to the Court,

12  based on case law, she cannot do.  That's the jury's

13  job, not Dr. Fiester's job.  I would ask that she not

14  be permitted to come in and testify that the plaintiff

15  is a credible informant.

16         To the extent that Ms. Brown says that she's

17  not going to offer opinions that Randles was subjected

18  to a hostile work environment based on her sex and

19  sexual harassment and so forth and it's not in her

20  report, it is in her report.  She told me she was going

21  to testify to that.  I would submit that it sounds like

22  plaintiff's counsel is not going to take her down that

23  path.  But even if she intended to, the Court should

24  not allow her to go down that path because it's clearly

25  not admissible.

1           The problem I have -- and I've already said
2    with her, you know, talking about the diagnoses is
3    where the only thing she's relying upon is the
4    plaintiff and she hasn't looked at other evidence which
5    would inform her, by her own admission, that possibly
6    she might reach a different conclusion.  How is that a
7    differential diagnosis?  It's simply not.
8           THE COURT:  Well, I want to finish reading
9    her deposition, but I think she got into that.  She
10   said that her methodology was a standard medically
11   accepted way to diagnosis people.
12          MS. BARDOT:  Right.  And then I asked her.
13   All right.  You know, basically to do a differential
14   diagnosis, you need to take into account other
15   information that is available?
16          THE COURT:  And she said sometimes you do,
17   sometimes you don't.
18          MS. BARDOT:  Well, in any event, I think she
19   testified that if the evidence showed that her change
20   was the result of something other than this alleged
21   sexual harassment and she was aware of that, that it
22   might change her opinions.  And the fact that that
23   evidence is available and she hasn't even looked at it,
24   I would submit, makes it not a proper differential
25   diagnosis.

1          I mean, I could have sat down with the

2    plaintiff and said, "I'm going to just check these

3    boxes.  Let me ask you this question:  Did you have one

4    or more of these symptoms for three months?"

5              Check, check, check, check.

6              I'll leave it to the Court's discretion.  You

7    know my position on that.

8              THE COURT:  If she were to testify that the

9    methodology she used was a reliable, medically accepted

10   method for evaluating someone such as Ms. Randles'

11   medical condition, then you can cross-examine her about

12   the fact that she didn't do a differential diagnosis,

13   that she said in another case that it was essential.

14             MS. BARDOT:  I hear what you're saying.  I've

15   stated my position.  I think when you say, "I've gone

16   through a reliable methodology and the methodology is

17   one which necessarily requires you to do a differential

18   diagnosis and you acknowledge that you haven't looked

19   at evidence that would lead you to a differential

20   diagnosis" -- you just haven't even looked at it, but

21   you can say the buzz words, "I've gone through a

22   reliable methodology," but where the facts suggest you

23   haven't, I don't think that works.

24             THE COURT:  All right.

25             MS. BARDOT:  I've also asked the Court to

1    exclude her from talking about prognosis, future

2    conditions, which Ms. Brown also touched on.  As I

3    indicated, when she testified, she said, you know, that

4    she had seen her five months ago, that she didn't take

5    the time during the interview to determine what

6    symptoms she continued to have or continued to

7    subscribe to -- which obviously is necessary to make a

8    prognosis -- and that it would be fairly hard to tell

9    when her mental health conditions would go into

10   remission.

11           And so I would submit where you don't have

12   any of the facts to talk about the prognosis, it's not

13   appropriate.  So that was the other basis upon which I

14   filed the motion.

15           THE COURT:  All right.  Ms. Brown, anything

16   further on this?  Do you intend to ask her about

17   Ms. Randles' credibility?

18           MS. BROWN:  Wait.  No, not her credibility

19   with respect to the Pihonak reports.  What she says is

20   she has to assess whether the information that she's

21   getting for this checklist, for the psychiatric

22   analysis, seems like it's reliable information.

23   There's two different issues.  She's not going to opine

24   that Ms. Randles is a truthful person.  She's never

25   going to do that.  That's not what she's doing.

1          THE COURT:  What about the prognosis issue?

2          MS. BROWN:  She can opine just like -- she

3    can opine that she doesn't know.  That's the truth.

4    She doesn't know when her symptoms would go into

5    remission.  That's all she can say.  It's truthful

6    testimony, and that's what a psychiatrist is there to

7    evaluate.  Based on the symptoms and --

8          THE COURT:  Well, I thought she was going to

9    testify that her conditions were permanent.

10          MS. BROWN:  She will testify that she doesn't

11    know when they will go into remission and that she

12    anticipates that they would be lingering.  I mean,

13    she's going to give a prognosis, yes, but that's within

14    her diagnosis to do.  They can cross-examine her on

15    that.  Their expert will say she has no psychiatric

16    damages if they call him, which I guess they said

17    they're not going to.  But it's within her diagnosis to

18    do that based on her psychiatric evaluation.  That's

19    what psychiatrist do.

20          I mean, I don't want to underplay the

21    profession.  They talk to people, and they make

22    psychiatric evaluations --

23          THE COURT:  Right.

24          MS. BROWN:  -- based on the conversations

25    they're having, which is exactly what Dr. Fiester did

1  in this situation, Your Honor.

2          And so for that reason, I can't see excluding

3  her opinions, and I think it's clear what she's going

4  to testify to and what she's not going to testify to.

5          THE COURT:  All right.  Go ahead.  I'll give

6  you the last word.

7          MS. BARDOT:  I would just say saying, "I

8  don't know when something is going to change," when she

9  doesn't even know what her condition is presently

10  because she said clearly during her deposition, "I

11  didn't ask her those questions when I interviewed

12  her" -- and I've cited that in our brief.

13          To put her on the stand to say, "Well, she

14  may have some lingering symptoms.  I don't know because

15  I didn't ask her, and I don't know when they'll end,"

16  just throws out there all this speculation about what's

17  maybe going on with her diagnosis continue.  And it's

18  not an opinion.  It's a lack of an opinion, frankly.

19  And so I would ask that to the extent she's able to

20  testify, that she not be able to do that.

21          THE COURT:  All right.  Thank you.

22          I want to review her deposition again, and

23  I'll make a definitive ruling before the trial.

24          But it seems to me that on the one hand, that

25  her testimony would be fairly confined to opinions

1 that, based on the information she obtained from

2 Ms. Randles, that she diagnosed her as suffering from

3 X, Y, around Z and leave to it cross-examination as far

4 as what may or may not be supportive of that.

5          I don't think she's going to be able to

6 testify either as to what I mentioned before, that she

7 was subjected to a severe and pervasive hostile work

8 environment, or opine about her credibility.

9          Again, I want to read the deposition, and

10 I'll give you a more fulsome decision before we start.

11          MS. BARDOT:  Will you also render an opinion

12 with regard to the future --

13          THE COURT:  On the prognosis, yes.

14          MS. BARDOT:  Yes, sir.  Thank you.

15          THE COURT:  All right.  Let's take up yours,

16 Ms. Bardot, on -- it references to Mr. Carr and a

17 series of other issues.

18          MS. BARDOT:  The whole shebang.

19          THE COURT:  Hold on.  Let me find it.

20          Here we go.  All right.

21          MS. BARDOT:  Your Honor, I told you I would

22 bring Mr. Carr's IA file with me today.  I came home

23 last night without it.  I had my secretary courier it

24 to my house this morning.  My husband has been so kind

25 as to clear the garage out so I can park in the garage.

1  And instead of going out the front door where they left

2  it and I would've seen it and picked it up, I went out

3  the garage door.  And so it's sitting at my front door.

4  I have it on my email.  I could go to my car and email

5  it to you if you have any interest in reviewing it at

6  this point.

7         THE COURT:  All right.  Let me go back to the

8  last motion.  I don't think I said this, but I'm not

9  inclined to exclude Dr. Fiester based on the late

10 providing of the cases.

11        MS. BARDOT:  Thank you.

12        THE COURT:  All right.

13        MS. BARDOT:  You'll note my exception.

14        So, anyhow, just because you mentioned

15 Mr. Carr first, I wanted to mention that to you.

16        Our motion is on a number of issues.  The

17 first part of it has to do with Sheridan Stapleton, who

18 has much to say, much of which is based on hearsay or

19 information that I will submit to the Court is

20 irrelevant.

21        The first portion of what I'll call the

22 Stapleton motion has to do with this testimony that she

23 is purportedly going to give with regard to what

24 Michelle Walsh and Denise Randles may have told her

25 about some behavior by Steve Thompson at some somewhat

1  unknown time about being off duty at a concert with

2  them and another officer.  And he was drinking, and

3  they were drinking.  And he slapped her and -- not

4  Ms. Stapleton, but slapped Ms. Randles and Ms. Walsh on

5  the bottom, which such was never told to anybody at the

6  town or at the police department.

7          And I would submit that it is hearsay and it

8  is being offered for the truth of the matter.  The

9  plaintiff tries to get around that by saying that it

10 would be admissible under Federal Rule of Civil

11 Procedure 801(d)(1)(B)(1).

12         And as I indicated, it would not because the

13 statement that's, you know, at issue is whether or not

14 she was told that Denise Randles was spanked on the

15 bottom by Mr. Thompson.  And it would be admissible if

16 we were challenging that statement, but we've never

17 challenged that statement.  The town didn't even know

18 anything about it until Ms. Stapleton testified.  So I

19 would submit it doesn't fall under that exception.

20         And I would submit also that it would be

21 inadmissible under Rule 403 because, as I've cited in

22 our brief, the town is not responsible for what

23 consenting adults do on their off-duty time at a

24 concert that they don't even know about.

25         And the prejudice of allowing that to come in

1  through this hearsay statement -- and I'm not talking

2  about whether Ms. Randles can talk about that.  That's

3  another issue that we may have to address at a later

4  point in time.  But for this purpose, having

5  Ms. Stapleton testify about something she was told

6  that's not even sexual harassment under the case law,

7  where it's off duty, I think under 403 should be

8  excluded through her.

9         They then say it's admissible under Federal

10  Rule 803(3) to show the then existing emotional or

11  mental condition of the declarant.  But that's not why

12  it's being offered.  It's not being offered to show how

13  Ms. Randles felt at the time, and it's never been

14  suggested that it's being offered for that purpose.

15         Again, even if it were, to the extent this

16  happens, you know, off duty where she voluntarily took

17  herself to a concert is not supportive of a sexual

18  harassment, hostile work environment claim.

19         Then the plaintiff says it's admissible to

20  demonstrate the effect the report had on Ms. Stapleton,

21  which is completely irrelevant in this case.  This is

22  not about Ms. Stapleton's state of mind.  There's

23  nothing about her state of mind that has any bearing on

24  this case.

25         And so for all of those reasons, the

1   Stapleton concert hearsay testimony, we submit, should

2   be excluded.

3           I don't know if you wish to do these one by

4   one or --

5           THE COURT:  No.  Let's go through all of

6   them.

7           MS. BARDOT:  Okay.  Then with regard to this

8   alleged harassment of Ms. Stapleton that she says

9   occurred in October of 2017, when she says that she was

10  at a meeting with Brad Anzengruber and Steve Thompson

11  to talk about her abuse of leave and that Steve

12  Thompson was asking her, you know, why she was sick and

13  he looked over the table and looked her up and down and

14  said, "You don't look sick to me."And then she just

15  goes from there, Ms. Stapleton, and says, "I tried to

16  report this to the chief, and here are my emails to

17  Brad Anzengruber," which, of course, say nothing about

18  this alleged incident.  And it just goes on and on from

19  there.

20          And then she even goes so far to say in her

21  deposition, "Well, I know the chief knew about it

22  because I heard from Pihonak that the chief met with

23  Anzengruber.  And although I didn't see it, I believe

24  that's probably what they were talking about and I

25  believe she probably was told about this, you know,

1 looking me up and down.  And then I get this email back

2 from Brad Anzengruber that says the chief isn't going

3 to talk to you."  I mean, it just goes down this yellow

4 brick road to, like, complete speculation and something

5 that factually never occurred.

6          And to the extent that Steve Thompson even

7 looked at her that way, it's not sexual harassment.

8 It's a one-time event, and I think, you know, the

9 prejudice of it is far outweighed by any probative

10 value, especially given the way that Ms. Stapleton has

11 tried to expand upon what she believes might have

12 happened in a meeting that there's no facts to support.

13 That's kind of the end of the Stapleton issue.

14          Well, it's not because the VICAR information,

15 I suppose, they want to try to get in through

16 Ms. Stapleton as well.  And it's just not factual in

17 the first instance.  I've given you the cover sheet.

18 I'm happy to send you the rest of the first IA file.

19 But it has nothing to do with what Ms. Stapleton

20 supposes it has to do with based on a conversation she

21 says she had with Ms.Farley, who also would not have

22 been in a position to look at an IA file because IA

23 files under General Order 204(IV)(C)(2) at law are

24 confidential.  And Ms. Farley isn't an IA investigator,

25 nor does anybody claim that she was.  She's a

1   dispatcher.

2          And so it wouldn't meet any level of an

3   exception to hearsay, and it's factually just not true.

4   So to allow this person to come in and, you know, based

5   on rumor and conjecture suggest that there was a prior

6   IA file of Mike Carr that contains information, which

7   it doesn't exist, not only is it hearsay, but it would

8   be horribly prejudicial.  It's just not true.

9          And so that is our position with regard to

10  the Mike Carr matter.

11         With regard to what I'll call the "me too"

12  evidence -- because that's the way the case law talks

13  about it -- it's my understanding that the plaintiff is

14  going to try to bring in Saa and Passmore.  Those are

15  two prior officers at the department, both of whom were

16  still there when Ms. Randles left, to talk about how

17  they felt prejudiced during their time working at the

18  department.

19         Saa is going to say that when he was put out

20  on administrative leave.  He was brought back, and he

21  was put in a position where he had to work lawn care.

22  And he felt, as an immigrant from another country, that

23  being put in a position where he had to do lawn care

24  was discriminatory.

25         And then, you know, Passmore is also going to

1  talk about how he just felt like, you know, people were

2  out to get him.

3          It's so far removed from a sexual harassment,

4  hostile work environment case, and it's also postdating

5  when Ms. Randles left the department.  So to the extent

6  they say they should be permitted to introduce evidence

7  about the town's past behavior, it's not past behavior.

8  It's things that happened after she left under very

9  different circumstances.

10          And Passmore, the reason he was put out was

11  because he stole time from the department.  He was

12  indicted for it.  He was criminally charged.  He pled

13  guilty.

14          So, I mean, to suggest that somehow --

15  they're apples and apples -- when they happened after

16  the fact under entirely different circumstances, it's

17  not appropriate "me too" evidence.  So I think I've hit

18  on that.

19          And then with regard to the training

20  evidence, they would like to try to get into whether

21  the town trained employees on the sexual harassment

22  policy and reporting of the sexual harassment policy.

23  This is not a training case.  It's not a case where

24  there's a claim of lack of training.  They say that it

25  should come in because it might go to the

1    Faragher-Ellerth defense, which they say we don't have

2    anyhow.

3              THE COURT:  Right.

4              MS. BARDOT:  But I've cited to the case law

5    that says in this circuit, it's not relevant because

6    it's -- the same exact argument was made in this

7    *Barrett* case that I've cited.  They said there was no

8    training.  That was the issue the court was addressing,

9    and it said, "This argument is incompatible with the

10   law of this circuit.  Distribution of an

11   anti-harassment policy provides 'compelling proof' that

12   the company exercised reasonable care in preventing and

13   promptly correcting sexual harassment."  They say what

14   you would have to show is that we adopted it in bad

15   faith or that it was otherwise defective or

16   disfunctional, that the training issue is not relevant.

17   It's accepted in this circuit as something that the

18   court would look into.

19             So for that reason, to the extent that's

20   their basis and it's the only basis that they've raised

21   as to why the training evidence should come in, I would

22   submit that does not work.

23             Then with regard to, you know, this assertion

24   that they should be able to make references to the "me

25   too" movement in front of the jury, it is nothing other

1    than for the purposes of inflaming the jury.  The

2    argument that somehow they have to get into that to ask

3    the jury whether or not we exercised reasonable care to

4    prevent sexual harassment, it's not a credible

5    argument.  They're not related, and it's highly

6    inflammatory, as the Court probably well knows.

7              With regard to the Jones matter, there seems

8    to be a miscommunication between counsel and myself.  I

9    was not asking that the Court rule at this point on

10   whether Ms. Jones could testify.  She's not been listed

11   as a witness.  I certainly may object to that if she

12   comes to trial, but my point on this was Ms. Stapleton

13   testified during her deposition about how Ms. Jones

14   felt about the Carr incident at the time she was

15   informed that Mr. Carr had been taping her in the

16   bathroom back in the 2011-2012 time frame.

17             And to the extent that Ms. Stapleton would

18   offer that testimony, that's what I was addressing.

19   First, it would be hearsay.  Second, it's irrelevant.

20   Mr. Carr committed a crime.  He wasn't sexually

21   harassing anyone in the sense of Title 7.  Nobody even

22   knew what he was doing.  He wasn't doing unwanted

23   conduct towards somebody.

24             What happened was in 2016, he left a note

25   basically saying he was leaving the department, he was

1   going to commit suicide.  They became very concerned.

2   They went in his office searching.  It was in

3   conducting that search in 2016, trying to figure out

4   where he might be, that it was discovered that he had

5   this pen that apparently had been taking photos five

6   years earlier before Chief Deboard was even at the

7   department, which led to the criminal charges against

8   him and led to Maggie Deboard sending an officer to

9   find him and drag him back here so he could be

10  criminally charged.

11          So that's not a sexual harassment matter in

12  any event.  It's a criminal matter that was promptly

13  addressed by Chief Deboard from actions he took when

14  she wasn't there that have no relevance to a hostile

15  work environment sexual harassment case.

16          And then the last thing I had raised is I

17  just was asking the Court to prohibit the plaintiff

18  from having witnesses talk about legal terminology.

19  You know, certainly, factually, they can say what they

20  say.  You know, he did this to me, he did that to me,

21  but drawing legal conclusions is what I asked about.

22          THE COURT:  All right.

23          MS. BARDOT:  Thank you.

24          THE COURT:  All right.  Counsel.

25          MS. KELLY:  There was a lot that was said

1    there.   Fortunately, we have good briefs, I think, on

2    these issues.

3            THE COURT:  Yes, and I've read them.

4            MS. KELLY:  With respect to the concert

5    incident, I think our position there is well set out in

6    our opposition.  It is relevant for a number of

7    reasons.  This slapping, which Sheridan termed sexual

8    assault, is corroboration and rebuts as prior conduct

9    and prior report of the harassment and is not hearsay

10   for that reason.  I mean, an act is not hearsay.

11           Ms. Randles and Ms. Walsh both told

12   Ms. Sheridan about this.  It did have an effect on

13   Ms. Sheridan's state of mind.  It really upset her and

14   increased her desire to try to report to Chief Deboard.

15           THE COURT:  Why is that relevant to Randles'

16   claim?

17           MS. KELLY:  How is what relevant?

18           THE COURT:  Stapleton's state of mind.

19           MS. KELLY:  Because, I think, it helps in

20   context to explain just how important Sheridan

21   Stapleton's report to the chief would be.  She

22   understood that there were two sexually highly

23   inappropriate and harassing, one an assault, and also

24   her concern about Michael Carr and that she tried to go

25   to speak to Chief Deboard about it.

1          They're a little bit related to the email

2    situation where Sheridan sent that.

3          If the Court will just bear with me a moment

4    here.

5          Ms. Sheridan's email in 2017, during the time

6    period that Steve Thompson was harassing Ms. Randles --

7    also the concert incident was during the time that

8    Steve Thompson was harassing Ms. Randles.  And

9    Ms. Randles reporting that to Sheridan, the concert

10   incident, also -- and they said, "Don't tell anybody."

11   It's also relevant to Ms. Randles' state of mind

12   because she was afraid to report her supervisor.

13         But the Sheridan emails -- she reports that

14   two high-level male managers treated her

15   inappropriately and made her uncomfortable.  She

16   reported in the email that she believed that she was

17   treated differently by these two male managers who

18   treated her inappropriately.  She reports that she felt

19   threatened, that they caught her off guard, and that

20   she considers the kind of disparate treatment that she

21   experienced, along with being uncomfortable, and then

22   acting inappropriately to be an HR matter.  She makes

23   it clear that she's only reporting it to Brad

24   Anzengruber because he is her next chain of command.

25         She put plenty of information in that email

1  to put a reasonable employer on notice that her

2  concerns may at least potentially be about

3  discrimination.

4          This also ties --

5          THE COURT:  And did Randles know about all of

6  this at the time?

7          MS. KELLY:  She didn't know about it at the

8  time, but the -- it's very relevant to the policy, to

9  the efficiency of a policy.

10          The town provides no -- we're talking about a

11  small police department, and those supervisors are

12  charged under the town's policy to identify --

13          THE COURT:  But this most directly goes to

14  the defendant's defense if, in fact, they present it,

15  right?

16          MS. KELLY:  In part, absolutely.

17          THE COURT:  All right.

18          MS. KELLY:  The efficacy of the policy, the

19  ability of this woman who had pressing concerns in her

20  mind of two drastic events that she knew about or felt

21  she knew about.  It explains why it was so important to

22  her, why she was so upset, the whole interaction with

23  Pihonak.  He was a lieutenant at the time.  It was one

24  of his jobs to recognize and advise about concerns,

25  including under harassment.  Sheridan in her deposition

1  testified that she thought it was a violation of the

2  town's harassment policy.

3           Either way, whether -- and the town just

4  doesn't provide any training.  These are police

5  officers.  How are they supposed to know?  That is

6  relevant to their policy.

7           Pihonak testified that, you know, in order to

8  try to figure out whether a crime has been committed,

9  they had been trained on the elements.  And I asked

10 him, "Well, what are the elements of sexual

11 harassment?"  They have no idea.  I mean, that is part

12 and parcel of their defense.  They don't know, and

13 they've never been trained on it.

14          Maggie Deboard too.  And HR, as Maggie

15 Deboard testified, doesn't even get involved in

16 complaints of sexual harassment or retaliation.

17          So, you know, I think most of the issues that

18 Ms. Bardot has brought up are really fact dependent.

19 They're interrelated, and they go to -- they're

20 admissible for a number of reasons, and I think it's

21 very difficult -- it would be very difficult for the

22 Court right now to categorically say that Sheridan

23 can't talk about, you know, the report, that it's

24 relevant to Randles' state of mind.  It's relevant

25 to --

1          THE COURT:  But she didn't know about it; did
2     she?
3          MS. KELLY:  That doesn't matter.  It still
4     rebuts.  They're claiming now that Denise Randles --
5          THE COURT:  How can it relate to her state of
6     mind if she didn't know about it?
7          MS. KELLY:  Whose state of mind?
8          THE COURT:  Randles.
9          MS. KELLY:  Because she also said, "Don't
10    tell anybody."
11         THE COURT:  I'm sorry.  Who said that?
12         MS. KELLY:  Denise Randles.  So it
13    reflects --
14         THE COURT:  No.  But how could Stapleton's
15    state of mind, based on these emails and reports, bear
16    on Randles' state of mind, who didn't know about the
17    statements and reports?
18         MS. KELLY:  I'm suggesting to the Court that
19    Sheridan's state of mind is relevant because it
20    explains her own behavior and her own attempts to --
21         THE COURT:  And why is that relevant in this
22    case brought by Randles?
23         MS. KELLY:  Because she tried to complain of
24    what she considered to be a sexual assault, and she
25    tried to complain to Deboard about what she

1  characterized as a violation of the town's harassment

2  policy.  It helps to provide context.  It helps to

3  explain why she's doing what she's doing.  I mean, the

4  Court could give a limiting instruction.

5              THE COURT:  Why who is doing what she's

6  doing?

7              MS. KELLY:  I'm sorry?

8              THE COURT:  Why who is doing what she's

9  doing?  Randles?

10             MS. KELLY:  I really am having a hard time

11 hearing you.

12             THE COURT:  I'm having trouble understanding

13 why Stapleton's experience is relevant to Randles'

14 claims.

15             MS. KELLY:  Which part?

16             THE COURT:  All of it.

17             MS. KELLY:  All of it.  Well, like I said,

18 Your Honor, the email, I think you recognized, if I'm

19 not mistaken, a moment ago is very relevant to their

20 policy.  She wanted to go --

21             THE COURT:  But that at best goes to this

22 defense that the defendant may or may not present,

23 correct?

24             MS. KELLY:  It is certainly relevant to the

25 defense.  It is certainly relevant to the defense.

1            It's certainly relevant to the fact that they
2    don't have any training to even recognize, you know,
3    what a claim of discrimination looks like.
4            THE COURT:  I understand.
5            MS. KELLY:  How are they supposed to know?
6    That is really relevant to their defense.
7            And like I said, the email itself makes it
8    very clear that she thinks she's being treated
9    disparately by two male managers who are at command
10   level who laughed at her.
11           The fact that Thompson during that meeting
12   looked at her in a way that she found violated the
13   policy on sexual harassment supports discriminatory
14   animus from the town.  It shows that Steve Thompson,
15   you know, in the view of a town employee, violated the
16   policy and that her supervisor snickered at it.
17           That is reflective of the town not taking
18   seriously any -- dismissing concerns of women.  And not
19   only not taking seriously the policy, but participating
20   in the harassment.
21           THE COURT:  All right.  I understand your
22   position.
23           MS. KELLY:  With respect to the Mike Carr, I
24   don't know that we would -- I think that just depends.
25   We're not pushing hard on that.  It just -- it depends

1  on what the testimony at trial is.

2              THE COURT:  All right.

3              MS. KELLY:  Again, that is one of the events

4  Sheridan's supervisor told her in the course of

5  employment and as part of her duties, that Mike Carr

6  had a previous IA.  And this informed her opinion about

7  why it was so dangerous, why it was so wrong to promote

8  Mike Carr.

9              And then she had this knowledge about Steve

10  Thompson's prior assault.  And she really wanted to

11  talk to her about that, and she tried to talk to her

12  about that.  The fact that she was so shut down by Brad

13  Anzengruber, who specifically said in his email

14  response, "I talked to the chief, and she's not meeting

15  with you."  And he falsely characterized what happened

16  in the meeting.  I mean, that's huge in terms of how do

17  you complain.

18              THE COURT:  All right.

19              MS. KELLY:  Ms. Bardot is representing that

20  things are factually not true, there's no basis for

21  anybody to make a determination whether Mike Carr had a

22  previous IA for pornography or anything else.  We don't

23  know.  The Court doesn't know.  She just declared that

24  to be so.  There's no support for that.

25              THE COURT:  All right.

1           MS. KELLY:  In terms of the "me too" evidence

2   for other employees, I think the rule is clear.  It

3   doesn't have to be a past act.  In *Spulak v. KMart*, at

4   894 F.2d 1150 at 1156, the court said, quote, As a

5   general rule, the testimony of other employees about

6   their treatment by the defendant is relevant to the

7   issue of the employer's discriminatory intent."  Again,

8   there is a fact-based analysis that the Court is

9   obligated to make.

10          And we're talking about a very small police

11  department, the same decision-makers, the same actors

12  here, Steve Thompson, Brad Anzengruber.  The fact that

13  Claudio Saa felt discriminated against, went directly

14  to the chief, and was shut down is relevant to the

15  town's discriminatory animus.  It's dysfunctional

16  policy, the command staff's willingness to allow

17  discrimination to go on.  She literally said, "I'm not

18  ready to report you to EAP.  Now, what's your problem?"

19          I mean, they've touted over and over and over

20  again how great their policy is.  So in terms of the

21  Faragher-Ellerth, we think the Court will find that

22  Mr. Thompson was a supervisor and direct liability

23  should attach.  But we don't have that ruling yet, and

24  we are allowed to rebut what we anticipate.  And the

25  defense has stated loud and clear there's going to be a

1    defense.

2           So the limited testimony here from

3    Passmore -- the only people that were decertified and

4    that Chief Deboard went after were witnesses for

5    Ms. Randles.  I mean, those are facts.  We don't have

6    to get into a minitrial about what everybody did, you

7    know, whether -- but those are facts.  Passmore is the

8    one who reported to command staff Ms. Randles'

9    complaint.

10          Claudia Saa was her last supervisor.  He had

11   no problem with her.  He complained about

12   discrimination in the past.  He was shut down.

13          Frankly, her whole motion *in limine* does give

14   a picture of a department that tolerates

15   discrimination, a dysfunctional policy, let Steve

16   Thompson get away with predatory behavior.  They all

17   knew.  They all suspected.  The town has an affirmative

18   duty under its own policy to root out discrimination.

19   They knew he was her supervisor, and they did nothing.

20          THE COURT:  All right.

21          MS. KELLY:  They did nothing.

22          So I think the point is this is a very

23   fact-dependent case, and some of the issues are

24   interrelated.

25          The training -- that was next on my list --

1    I've already touched upon that with Your Honor.

2            I'm not aware -- Ms. Bardot has repeatedly

3    said this is not a failure to train case.  I'm not

4    aware of a cause of action that anybody brings for

5    failure to train.  The failure to train its employees

6    in a vital function that is directly at issue in this

7    case is a critical factor.

8            Again, they don't even know -- HR doesn't get

9    involved.  They're charged with knowing how to

10   recognize and respond to sexual harassment under the

11   law and under their policy.  The fact that they don't

12   have a clue and that they laugh about it and engage in

13   it --

14           THE COURT:  Well, I know they have a defense.

15   But have you alleged in the complaint that the town's

16   liability depends on anything other than Thompson's

17   conduct in his role as a supervisor?

18           MS. KELLY:  Yes.

19           THE COURT:  What's that?

20           MS. KELLY:  Well, the retaliation that

21   continued after Thompson was gone and the tolerance of

22   it by other members of management.  Chief Deboard --

23           THE COURT:  But with respect to the

24   underlying sexual harassment?

25           MS. KELLY:  The underlying sexual harassment,

1   she does not allege that she was sexually harassed by

2   anyone other than Steve Thompson.

3          THE COURT:  And the town's liability has been

4   based simply on his status as what you claim to be a

5   supervisor?

6          MS. KELLY:  Or alternatively a disfunctional

7   and ineffective policy that the Fourth Circuit said

8   will defeat an affirmative defense.

9          THE COURT:  But that goes to their defense.

10  In terms of your case in chief, your claim against the

11  town is based on Thompson's position relative to

12  Randles', correct?

13         MS. KELLY:  Yes.

14         THE COURT:  Okay.

15         MS. KELLY:  But the other evidence of

16  discrimination, I think, is recognized as relevant to

17  the discrimination at issue, even if it's not exactly

18  the same kind.  You know, it's tough to prove

19  discriminatory intent sometimes.  You know, the fact

20  that --

21         THE COURT:  But discriminatory intent is not

22  part of your liability claim against the town; is it?

23         MS. KELLY:  That's true.  We don't have to

24  prove intent to prove harassment.

25         THE COURT:  To prove liability based on

1   Thompson's harassment, correct?

2          MS. KELLY:  To prove liability based on

3   Thompson's harassment, I don't think we have to prove

4   intent.

5          THE COURT:  Right.

6          MS. KELLY:  I agree with Your Honor.

7          But I think the corroboration of how the town

8   treated other people is corroborating evidence about

9   the -- it's the town who is the defendant here, not

10  Steve Thompson.  I think that's the point that

11  Ms. Bardot is missing.

12         So the discriminatory treatment and

13  tolerances of it with respect to other people is

14  relevant to discriminatory animus.  I think that's what

15  *Calobrisi v. Booz Allen* found.  I think that's what

16  *Spulak v. KMart* found.

17         And I think it's what *Hunter v.*

18  *Allis-Chalmers*, a Seventh Circuit case that the Fourth

19  Circuit has cited -- it is *Hunter v. Allis-Chalmers*

20  *Corp.*, 797 F.2d 1417 at 1423.  For example, another

21  employee was, quote, allowed to testify that Lambert

22  had suspended another black worker for a minor

23  infraction.  This was not hearsay evidence either.  It

24  was testimony about an act, not a statement offered for

25  its truth value," which goes back to the Sheridan

1  testimony as well.

2            THE COURT:  All right.

3            MS. KELLY:  And then the legal terminology, I

4  mean, it's out there for me to try to argue.

5  Certainly, words -- the words "sexual harassment" and

6  "retaliation" are in common parlance.  We don't intend

7  to have anybody testify that they think it was a

8  violation of Title 7.

9            But very importantly, I believe -- again,

10  because the defense has touted so much its policy and

11  included acknowledgments and Sheridan recognized it --

12  if a town employee who is familiar with the policy

13  believed that the policy was violated, that is

14  admissible, I submit.  Because, you know, it explains

15  their behavior and, again, goes to the policy.  But,

16  you know, that's not legal terminology.  They've opened

17  the door to that kind of testimony, relied so much on

18  their policy, not to say they wouldn't be capable of

19  saying that it violated Title 7 or that it's a legal

20  term of art.

21            Your Honor, obviously, if you found

22  appropriate, you could give some kind of an

23  instruction.  But violations of their policy, that's

24  fair game.

25            THE COURT:  All right.  Thank you.

1          Ms. Bardot.

2          MS. BARDOT:   I tried to be very specific as

3    to what I was asking the Court for, and I feel like

4    Ms. Kelly has just given you a very broad overview of

5    what she thinks the evidence will show without being

6    very specific.   It makes it somewhat hard to reply.

7          You know, to the extent that she says, you

8    know, this act at the concert that Ms. Sheridan

9    Stapleton wants to testify about is not hearsay because

10   it's an act, I agree that an act is not hearsay.   But

11   she didn't see it.   She wasn't there.   She didn't

12   observe it.   Through her, it is hearsay.

13         And, you know, she says, "Well, it's

14   admissible because it's a prior report of the

15   behavior."   It's to a co-employee, not to the town.   So

16   it's just not coming through Ms. Stapleton.   It's not

17   hearsay, and it doesn't meet an exception for hearsay.

18   I would submit, as I have, that under 403 it should be

19   precluded.

20         The meeting with Anzengruber, my golly, you

21   know, Ms. Kelly has said to you, "Well, if you look at

22   the emails she sent to you, I think you've acknowledged

23   certain things."   If you look at the email, there is

24   nothing in the emails that talks about anything that

25   happened at that meeting other than Thompson

1    questioning in a way that Ms. Stapleton found improper

2    and uncomfortable.   I think those are the words she

3    used.

4              THE COURT:   Right.

5              MS. BARDOT:   There's nothing in there that

6    says, you know, "He looked me up and down.   I felt

7    sexually harassed.   I felt uncomfortable because of

8    sexual behavior," you know, anything about that

9    whatsoever.

10             And so to suggest to the Court that somehow

11   by sending those emails to Anzengruber, something about

12   sexual harassment or being looked up and down got

13   escalated to the chief, you can't make that connection

14   because those emails contain nothing that would lead a

15   reasonable person to even suspect such an allegation

16   was coming.

17             So to the extent they want to get into all of

18   this because it talks about what Stapleton may have

19   told Deboard had she been able to, who cares?   Who

20   cares?   And nothing precluded Stapleton from sending an

21   email if any of this really happened, and she could

22   have gone to HR.   And she knew the policy, and she's

23   acknowledged that.   So what we're getting into is all

24   kinds of superfluous stuff about Stapleton that has no

25   connection to Ms. Randles.

1             And I agree that in certain circumstances,

2    "me too" evidence is admissible.  The case law is clear

3    on that, but this just isn't that.  And so that would

4    be those issues on Ms. Stapleton.

5             This response with regard to Michael Carr

6    about, "Well, it depends on what we're going to do with

7    him," well, it can't depend.  I mean, at this point, at

8    the very least, the Court should say, "You're not going

9    to mention this in opening," because there's no facts

10   which support that there was a prior IA.  It didn't

11   happen.

12            I'm happy to send you that file.  I wish I

13   brought it with me.  I don't want to file it in the

14   public record.  It's highly personal.  It has to do

15   with his home life.  It has nothing to do with his work

16   life.  He was a man who had some mental health issues.

17   It's not work related.

18            So Ms. Stapleton just makes this stuff up

19   maybe based on rumors she heard from Ms.Farley, who is

20   not a person who does employment stuff within the town.

21   So it doesn't meet -- it's double hearsay.  It doesn't

22   meet the elements to allow it in.  So to say, "Well,

23   we'll see how it develops in court," it's not

24   appropriate.

25            You know, there's been no facts from the

1   plaintiff to establish what actually happened in this

2   prior IA.  That's nonexistent because there can't be

3   any facts.  It's nonexistent.

4         And so I take great issue with the suggestion

5   that we'll just get up and we'll mention all of this in

6   opening and we'll plant the seed that has no evidence.

7   Then if the Court strikes it, the jury is going to be

8   like, "I wonder what happened with Mike Carr."  So it's

9   highly prejudicial for those reasons.

10         I've talked about the other employees.

11  Again, to the extent we're talking about two male

12  employees complaining about completely different things

13  that come after the fact, when Ms. Randles had left the

14  town, I've addressed why I think that is not

15  admissible.

16         The training.  Again, I keep hearing

17  Ms. Kelly say that it's relevant on the

18  Faragher-Ellerth defense.  I don't know what more I can

19  do other than cite a case directly on point that says

20  it's not, and that's what I've cited.

21         She didn't address the "me too" movement

22  stuff -- I've talked about that -- or the Jones

23  evidence.  So I would just rest on the points I made.

24         THE COURT:  All right.  Thank you.

25         I'll give you the last word.

1          MS. KELLY:  Okay.  I'd really love to answer
2  any of the Court's questions on this.
3          Again, Ms. Bardot makes such a deal out of
4  how Sheridan didn't put something specific in her
5  email.  She doesn't have to.  There's no requirement
6  that she does.
7          She's even suggested that Stephen Thompson's
8  behavior at the concert wasn't sexual harassment.  You
9  don't have to wait for there to be some decision or
10  determination about whether something is or isn't
11  sexual harassment.  They're entitled to complain.  She
12  just -- especially since the recipient of the email,
13  Brad Anzengruber, was one of the perpetrators.  I mean,
14  he's captain.  He's right under the chief.
15          I'm sure Your Honor knows, because I know you
16  just had a police case and for other reasons, it's
17  officer, sergeant, lieutenant, captain, and chief.
18  We're talking about a lieutenant and a captain, who is
19  Sheridan's direct supervisor, laughing at her and then
20  shutting her down when she tries to complain.  She only
21  talked to him at all because he was in her direct chain
22  of command, and she was trying to follow procedure.
23          You know, the reality is there's a paper of
24  policy, and then there's the reality of how that
25  Herndon Police Department runs.

1              Ms. Bardot has suggested that Tammy Farley

2    was not someone who does employment stuff.  Wrong.  All

3    of those guys do employment stuff.  HR just basically

4    has very little to do with the Herndon Police

5    Department.  The supervisors are the ones that handle

6    things.

7              Also, Your Honor, I would remind the Court

8    that we also have a retaliation claim here.  The

9    behavior against Passmore was extraordinary.  I mean, I

10   don't think we have to get into the nitty-gritty of

11   whether he did or didn't do what he was accused of

12   doing.  But the fact that he was targeted by Chief

13   Deboard -- I mean, you can target anybody.  You can

14   find some -- especially in a very rural-oriented

15   environment.  You know, you stepped over the line.  You

16   were ten minutes late.

17             They targeted Jay Passmore and hounded him.

18   They're still hounding him, which is not before the

19   Court.

20             And Claudio Saa, that's extraordinary.

21             And Ms. Randles does have a retaliation case

22   that is harassment that continued after Steve Thompson

23   left.

24             And I mean, a jury is entitled to hear what

25   happened to them, and they can make their own

1   conclusions.  But it is relevant that he was the one

2   who reported, helped Ms. Randles, and went to command

3   staff and reported it.  They couldn't ignore it then.

4   They had to respond, and they did.  We recognize that.

5           And Claudio Saa, her last supervisor who had

6   no problem with her -- right when Carson was trying to

7   drum up all kinds of IAs and accuse her of this and

8   that, he didn't have any problem with her.  So, you

9   know, that is strong evidence of retaliatory animus.

10          Again, much of this is interrelated, but I

11  think --

12          THE COURT:  But none of that would relate to

13  retaliatory animus based on sex; would it?

14          MS. KELLY:  Well, retaliatory animus for

15  having complained about it.

16          THE COURT:  Complained about sex, right?

17          MS. KELLY:  Right.  Right.

18          THE COURT:  But none of it relates to that.

19  Saa, Passmore, none of that has anything to do with

20  retaliation based on protected activity related to

21  complaints about sexual harassment; does it?

22          MS. KELLY:  I think it does.  I mean,

23  Passmore brought the complaint about discrimination.

24          THE COURT:  On what basis?

25          MS. KELLY:  On the basis of, you know, that

1  he was a Hispanic and he was being treated differently.

2          THE COURT:  Right.

3          MS. KELLY:  And Passmore, to my knowledge,

4  didn't complain about discrimination.  But the fact

5  that Maggie Deboard went after and charged these two

6  men after Denise Randles had complained and saw to it

7  that they -- they both resigned because of the

8  harassing IAs that were put out on them.  She didn't

9  quit there.  She followed them and made sure they were

10  decertified.

11          I mean, I think it kind of looks like, you

12  know, you take on me, you take on the town, you

13  complain to me, you make a problem for me, I am taking

14  you all out.

15          I think it is.  The jury would be entitled to

16  look at that and consider it.  Ms. Bardot can argue,

17  no, there's -- but the fact that her two important

18  witnesses for her were targeted by Deboard and the

19  town, I think that is evidence of retaliatory animus

20  connected to Denise Randles.

21          THE COURT:  All right.

22          MS. BARDOT:  I'd like the last word.  It is

23  my motion.

24          THE COURT:  Okay.

25          MS. BARDOT:  Very briefly.  You know, the

1  suggestion that because these people left after Denise

2  Randles was there and that they were targeted because

3  of Denise Randles is an after-the-fact -- like what are

4  we going to do now?  Bring every disgruntled employee

5  who came after the fact, and if they have any complaint

6  with regard to anything that happened at the department

7  because they're connected to Denise Randles, because

8  they're her friends, that somehow it becomes relevant.

9  It's not.  It's apples and oranges.

10        And the fact of the matter that Maggie

11 Deboard had officers decertified, Passmore was found

12 guilty of a crime brought by Fairfax County against

13 him.  She's obligated under law to have him

14 decertified.  She's obligated under law to have -- and

15 she wasn't at the time Thompson left, and that's what I

16 think Ms. Kelly fails to appreciate.  The law was not

17 in effect then.  So whether she would have done

18 anything to Thompson, who knows?

19        But the fact of the matter is when you have

20 an officer who you believe has committed an offense

21 which would not allow them to be a certified law

22 enforcement officer, she is obligated, as the chief of

23 police, to move for decertification.  She doesn't make

24 that determination.  It goes to a board that makes that

25 determination.  So to now suggest that somehow that is

1    retaliation, it's just not.

2            We're going so far afield.  If we want to

3    have a little trial about what Passmore did and the

4    crimes he committed, we can go down that route, but

5    it's a waste of time because it has nothing to do with

6    Denise Randles.

7            So that would be the last word I have on

8    that.

9            THE COURT:  All right.  Again, the Court is

10   not going to be able to make a definitive ruling until

11   any of this evidence is presented.  But I will tell you

12   that my reaction is that certainly the Stapleton -- I

13   have a hard time understanding how any of this would

14   come in certainly during plaintiff's case in chief.

15           The Stapleton testimony is clearly hearsay.

16   This case is about Randles, no one else.  I think the

17   other evidence would raise relevance issues or 403

18   issues.  So just understand where the Court's head is

19   on this.  None of this should be mentioned in opening

20   statement.

21           All right.  What do we have left?  I think we

22   have your motion to exclude some witnesses, Ms. Kelly.

23           MS. BARDOT:  Your Honor --

24           THE COURT:  Yes.

25           MS. BARDOT:  -- just for clarification

 1  because you didn't rule on the rest of the motion --

 2          THE COURT:  I'm sorry.

 3          MS. BARDOT:  So we focused a lot on Sheridan,

 4  but you didn't rule on anything with regard to the --

 5          THE COURT:  All of it.  All of it.

 6          MS. BARDOT:  All of it.

 7          THE COURT:  All of it.  At this point, I

 8  don't see how any of it is admissible during

 9  plaintiff's case in chief absent -- you know, there may

10  be doors opened.  The evidence may develop in a certain

11  way that I have a different view of it.  At this point,

12  at least during plaintiff's case in chief, it's

13  difficult for me to see how any of this is admissible.

14          MS. BARDOT:  So during opening it should not

15  be mentioned?

16          THE COURT:  Correct.

17          MS. KELLY:  Is Your Honor referring to

18  everything, including, for example, the training?

19          THE COURT:  Yes.  None of that should be

20  mentioned in opening statement.  All right.

21          MS. KELLY:  Okay.

22          THE COURT:  All right.

23          MS. BROWN:  One more, Your Honor.

24          THE COURT:  Yes.

25          MS. BROWN:  The last motion is our two

1  motions.  You've ruled on the first.  It was a

2  three-part motion.  You ruled on part one from the very

3  beginning.  So what remains now is the mitigation, the

4  issue that we'd like to exclude the evidence on

5  mitigation or failure to mitigate.  And then the second

6  is the witnesses that were identified as part of the

7  pretrial but not earlier.

8        THE COURT:  Right.  I'm just not going to be

9  able to rule on the mitigation issue until I start

10 hearing evidence and see what they want to present.

11 That's not going to come up until their case in any

12 event --

13       MS. BROWN:  Understood, Your Honor.

14       THE COURT:  All right -- or cross depending

15 on what happens.

16       So I understand your issue on mitigation.

17 You're claiming they didn't disclose in discovery any

18 mitigation evidence.  There's a legal issue as far as

19 what the scope of mitigation is in this case.  Correct?

20       MS. BROWN:  That's correct, Your Honor.

21       THE COURT:  All right.

22       MS. BROWN:  I understand your ruling on that.

23       The last issue is five witnesses who are

24 identified in the pretrial disclosures.

25       THE COURT:  Right.

```
 1              MS. BROWN:  As we noted in our briefs, Your
 2   Honor, this was an extraordinary long period of time in
 3   which the conduct underlie just because somebody had
 4   some involvement at one point.  The whole point of
 5   discovery is for us to understand who would be involved
 6   in that so that we could make decisions on who we could
 7   expect to see at trial.  To have five witnesses --
 8              THE COURT:  One was disclosed the day before
 9   discovery was over.  Who was it?
10              MS. BROWN:  The town manager, William Ashton.
11              THE COURT:  Ashton.  The other ones were just
12   in the pretrial disclosures?
13              MS. BROWN:  That's right.
14              THE COURT:  All right.
15              MS. BROWN:  And for that reason, Your Honor,
16   we feel it doesn't comport with the scheduling order.
17   We had no opportunity -- discovery in this case was
18   extended multiple times to get all of the witnesses in.
19   We were allowed to take more than the normal allowable
20   lot of depositions.
21              THE COURT:  Right.
22              MS. BROWN:  Had we known that these five
23   people were going to be part of this motion -- it
24   doesn't mean that their names didn't come up.  The
25   issue is we didn't expect to see them at trial.  And
```

1  now to be sprung with the pretrial disclosures, we just

2  think they should be excluded.  Well, they should be

3  excluded for that reason, Your Honor.  We're asking the

4  Court to do so.

5          THE COURT:  All right.

6          MS. BARDOT:  Your Honor, let me address Bill

7  Ashton first.  Bill Ashton is the town manager.  He was

8  actually identified in the plaintiff's initial

9  disclosures as a witness they intended to call.  He's

10 also been identified in their witness list for trial.

11 He's been identified -- he was going to be deposed by

12 the plaintiff as part of the 30(b)(6), which they were

13 not permitted to take when Judge Anderson found that

14 they had abused discovery and entered an order telling

15 them they could take no more depositions.  And

16 Ms. Kelly represented at one of the hearings on that

17 matter that that's the reason they didn't proceed with

18 that.

19         And when that deposition didn't proceed, I

20 went ahead and added him to the initial disclosures, as

21 I would have after his deposition most likely depending

22 on the substance of what they asked him.  So they've

23 relied upon him.

24         THE COURT:  What about the other four?

25         MS. BARDOT:  Yes.  So the other four

1  witnesses, Your Honor, are all related to the last two

2  IAs, which have become a big issue as we've headed

3  toward the end of this case.  They're now claiming that

4  those IAs were completely other than they were.

5          So what happened was once I started to hear

6  that they're claiming that, for instance, the last

7  IA -- and this just came up in a recent spoliation

8  motion.  They're now claiming that the last IA, the

9  reason that it happened was because the plaintiff

10 failed to write a report and the reason she failed to

11 write her report was because we locked her out of the

12 system and basically set her up so she couldn't write

13 the report and then started the IA.  It's factually

14 just completely untrue.

15         And we produced the IA files to them back in

16 April 2023.  And it became evident to me, once I

17 started to hear about the fabricated nature of what

18 they say the IA stood for --

19         THE COURT:  Which IA are we talking about?

20         MS. BARDOT:  The last one, the one that has

21 to do with the bungled car recovery.  It's on videotape

22 that they have.  What started that IA or what caused

23 that --

24         THE COURT:  This pertains to the car --

25         MS. BARDOT:  The recovery of the stolen

1 vehicle.

2             THE COURT:  Okay.  Oh, I see.

3             MS. BARDOT:  It's the last IA that she claims

4 was sort of the straw that broke the camel's back.

5             THE COURT:  Right.

6             MS. BARDOT:  Frankly, I never understood,

7 until I got the spoliation motion, that the claim was

8 that somehow that was like a bogus IA in the sense that

9 she's now saying it wasn't her recovery of the car,

10 that it was the reporting issue.  It's not.  It's

11 clearly not.

12             So what I determined was if that's what her

13 position is going to be at trial, I need to have

14 rebuttal witnesses, and that's what these witnesses

15 are.  These are the witnesses who started those IAs,

16 who know the purpose of the IA.  They know who they

17 are.  They're in the reports that they've had all

18 along.  And if they're going to claim those IAs were

19 initiated on some other basis other than what they

20 were, which is what they're now saying, then we intend

21 to call what are clearly rebuttal witnesses to say, "I

22 started that IA.  That's not why I started that IA.

23 Look at this tape.  Look her processing" --

24             THE COURT:  When did they first make that

25 claim?

1           MS. BARDOT:  In the spoliation motion.

2           THE COURT:  Which was when?

3           MS. BARDOT:  Excuse me?

4           THE COURT:  Which was when, roughly?

5           MS. BARDOT:  We don't even have the hearing

6    until tomorrow.  So a couple of weeks ago.

7           THE COURT:  Okay.

8           MS. BARDOT:  So I determined, you know, this

9    may be an issue and I may need these people for

10   rebuttal.  They're not for the case in chief.  I mean,

11   we've got Jay Carson coming.  Jay Carson is the one who

12   did the investigation.  He's looked at the videotapes.

13   He can certainly go through the process.

14           They're sort of belt and suspenders witnesses

15   in the sense that just in case we need to get into a

16   little more depth and that's what they present, I want

17   to have them available.  I never intended to call them

18   initially, but they're not surprise witnesses.

19           And the case that they cite -- in fact,

20   here's how much not surprise witnesses they are.  One

21   of the witnesses is Anzengruber, right.  Anzengruber is

22   the one that has to do with the Sheridan Stapleton

23   emails.  They brought all of this up.  Anzengruber is a

24   witness that they claim has personal knowledge.  He's

25   been known since the first deposition in this case.

1              If they're going to come in and have Sheridan
2    Stapleton potentially testify that certain things
3    happened in front of Anzengruber -- that's now going to
4    be their position -- when clearly on paper it does not
5    jive, then he will be a rebuttal witness.
6              I'm never required to disclose rebuttal
7    witnesses.  I didn't even have to put them on my
8    witness list.  I'm not a hide the ball kind of person.
9    I put them on my witness list.  I could've called him
10   without doing that.  Those are the things that they
11   would address.  So all of those witnesses are those
12   types of witnesses.  Under the rules, I don't have to
13   disclose them, but I did.
14             And the case that they cite which they relied
15   upon where they say that the court excluded witnesses
16   were witnesses that were disclosed and there wasn't
17   even a proffer of their testimony, such that it would
18   be a total and utter complete surprise to the other
19   side.  And the court went on with respect to the other
20   witnesses in that case and said for nine of the other
21   witnesses, it's harmless that they weren't disclosed.
22   And they weren't even being used as rebuttal witnesses
23   because the plaintiff has long been aware of these
24   individuals and the potentially relevant information
25   they possess.

1          They've not even argued in their brief
2    factually how they could be surprised.  Anzengruber, he
3    is front and center from the time Sheridan Stapleton
4    testified.  He is the one who has -- there's been
5    testimony by Hamilton that they elicited, that
6    Anzengruber is the one who started the PIP.  If the
7    plaintiff wants to come in and persist on saying that
8    Steve Thompson started the PIP, it's not true.
9    Anzengruber will be a rebuttal witness.
10          That's the purpose these people serve, to
11   rebut the ever-changing factual statements that are
12   being made by plaintiff's counsel.
13          And so I would submit there's no surprise as
14   to any of these witnesses.  They're all related --
15   they're either Anzengruber or they're all related to
16   these final IAs.  So that would be our position on
17   that.
18          THE COURT:  All right.  Ms. Brown.
19          MS. BROWN:  Your Honor, this is the second
20   time that defense counsel --
21          THE COURT:  I'm sorry?
22          MS. BROWN:  This is the second time that
23   defense counsel showed up before this Court and said
24   that we were precluded because of discovery abuses.  We
25   were not.  There's no record whatsoever of us abusing

1  discovery.

2          THE COURT:  I understand.

3          MS. BROWN:  Judge Anderson worked hard to

4  corral it to get it to pretrial, but to suggest that we

5  were precluded because of discovery abuses is not

6  correct.  The only motion about discovery disputes

7  that's going to be in this case is the one on Friday

8  because they destroyed evidence.  So I just want to

9  respond to that.  It's the second time I've heard it.

10          THE COURT:  All right.  She says these are

11  all rebuttal witnesses that she wasn't required to

12  disclose, in any event, and it relates to issues that

13  came up late in the case.

14          MS. BROWN:  The fact that Denise Randles

15  resigned because of an IA is in the complaint.  That

16  was in the operative complaint from the very beginning

17  of this case.  There's no surprise.  We both knew that

18  the IAs and what happened leading up to her termination

19  would be a central issue at the trial of this matter.

20  There's no surprise to defendants.  They didn't learn

21  anything new as a result of that.

22          They knew who these witnesses are.  They work

23  for them.  They waited until the pretrial disclosures,

24  and they sprung on us five witnesses, not just four.

25  And I'm taking out Ashton, the one who was identified

1   before discovery closed.   There's five new witnesses

2   that are identified.

3           The fact that she resigned, that they were

4   targeting her, that the department was after her

5   through a series of IAs by a number of other

6   individuals has been at issue in this case and has been

7   the foundation of this case from the very beginning.

8   They shouldn't be allowed to spring five new witnesses

9   on us.

10          I hear Your Honor as to rebuttal.   That is

11  what it is.   But we don't expect to see them during the

12  rest of the case.   And it should only be in response to

13  what we do because they really shouldn't be allowed to

14  do this at the end of the day if they want to call them

15  separate from that.   So that's our position.

16          Thank you.

17          THE COURT:   All right.   At this point, I am

18  going to deny the motion.   As I understand it, these

19  witnesses are being disclosed as rebuttal witnesses.

20  At least at this point, that's what they'll be limited

21  to.

22          All right.   Anything else?

23          MS. BARDOT:   I just have one question.

24          THE COURT:   Yes.

25          MS. BARDOT:   Would you be gracious enough to

1   allow us to deliver our multiple pallets of boxes to

2   the courtroom Friday afternoon, the 13th?

3                   THE COURT:  Yes.

4                   MS. BARDOT:  Thank you.

5                   THE COURT:  All right.  Let me also talk

6   about the trial a little bit.  The trial schedule is a

7   little complicated, but let me tell you what we're

8   going to do.  We're scheduled to begin on the 16th.

9   October 16 we're scheduled to begin.  I will meet with

10  counsel at 9:00, and we'll begin jury selection at

11  10:00.

12                  On Wednesday, the 18th, there's something I

13  have to handle at 9:00.  So we'll begin the trial at

14  10:00.

15                  And on Friday, the 20th, we're going to

16  adjourn shortly before noon.

17                  If we go over into the next week, we won't

18  have trial on that Tuesday and Wednesday, the 24th and

19  25th.

20                  And then we're cleared after that until we

21  finish the trial.

22                  MS. BARDOT:  So, Your Honor, just so I'm

23  clear, we will start at 9:00 a.m. on the 17th and --

24                  THE COURT:  No, the 16th.

25                  MS. BARDOT:  And how about the 17th and the

1   19th?

2           THE COURT:  They're full trial days.  What I

3   do is I meet with counsel at 9:00.  We start with the

4   jury at 9:30.

5           MS. BARDOT:  So the 20th is a Friday.  We'll

6   adjourn by noon?

7           THE COURT:  Yes.

8           MS. BARDOT:  Then what days did you say the

9   following week?  I'm sorry.

10          THE COURT:  That Tuesday and Wednesday, the

11  24th and the 25th.

12          MS. BARDOT:  We are off those days?

13          THE COURT:  Off those two days.

14          MS. BARDOT:  And then back on the following

15  days, if necessary?

16          THE COURT:  Yes.

17          MS. BARDOT:  Thank you.

18          THE COURT:  All right.  Anything else we can

19  profitably talk about?

20          MS. BROWN:  Not from the plaintiff's

21  perspective.  Thank you.

22          MS. BARDOT:  No.  Thank you.

23          THE COURT:  All right.  Thank you.

24          Counsel is excused.

25          The Court will stand in recess.

1                  ------------------------------------
                              Time:   11:31 a.m.
2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21
        I certify that the foregoing is a true and
22
   accurate transcription of my stenographic notes.
23

24
                                         /s/
25                           Rhonda F. Montgomery, CCR, RPR